**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA : | | |
| | : | |
| v. | : | **14-cr-141 (CRC)** |
| | : | |
| AHMED ABU KHATALLAH | : | |

**DEFENDANT'S MOTION TO**
**DISMISS FOR LACK OF EXTRATERRITORIAL JURISDICTION**

Mr. Ahmed Abu Khatallah, through undersigned counsel, respectfully moves this

Honorable Court to dismiss Counts Four through Eighteen of the superseding Indictment

[Dkt. #19] ("Indictment"), and to dismiss in part Counts One and Two of the Indictment, because

the charged offenses cannot be applied extraterritorially.

**Factual Background**

Mr. Abu Khatallah is a Libyan national.  He is charged in the eighteen-count Indictment

with offenses arising out of the September 2012 attacks on the United States Special Mission and

Central Intelligence Agency ("CIA") Annex in Benghazi, Libya.  The charges include conspiracy

to provide material support and resources to terrorists resulting in death, in violation of 18 U.S.C.

§ 2339A (Count One); providing material support and resources to terrorists resulting in death, in

violation of 18 U.S.C. § 2339A (Count Two); murder of an internationally protected person, in

violation of 18 U.S.C. §§ 1116 and 1111 (Count Three); murder of an officer and employee of

the United States, while such officer and employee was engaged in and on account of the

performance of official duties, in violation of 18 U.S.C. §§ 1114 and 1111 (Counts Four, Five

and Six); attempted murder of an officer and employee of the United States, while such officer

and employee was engaged in and on account of the performance of official duties, in violation

of 18 U.S.C. §§ 1114 and 1113 (Counts Seven, Eight and Nine); killing a person in the course of

an attack on a federal facility involving the use of a firearm and dangerous weapon, in violation

of 18 U.S.C. §§ 930(c) and 1111 (Counts Ten, Eleven, Twelve and Thirteen); malicious

damaging and destroying U.S. property by means of fire and an explosive causing death, in

violation of 18 U.S.C. § 844(f)(1) & (3) (Counts Fourteen and Fifteen); and maliciously

destroying and injuring dwellings and property and placing lives in jeopardy within the special

maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. §§ 1363 and 7

(Counts Sixteen and Seventeen); and using, carrying, brandishing and discharging a firearm

during a crime of violence, in violation of 18 U.S.C. § 924(c) (Count Eighteen).

     Of the charged offenses, only the offense charged in Count Three, murder of an

internationally protected person, in violation of 18 U.S.C. §§ 1116 and 1111, contains a clear

indication that the statute applies extraterritorially as charged.  Section 1116 specifically

provides that if the victim of the offense "is an internationally protected person outside the

United States, the United States may exercise jurisdiction over the offense if . . . the victim is a

representative, officer, employee, or agent of the United States . . . ."  18 U.S.C. § 1116(c).  The

offenses charged in Counts Four through Fifteen and Eighteen -- violations of §§ 1114, 930(c),

844(f), and 924(c) -- contain no such clear indication and cannot be applied extraterritorially.

Counts Sixteen and Seventeen charge violations of § 1363 and invoke the special maritime and

territorial jurisdiction of the United States pursuant to 18 U.S.C. § 7.   Although § 7 includes

some foreign locations -- and thus a clear indication that the statute may be applied

extraterritorially in some instances -- because the Special Mission and Annex were not qualifying foreign locations, § 1363, as charged here, also cannot be applied extraterritorially. Finally, § 2339A, providing material support for certain enumerated offenses, charged in Counts One and Two, may be applied extraterritorially only to the extent the underlying offense may be applied extraterritorially, and Counts One and Two must be dismissed, in part, to the extent these counts charge Mr. Abu Khatallah with providing material support for any offense other than a violation of § 1116 -- the only charged offense which contains a clear indication of extraterritorial application.

## Argument

The criminal laws of the United States generally do not apply to foreign nationals in foreign locations, and there is a presumption against the extraterritorial application of statutes. *United States v. Ali*, 718 F.3d 929, 935 (D.C. Cir. 2013).   This presumption is "based on the assumption that Congress is primarily concerned with domestic conditions."  *Foley Bros. v. Filardo*, 336 U.S. 281, 285 (1949).  "Because Congress's primary arena of sovereignty is the territorial United States, it makes sense to presume, absent other evidence, that its commands linguistically apply only there."  *United States v. Delgado-Garcia,* 374 F.3d 1337, 1344 (D.C. Cir. 2004) (recognizing presumption against extraterritorial application of criminal statutes absent affirmative evidence of contrary intent).

When the government seeks to apply a statute extraterritorially, the Court must first determine whether Congress intended such application.  *Id.*  "When a statute gives no clear indication of an extraterritorial application, it has none."  *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010); *see also E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) ("[U]nless there is 'the affirmative intention of the Congress clearly expressed,' . . . we must

presume it 'is primarily concerned with domestic conditions.'" (internal citations omitted));

*United States v. Yunis*, 924 F.2d 1086, 1091 (D.C. Cir. 1991) ("[C]ourts should hesitate to give

penal statutes extraterritorial effect absent a clear congressional directive.").

Courts may consider contextual as well as textual evidence to determine Congressional

intent, but "must apply the canons of construction to interpret, not rewrite, congressional acts."

*Delgado-Garcia*, 374 F.3d at 1345.  When determining the scope of a statute and whether

Congressional intent is present, the Court must also consider whether extraterritorial application

accords with international law -- "'an act of Congress ought never to be construed to violate the

law of nations if any other possible construction  remains'." *Ali*, 718 F.3d at 935 (quoting

*Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804)).

The party seeking to invoke the court's jurisdiction bears the burden of overcoming the

presumption against extraterritoriality.  *Arabian Am. Oil Co.*, 499 U.S. at 250.  Where the

jurisdictional language relied upon is ambiguous or where equally plausible interpretations exist,

the burden of showing extraterritorial application is not met.  *Id.*

## I.     Section 1114 Does Not Apply Extraterritorially.

Counts Four, Five and Six charge Mr. Abu Khatallah with murder in violation of

18 U.S.C. § 1114, and Counts Seven, Eight and Nine charge him with attempted murder in

violation of § 1114, which provides:

> Whoever kills or attempts to kill any officer or employee of the
> United States or of any agency in any branch of the United States
> Government (including any member of the uniformed services)
> while such officer or employee is engaged in or on account of the
> performance of official duties, or any person assisting such an
> officer or employee in the performance of such duties or on
> account of that assistance, shall be punished--
>
> (1) in the case of murder, as provided under section 1111;

>(2) in the case of manslaughter, as provided under section 1112; or

>(3) in the case of attempted murder or manslaughter, as provided in section 1113.

This statute contains no reference to extraterritorial application, and there is no clear indication that Congress intended this provision to be applied abroad.

Although the statute applies to "any" officer or employee, as the Supreme Court has recognized, "it is well established that generic terms like "any" or "every" do not rebut the presumption against extraterritoriality." *Kiobel v. Royal Dutch Petroleum Co.,* 133 S. Ct. 1659, 1665 (2013) (language in Alien Tort Statute providing jurisdiction over "any" civil action did not rebut presumption against or evince clear indication of extraterritorial reach); *Small v. United States*, 544 U.S. 385, 388 (2005) ("In law, a legislature that uses the statutory phrase 'any person' may or may not mean to include 'persons' outside 'the jurisdiction of the state.'" (internal quotations omitted)).   More specific language is necessary to indicate that a federal law may apply extraterritorially, for example when a statute provides for application "regardless of where the offense is committed." *Kiobel*, 133 S. Ct. at 1665 (citing 18 U.S.C. § 1091(e)).

A comparison between § 1114 and § 1116 demonstrates that Congress did not intend for § 1114 to apply extraterritorially.  As noted above, § 1116 prohibits the killing of any internationally protected person.  Section 1116 was amended in 1996 to broaden "the jurisdictional reach of the statute[] to also provide extraterritorial jurisdiction if the victim is a representative, officer, employee or agent of the United States." *United States v. Sepulveda*, 57 F. Supp. 3d 610, 617 (E.D. Va. 2014).  Significantly, at the same time, Congress also amended § 1114, prohibiting the killing of any officer or employee of the United States, rather than specific categories of officers and employees.  Unlike § 1116, however, § 1114 was not amended to include extraterritorial application.  The amendment to § 1116 would have been unnecessary if

Congress had intended § 1114 to apply to the extraterritorial killing of all officers and employees of the United States.  Moreover, the amendment to § 1116 demonstrates that when Congress intended a homicide statute to apply extraterritorially, it specifically stated so.  *See also* 18 U.S.C. § 2332 (prohibiting killing of "a national of the United States, while such national is outside the United States").  Absent any "clear indication" Congress intended the extraterritorial application of § 1114, "it has none."  *Morrison*, 561 U.S. at 255.  Here, the failure to include extraterritorial application in § 1114, while specifically including such a provision in § 1116, is a clear indication that Congress did *not* intend the extraterritorial application of § 1114.

With little analysis, two other Circuits have upheld the extraterritorial application of § 1114.  *See United States v. Siddiqui,* 699 F.3d 690, 700 (2d Cir. 2012*); United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011); *United States v. Benitez*, 741 F.2d 1312, 1316-17 (11th Cir. 1984).  The law of this Circuit does not permit such a finding.  *See Delgado-Garcia,* 374 F.3d at 1344-50.  In *Benitez*, the Eleventh Circuit found that "Congress must have intended" the statute to apply extraterritorially, *Benitez,* 741 F.2d at 1317, but pointed only to the status of the victims and cited nothing demonstrating such an intent.  The Second Circuit in *Al Kassar* and *Siddiqui* did the same, relying on *Benitez* and finding that the nature of the offense alone was sufficient to imply intent to apply the statute extraterritorially.  *Al Kassar*, 660 F.3d at 118; *Siddiqui*, 699 F.3d at 701.  In *Siddiqui*, the court made this finding after noting that, in the Second Circuit, "[t]he ordinary presumption that laws do not apply extraterritorially has no application to criminal statutes."  699 F.3d at 700.

In contrast, the law of this Circuit requires the Court to apply the presumption to criminal as well as civil statutes, and more is necessary to find a Congressional intent to apply a statute beyond U.S. borders, absent a specific indication in the text of the statute.  *Delgado-Garcia,* 374

F.3d at 1344-50 (finding presumption overcome and extraterritorial application of criminal statute implied for statute with international focus designed to protect borders, where natural inference was that offenses would likely occur outside U.S. borders).   Section 1114 protects U.S. officers and employees, and while some of these individuals work outside of the territorial United States, nothing in the statute suggests an international focus.  Moreover, as noted above, other homicide statutes specifically provide for extraterritorial application in limited circumstances when the victim is within a specific category of officers or employees of the United States or is a U.S. national -- negating any suggestion of Congressional intent for extraterritorial application for all U.S. officers and employees.  *See*  18 U.S.C. §§ 1116, 2332.

## II.      Section 930(c) Does Not Apply Extraterritorially.

Counts Ten through Thirteen charge Mr. Abu Khatallah with violations of 18 U.S.C. § 930(c).  Section 930 provides:

> (a) Except as provided in subsection (d), whoever knowingly possesses or causes to be present a firearm or other dangerous weapon in a Federal facility (other than a Federal court facility), or attempts to do so, shall be fined under this title or imprisoned not more than 1 year, or both.

> (b) Whoever, with intent that a firearm or other dangerous weapon be used in the commission of a crime, knowingly possesses or causes to be present such firearm or dangerous weapon in a Federal facility, or attempts to do so, shall be fined under this title or imprisoned not more than 5 years, or both.

> (c) A person who kills any person in the course of a violation of subsection (a) or (b), or in the course of an attack on a Federal facility involving the use of a firearm or other dangerous weapon, or attempts or conspires to do such an act, shall be punished as provided in sections 1111, 1112, 1113, and 1117.

> * * *

> (g) As used in this section:

> (1) The term "Federal facility" means a building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties.

Like § 1114, this statute contains no reference to extraterritorial application, and there is no clear indication that Congress intended this provision to be applied abroad. This statute also lacks a connection to international activities that would evidence some intent to apply it beyond U.S. borders. Although some "Federal facilities" may be located outside of the United States, this fact alone does not demonstrate a Congressional intent to apply the statute extraterritorially.

Only one reported case addresses the extraterritorial application of § 930(c). *See United States v. Bin Laden,* 92 F. Supp. 2d 189 (S.D.N.Y. 2000) (finding §§ 844(f), 924(c), and 930(c) apply extraterritorially). The court found that § 930(c) could be applied extraterritorially to foreign nationals "[g]iven (i) that this provision is explicitly intended to protect vital United States interests, (ii) that a significant number of Federal facilities are located outside the United States, and (iii) that, accordingly, foreign nationals are in at least as good a position as are United States nationals to attack Federal facilities." *Bin Laden* at 198, 201-02. The court rejected the defendant's argument that "(i) because Section 930(c) was added to Section 930 by Title VI, Section 60014 of the Violent Crime Control and Enforcement Act of 1994, Pub.L. 103-322, 108 Stat. 1796, 1973, and (ii) because Title VI 'contained several statutory provisions that expressly provided for extraterritorial jurisdiction,' it follows that 'Congress's failure to provide for extraterritorial jurisdiction in' Section 930(c) means that Congress did not intend that it apply extraterritorially." *Id.* at 202 (citation omitted). The court rejected this argument based on its reading of *United States v. Bowman,* 260 U.S. 94, 98 (1922), but that reading conflicts with the D.C. Circuit's application of the presumption against extraterritorial application absent a clear indication of Congressional intent.

The court in *Bin Laden* found that *Bowman* established an exception to the presumption against extraterritorial application when a statute is enacted based on the government's right to defend itself against obstruction or fraud and the requisite intent may be inferred merely from the nature of the statute. *Bin Laden,* 92 F. Supp. 2d at 193. As noted above, the law of this Circuit requires the Court to apply the presumption to all statutes, and a clear indication of Congressional intent is necessary. *Delgado-Garcia,* 374 F.3d at 1344-50. Although the court in *Delgado-Garcia*, like the court in *Bin Laden*, found that *Bowman* supported the extraterritorial application of the statute at issue, the court affirmed its commitment to the presumption against extraterritorial application and did not read *Bowman* as broadly as the court in *Bin Laden*. *Id.* The *Delgado-Garcia* court found that the § 1324(a) -- which criminalizes the unlawful bringing of, or attempts to bring, aliens into the United States -- had an international focus. *Id.* at 520. This international focus was the contextual feature of the statute that supported extraterritorial application. *Id.* The *Delgado-Garcia* court found that *Bowman* supported this finding because, as in *Bowman*, the natural inference was that this immigration offense would probably be committed in extraterritorial locations. *Id.* The court did not find that this inference regarding "probable locations," or a U.S. interest, was sufficient by itself to infer Congressional intent.

Here, the Court should not infer extraterritorial application from the mere fact that some "Federal facilities" are outside the territorial United States. Section 930(c) has no international focus. Rather, the obvious focus is Federal facilities within U.S. territory, and the court is required to presume that Congress intended to apply the statute within the territorial United States given the absence of any clear indication that Congress intended otherwise.

**III.    Section 844(f) Does Not Apply Extraterritorially.**

Counts Fourteen and Fifteen charge Mr. Abu Khatallah with violations of

18 U.S.C. § 844(f)(1) & (3), which provide:

> (f)(1) Whoever maliciously damages or destroys, or attempts to
> damage or destroy, by means of fire or an explosive, any building,
> vehicle, or other personal or real property in whole or in part
> owned or possessed by, or leased to, the United States, or any
> department or agency thereof, or any institution or organization
> receiving Federal financial assistance, shall be imprisoned for not
> less than 5 years and not more than 20 years, fined under this title,
> or both.
>
> * * *
>
> (3) Whoever engages in conduct prohibited by this subsection, and
> as a result of such conduct directly or proximately causes the death
> of any person, including any public safety officer performing
> duties, shall be subject to the death penalty, or imprisoned for not
> less than 20 years or for life, fined under this title, or both.

Like § 930(c), the mere fact that some property owned or leased by the United States may be

beyond the territorial United States is not sufficient to establish Congressional intent to apply this

provision extraterritorially.  This statute contains no reference to extraterritorial application and

there is not contextual basis to support Congressional intent for such application because the

statute does not have an international focus and logically applies to property within the territorial

United States.  For the same reason that the Court should reject the analysis in *Bin Laden* with

regard to § 930(c) -- because the law of this Circuit requires  a clear indication of Congressional

intent -- the court should reject the *Bin Laden* court's finding with regard to § 844(f).

**IV.    Section 924(c) Does Not Apply Extraterritorially.**

Count Eighteen charges Mr. Abu Khatallah with a violation of 18 U.S.C. § 924(c), which

provides:

> (c)(1)(A) Except to the extent that a greater minimum sentence is
> otherwise provided by this subsection or by any other provision of
> law, any person who, during and in relation to any crime of

> violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime --
>
> (i) be sentenced to a term of imprisonment of not less than 5 years;
>
> (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and
>
> (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

This statute also contains no reference to extraterritorial application, and the contextual and legislative history demonstrates that its focus is domestic.

Section 924(c) is set within a comprehensive statutory scheme regulating the domestic licensing, trade and use of guns and other firearms.  Congress's evident goal in § 924(c) was to address one aspect of the gun violence problem within the United States, by attempting to deter criminals from using firearms during the commission of other crimes.  *See generally United States v. Washington*, 106 F.3d 983, 1010 n. 41 (D.C. Cir. 1997).  Section 924(c) does refer to "any" crime of violence or drug trafficking crime, but as noted above, such generic terms do not rebut the presumption against extraterritoriality.  *See Kiobel,* 133 S.Ct. at  1665; *see also Small*, 544 U.S. at 388-89 (use of  phrase "convicted in *any* court" in 18 U.S.C. § 922(g) has no particular significance as to the issue of whether Congress intended law to apply to foreign convictions).

Although the Supreme Court has not directly addressed the extraterritorial application of § 924(c), the Court's decision in *Small,* with regard to § 922(g), strongly supports Mr. Abu Khatallah's position that Congress did not intend § 924(c) to have extraterritorial effect.

Section 924 contains several subsections defining different firearms offenses.  Section 922(g),

enacted at the same time as § 924(c), makes it a crime for an individual previously convicted of a

felony to possess a firearm.  The issue in *Small* was whether § 922(g) applies to an individual

who was previously convicted of a felony in a foreign court or whether the statute is limited only

to prior domestic convictions.  Relying on the presumption against extraterritorial application of

Congressional statutes and its reading of the statutory language and legislative history, the Court

held that § 922(g) does not prohibit the possession of firearms by individuals who have been

convicted in foreign courts.  The presumption against extraterritoriality did not directly dictate

the result in *Small* -- because the defendant who possessed the firearm was in the United States --

but the presumption was accorded significant weight in the analysis.  The Court began its

analysis with its line of cases recognizing the "legal presumption that Congress ordinarily

intends its statutes to have domestic, not extraterritorial, application."  *Small*, 544 U.S. at 388-89.

Applying the reasoning underlying this presumption, the Court found "no convincing indication"

in  the statutory language or the contextual or legislative history that would overcome the

presumption.

The decision in *Small* confirms that the presumption against extraterritoriality applies to

possession of a firearm abroad:  "That presumption would apply, for example, were we to

consider whether this statute prohibits unlawful gun possession abroad as well as domestically."

544 U.S. at 389.  Moreover , like § 922(g), the subject matter of § 924(c) is a domestic issue --

possession of firearms.  There is no more indication in the text or the contextual or legislative

history of  § 924(c) that Congress intended it to apply extraterritorially, than there is in the text or

contextual or legislative history of § 922(g).  Indeed, both statutes were initially part of the same

Omnibus Crime Control and Safe Streets Act of 1968.

The Court in *Small* found that application of § 922(g) to foreign convictions would be inconsistent with the principles which underlie the presumption against extraterritorial application of statutes. *Id*. at 389-90. The extraterritorial application of § 924(c) similarly is inconsistent with these principles. Section 924(c) regulates the possession of firearms, and the circumstances under which an individual may carry a firearm is quintessentially a matter of the law of the sovereign where the individual is located. Congress may set whatever limitations it deems appropriate for the possession of firearms in the United States. And while it may or may not have the power to set limitations on such possession in foreign countries, it should not be inferred that Congress intended to exercise such power in the absence of unambiguous evidence of such intent. *See Arabian Am. Oil Co.,* 499 U.S. at 248 (presumption against extraterritorial application "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord.").

The legislative history of § 924(c) confirms the absence of any extraterritorial intention. Section 924(c) was enacted as part of the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. 90-351, Title IV, § 902, June 19, 1968, 82 Stat. 233. Its history suggests that the "safe streets" referred to in the Act's title were those of the United States alone. The Act was a compendium of provisions ranging from technical and financial assistance to state and local law enforcement agencies (Title I), major changes to the rules relating to the admissibility of confessions and other evidence in the courts of the United States (Title II), authorization of wiretapping and electronic surveillance by domestic law enforcement agencies (Title III), and new licensing, transfer, transportation, and use and possession laws relating to firearms, with associated criminal penalties (Title IV). *See generally Id.,* S. Rep. No. 1097 *available in* 1968 U.S.C.C.A.N 2112, 2113. As explained in the Senate Report, the goal of the Title IV provisions,

which included the enactment of the new 18 U.S.C. § 924(c), was to "keep firearms out of the

hands of those not legally entitled to possess them" and to "assist law enforcement authorities *in

the States and their subdivisions* in combating the increasing prevalence of crime in the United

States." *Id.* at 2113-14 (emphasis added); *see also id.,* at 2163-66, 2164 (describing and

documenting the aim of Title IV of the Act as "curbing the problem of gun abuse that exists in

the United States").[1]

Given the text and contextual and legislative history of § 924(c), this Court should not

follow the decisions of the Second and Eleventh Circuits, permitting the extraterritorial

application of 924(c).  *See United States v. Belfast*, 611 F.3d 783, 815 (11th Cir. 2010); *United

States v. Siddiqui*, 699 F.3d 690, 701 (2d Cir. 2012).  The court in *Belfast* found that "there is

simply no limitation in the language of the statute concerning its application to crimes committed

outside of the United States," and the Second Circuit merely adopted the reasoning in *Belfast*

without discussion.  *Belfast,* 611 F.3d at 814; *Siddiqui*, 699 F.3d at 701.  That reasoning,

however, turns the presumption against extraterritorial application on its head -- Congress must

express an intent for extraterritorial application of a statute, not merely fail to specifically limit

the application to domestic offenses.  The law in this Circuit requires the court to find -- either in

the text of the statute or the context in which it was enacted – an affirmative expression of intent

---

[1] The legislative history of subsequent amendments to § 924 demonstrate the continued focus on the "safe streets" of "the States and their subdivisions."  In the floor debate on the 1998 amendments, for example, a leading proponent explained the aim of the bill: "Mr. Speaker, today we take an important step in the battle against firearm violence in America. . . . We need it because dedicated law enforcement officers across the country are being gunned down for the mere thrill of the kill."  144 Cong. Rec. H531 (Feb. 24th, 1998) (comments of Rep. McCollum); *see also id.* H532 ("Throughout North Carolina and the Nation, citizens routinely claim that crime is one of their greatest fears and concerns.  Nothing is scarier or more dangerous than a criminal possessing or brandishing a gun during the commission of a crime.  We do not have to put up with it and we will not.") (comments of Rep. Myrick).

to apply the statute extraterritorially.  *See Delgado-Garcia,* 374 F.3d at 1344  (affirmative evidence of intent required).

The court in *Belfast* also found that because "[t]here can be no violation of  § 924(c) without a predicate offense, . . . it follows that the statute's reach is determined by the breath of the predicate offense."  *Belfast*, 611 F.3d at 815.  Although the D.C. Circuit has recognized that "[g]enerally, the extraterritorial reach of an ancillary offense like aiding and abetting or conspiracy is coterminous with that of the underlying criminal statute,"  *Ali*, 718 F.3d at 939, § 924(c) is not a generic ancillary offense like aiding or abetting or conspiracy, which regulates the manner in which an individual participates in an underlying offense.  Rather, § 924(c) regulates a specific category of additional offenses -- those committed with a firearms.   Absent any indication that Congress intended to regulate the possession of firearms within the territory of a foreign state, such ancillary application of extraterritoriality is not appropriate, particularly where ancillary application could cause "unintended clashes between our laws and those of other nations which could result in international discord."  *Arabian Am. Oil Co.,* 499 U.S. at 248.

## V.      Section 1363 Does Not Apply Extraterritorially as Charged.

Counts Sixteen and Seventeen charge Mr. Abu Khatallah violations of 18 U.S.C. §§ 1363 and 7.  Section 1363 provides:

> Whoever, within the special maritime and territorial jurisdiction of the United States, willfully and maliciously destroys or injures any structure, conveyance, or other real or personal property, or attempts or conspires to do such an act, shall be fined under this title or imprisoned not more than five years, or both, and if the building be a dwelling, or the life of any person be placed in jeopardy, shall be fined under this title or imprisoned not more than twenty years, or both.

Because the statute relies on the special maritime and territorial jurisdiction of the United States, it may be applied extraterritorially only to the extent foreign locations are included within this special maritime and territorial jurisdiction.

Section 7 defines the "special maritime and territorial jurisdiction of the United States." Here, only subsection 7(9) is possibly applicable:

> With respect to offenses committed by or against a national of the United States as that term is used in section 101 of the Immigration and Nationality Act--
>
> (A) the premises of United States diplomatic, consular, military or other United States Government missions or entities in foreign States, including the buildings, parts of buildings, and land appurtenant or ancillary thereto or used for purposes of those missions or entities, irrespective of ownership; and
>
> (B) residences in foreign States and the land appurtenant or ancillary thereto, irrespective of ownership, used for purposes of those missions or entities or used by United States personnel assigned to those missions or entities.
>
> Nothing in this paragraph shall be deemed to supersede any treaty or international agreement with which this paragraph conflicts. This paragraph does not apply with respect to an offense committed by a person described in section 3261(a) of this title.

The Special Mission and Annex in Benghazi were not such premises or residences. These outposts were established in violation of the Vienna Convention on Consular Relations and Optional Protocol on Disputes art. 2, Apr. 24, 1963, 21 U.S.T. 77, and the Vienna Convention on Diplomatic Relations and Optional Protocol on Disputes art. 2, 12, Apr. 18, 1961, 23 U.S.T. 3227 ("Vienna Conventions"). These treaties require mutual consent between States for the establishment of missions, and the Vienna Convention on Diplomatic Relations provides that "[t]he sending State may not, without the prior express consent of the receiving State, establish offices forming part of the mission in localities other than those in which the mission

itself is established."  Art. 12, 23 U.S.T. 3227.  Section 7(9) cannot be applied in conflict with

"any treaty or international agreement."  The United States established the Special Mission and

Annex without the express consent of the government of Libya, and therefore, they were not

premises or residences as defined by § 7(9).  *See* Defendant's Motion to Dismiss Counts Ten

Through Fifteen [Dkt. # 90] (citing Accountability Review Bd., U.S. Dep't of State, Benghazi

Attack Report (Unclassified), 14-15 (2012) , *available at* http://www.state.gov/documents/

organization/202446.pdf  (The Mission "was never a consulate and never formally notified to the

Libyan government.")); *see also United States v. Passaro*, 577 F.3d 207, 213-14 (4th Cir. 2009)

(noting that "mission" as used in § 7(9) is "a foreign relations term of art signifying a particular

type of fixed place" and referring to definition within Vienna Convention on Diplomatic

Relations).

        Even if the status of the Special Mission could support application of § 7(9) jurisdiction

as a diplomatic mission despite the failure of the United States to comply with the Vienna

Conventions when establishing the Mission, the CIA Annex did not constitute such a premises or

residence under § 7(9), and Count Seventeen must be dismissed.  *See Passaro*, 577 F.3d at 213-

16 ("[W]e doubt that § 7(9) reaches so broadly as to encompass any area that U.S. soldiers

occupy, no matter how temporary or mobile their presence.").  In *Passaro*, the court considered

whether the Asadabad Firebase, a United States Army outpost in Afghanistan, "constituted a

United States 'military mission' so as to render it within the criminal jurisdiction of a federal

district court."  *Id.* at 214.  Noting that while "long-established and permanent U.S. military

bases abroad" would constitute "the straightforward 'military' analogue to embassies, the

'diplomatic' and 'consular' missions plainly within § 7(9)'s scope," the statute "would not reach

any piece of Afghan soil on which a soldier 'pitches his pup tent.'"  *Id.*  The court found:

> In cases that fall between these two extremes, courts must consider a number of common-sense, objective factors to determine whether a particular location qualifies as the "premises" of a United States "military mission" for purposes of § 7(9).  Relevant factors include the size of a given military mission's premises, the length of United States control over those premises, the substantiality of its improvements, actual use of the premises, the occupation of the premises by a significant number of United States personnel, and the host nation's consent (whether formal or informal) to the presence of the United States.  This list surely does not exhaust every factor relevant to determining § 7(9)'s reach; nor is any factor a prerequisite for jurisdiction.  But these factors do bring to bear relevant, objective considerations in resolving this question.

*Id.*  The court found that § 7(9) extended to Asadabad because "the United States had retained control for nearly a year and a half over this significant, discrete tract of land, maintaining a meaningful permanent presence to conduct significant military operations, which the Afghan government sanctioned."  *Id.* at 216.  In contrast, the Annex in Benghazi was not an area controlled by the U.S. or where the U.S. maintained a significant permanent presence, rather it was Libyan property covertly and illegally used by an unknown number of CIA agents for an unknown period of time, without the sanction or knowledge of the Libyan government.  This is not a diplomatic or military mission within the scope of § 7(9).

## VI.    Section 2339A Applies Extraterritorially Only to the Extent the Underlying Offense Applies Extraterritorially.

Count One charges conspiracy in violation of 18 U.S.C. § 2339A, and Count Two charges a substantive violation of § 2339A, which provides:

> (a) Offense. --Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section 32, 37, 81, 175, 229, 351, 831, 842(m) or (n), 844(f) or (i), 930(c), 956, 1091, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332f, 2340A, or 2442 of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), section

> 46502 or 60123(b) of title 49, or any offense listed in section
> 2332b(g)(5)(B) (except for sections 2339A and 2339B) or in
> preparation for, or in carrying out, the concealment of an
> escape from the commission of any such violation, or attempts
> or conspires to do such an act, shall be fined under this title,
> imprisoned not more than 15 years, or both, and, if the death of
> any person results, shall be imprisoned for any term of years or
> for life. A violation of this section may be prosecuted in any
> Federal judicial district in which the underlying offense was
> committed, or in any other Federal judicial district as provided
> by law.

This statute contains no reference to extraterritorial application.

The D.C. Circuit has not addressed the extraterritorial application of § 2339A.  However,

when deciding that the charge of material support for terrorism prior to 2006 was not triable by a

law-of-war military commission, the court noted:

> The Government cites 18 U.S.C. § 2339A, which criminalizes
> providing material support or resources knowing they are to be
> used in a violation of [18 U.S.C.] section 2332, but that offense
> was not made extraterritorial until October 26, 2001.  *See* Pub. L.
> No. 107-56, § 805(a)(1)(A), 115 Stat. 272, 377.

*Al Bahlul v. United States*, 767 F.3d 1, 30 n.23 (D.C. Cir. 2014).  Section 2332 criminalizes the

killing of "a national of the United States, while such national is outside the United States," and

contains a clear indication of exterritorial application.  Prior to October 26, 2001, § 2339 applied

to anyone " within the United States" who provided material support or resources, and could not

be applied extraterritorially.  The 2001 amendment to § 2339A eliminated the qualification

"within the United States," thereby permitting extraterritorial application to the extent that the

underlying offense applies extraterritorially.  *Cf. Ali*, 718 F.3d at 939 ("Generally, the

extraterritorial reach of an ancillary offense like aiding and abetting or conspiracy is coterminous

with that of the underlying criminal statute.").   Thus, as noted in *Al Bahlul*, on October 26, 2001

the offense of providing material support for use in a violation of § 2332 was made

extraterritorial.  While § 2239 does not specifically permit extraterritorial application, Congress's removal of "within the United States" evidenced its intent to permit such application.[2]

The 2001 amendment to § 2339 -- eliminating "within the United States" -- did not, however, permit extraterritorial application of every violation of § 2339.  If Congress had intended to do so, it would have added the same provision that is in § 2339B (providing material support or resources to designated foreign terrorist organizations), which specifically provides: "There is extraterritorial Federal jurisdiction over an offense under this section." 18 U.S.C. § 2339B(d)(2).  Congress's decision not to include this language in § 2339A demonstrates that the extraterritorial reach of the statute is limited to the extraterritorial reach of the underlying offense.  Because §§ 1114, 930(c), 844(f), and 1363 cannot be applied extraterritorially, these offenses cannot form the basis for the extraterritorial application of § 2339A as charged in Counts One and Two.  The Court, therefore, should dismiss the portions of Count One and Two that are not based on a violation of § 1116 (Count Three), the only charged offense that contains a clear indication that it may be applied extraterritorially.

## Conclusion

For the foregoing reasons, Counts Four through Eighteen should be dismissed because the charged statutes cannot be applied extraterritorially, and Counts One and Two should be dismissed, in part, to the extent these counts charge violations based on offenses other than a violation of § 1116.

---

[2] As discussed above, such intent for ancillary application of extraterritorial provisions is completely lacking in § 924(c).

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/

_____
MICHELLE M. PETERSON
MARY MANNING PETRAS
Assistant Federal Public Defenders
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500
shelli_peterson@fd.org
mary_petras@fd.org

RICHARD JASPER (N.Y. Bar # 1975739)
276 Fifth Avenue, Suite 501
New York, New York  10001
(212) 689-3858 (voice)
(212) 689-0669 (facsimile)
ricjasp@aol.com

ERIC L. LEWIS (D.C. Bar #394643)
JEFFREY D. ROBINSON (D.C. Bar #376037)
LEWIS BAACH PLLC
1899 Pennsylvania Avenue, N.W., Suite 600
Washington, D.C.  20006
(202) 833-8900 (voice)
(202) 466-5738 (facsimile)
eric.lewis@lewisbaach.com
jeffrey.robinson@lewisbaach.com

Counsel for Ahmed Abu Khatallah