## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | **Crim. No.: 14-141 (CRC)** |
| | : | |
| | : | |
| AHMED SALIM FARAJ ABU | : | |
| KHATALLAH, | : | |
| | : | |
| also known as "Ahmed Abu Khatallah," | : | |
| also known as "Ahmed Mukatallah," | : | |
| also known as "Ahmed Bukatallah," | : | |
| also known as "Sheik," | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S OPPOSITION TO
## DEFENDANT'S MOTION FOR RETURN TO LIBYA

The government opposes Defendant's Motion for Return to Libya [Dkt. # 89].

## I.      Introduction

Claiming that apprehending him in Libya and bringing him to the United States for trial violated due process, the defendant asks that the Court divest itself of personal jurisdiction and send him back to Libya.   Such relief would be unprecedented.   Seemingly taking a page from *Through the Looking Glass*, the defendant makes the nonsensical claim that his due process rights were violated by bringing him from Libya to the United States to stand trial in the District Court for the District of Columbia, with all the attendant rights thereby conferred upon him.   In reality, the apprehension of the defendant in Libya violated no law, treaty, or constitutional right.   In any event, pursuant to the *Ker-Frisbie*[1] doctrine, the defendant cannot defeat personal jurisdiction by asserting the illegality of the procurement of his presence.

---

[1]      *Ker v. Illinois*, 119 U.S. 436 (1886); *Frisbie v. Collins*, 342 U.S. 519 (1952).   *See generally* §VII, *infra*.

The defendant's motion largely parrots the arguments recently advanced unsuccessfully by the defendant in *United States v. Al Liby*, 23 F.Supp.3d 194 (S.D.N.Y. 2014), based on nearly identical facts.   While the defendant here seeks a "return to Libya," rather than a dismissal of the indictment, the result should be the same as the result in *Al Liby*.   The motion should be denied.

## II.    Background

The defendant, Ahmed Salim Faraj Abu Khatallah, a Libyan national, has been charged by indictment for his participation in the September 11-12, 2012, terrorist attack (the "Attack") on a U.S. compound in Benghazi, Libya, known as the U.S. Special Mission (the "Mission") and a second U.S. facility known as the Annex, which resulted in the deaths of four Americans.   The Attack was carried out by Libyan-based Islamist extremists, including members of Ansar Al-Sharia ("AAS") and Ubaydah Ibn Al Jarrah ("UBJ").   The defendant was the commander of UBJ, an extremist brigade that was absorbed into AAS.   AAS is an armed militia that holds anti-Western views and advocates the establishment of Sharia law in Libya.

The defendant was a senior leader of AAS in Benghazi.   The United States Department of State ("DOS") designated AAS in Benghazi as a Foreign Terrorist Organization on January 13, 2014.   At the same time the DOS announced its designation, it explained that AAS Benghazi has been involved in terrorist attacks against civilian targets, frequent assassinations, and attempted assassinations of security officials and political actors in eastern Libya, as well as the Attack.   The defendant was also designated by the DOS as a Specially Designated Global Terrorist.

As set forth in the superseding indictment, in the days leading up to the Attack, the defendant voiced concerns about and opposition to the presence of an American facility in Benghazi and said he was going to do something about this facility.   On September 11, 2012, the

defendant drove to the Mission with other attackers.   At approximately 9:45 p.m., a group of approximately twenty armed men, including close associates of the defendant, violently breached the main gate of the Mission.   During the Attack, buildings within the Mission were set on fire, resulting in the deaths of Ambassador J. Christopher Stevens and DOS Information Management Officer Sean Patrick Smith.   The defendant actively participated in the attack on the Mission by, among other things, coordinating efforts to turn away emergency responders.   After the remaining U.S personnel had evacuated from the Mission, the defendant entered the Mission compound and supervised the plunder of material from the Mission's Office, including documents, maps and computers containing sensitive information about the location of the Annex.   Following the attack on the Mission, the defendant returned to an AAS camp in Benghazi, along with a vehicle and material stolen from the Mission.   The remaining U.S. personnel escaped to the Annex. Beginning at approximately 12:30 a.m. on September 12, 2012, the defendant's co-conspirators attacked the Annex with small arms fire.   Later that morning, at approximately 5:15 a.m., the defendant's co-conspirators attacked the Annex with mortars, resulting in the deaths of Security Officers Tyrone Snowden Woods and Glen Anthony Doherty.

## III.    Procedural history

On July 15, 2013, the defendant was charged for his participation in the Attack by a sealed criminal complaint.   At that time, a warrant was issued for his arrest.   The defendant was captured on June 15, 2014, while in Benghazi.[2]   On June 26, 2014, a federal grand jury in this district returned a one-count indictment, charging the defendant with conspiring to provide material support to terrorists.   On October 14, 2014, the same grand jury returned an

---

[2]        The criminal complaint was unsealed on the government's motion on June 17, 2014.

eighteen-count superseding indictment, charging the defendant with additional offenses for his participation in the Attack, including offenses for which the maximum penalty is death.

## IV.     The apprehension of the defendant did not violate the Posse Comitatus Act.

The defendant claims that the United States military's role in his apprehension violated the Posse Comitatus Act.[3]   In fact, the military's role in the apprehension of the defendant was completely proper, and, even if it had been improper, the defendant would not be entitled to be set free.

### A.     The Posse Comitatus Act places certain restrictions on the involvement of the Army and the Air Force in civilian law enforcement.

The Posse Comitatus Act, which was enacted in 1878, precludes "except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully us[ing] any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws . . . ." 18 U.S.C. § 1385 (the "Act").[4]

> [It] was originally a section inserted into an Army Appropriation Act as a backwash of the Reconstruction period following the Civil War. Its legislative history,

---

[3]      Despite the fact that the defendant has filed his motion in response to this Court's order for dispositive legal motions, his claim that his apprehension violated the Posse Comitatus Act and his claims regarding the alleged violations of treaties and constitutional rights depend largely on factual assertions with no record support beyond the defendant's citations to various items from the Internet.  These Internet citations are clearly an insufficient evidentiary basis to support his claims.  *See, e.g., Al Liby,* 23 F.Supp.3d at 197 (defense counsel's declaration "'made upon information and belief'" from "'the record in his office, the pleadings and notices filed to date, and . . . conversations and meetings with his client'" did not constitute competent evidence of the assertions made regarding alleged violations of the *Ker-Frisbie* doctrine, the Posse Comitatus Act, and international treaties); *see also United States v. Gillette,* 383 F.2d 843, 848 (2d Cir. 1967) (an attorney's affidavit in support of a defendant's motion that does not allege facts based on personal knowledge is insufficient to create a factual issue to be resolved by the court); *United States v. Hammond*, 841 F. Supp. 421, 422 (D.D.C. 1993) (evidentiary inquiry was not warranted on defendant's motion to suppress tangible evidence, where defendant failed to substantiate those claims with sufficient proof).

[4]      In 1956, the Act was amended to include the Air Force but not the Navy.  *United States v. Yunis*, 924 F.2d 1086, 1093 (D.C. Cir. 1991) ("We cannot agree that Congress' words admit of any ambiguity.  By its terms, 18 U.S.C. § 1385 places no restrictions on naval participation in law enforcement operations . . . .   Nothing in this history suggests that we should defy the express language of the Posse Comitatus Act by extending it to the Navy, and we decline to do so.").

> [citation omitted], indicates that the immediate objective of the legislation was to put an end to the use of federal troops to police state elections in the ex-Confederate states where the civil power had been reestablished.

*Chandler v. United States*, 171 F.2d 921, 936 (1st Cir. 1948); *see also United States v. Allred*, 867 F.2d 856, 869 (5th Cir. 1989) ("The legislative and judicial history of the Act, however, indicates that its purpose springs from an attempt to end the use of federal troops to police state elections in ex-Confederate states."). A separate statute, 10 U.S.C. § 375, directs the Secretary of Defense to issue regulations prohibiting direct participation by military personnel in a civilian search, seizure, arrest, or other similar activity unless expressly authorized by law. *See, e.g.*, *United States v. Yunis*, 924 F.2d 1086, 1094 (D.C. Cir 1991) ("*Yunis II*").

### B. The Posse Comitatus Act does not apply extraterritorially.

The Act's prohibition of use of the "Army or the Air Force as a posse comitatus" applies domestically – not internationally. A "posse comitatus" literally translates as "power or force of the county" and is defined as "[t]he entire population of a county above the age of fifteen, which a sheriff may summon to his assistance in certain cases, as to aid him in keeping the peace, in pursuing and arresting felons, etc." *Black's Law Dictionary* 1046 (5th ed. 1979). This power of the local sheriff was well established in the United States at the time the Act was passed, *see, e.g.*, *Coyles v. Hurtin*, 10 Johns. 85 (N.Y. 1813); *Sutton v. Allison*, 47 N.C. 339 (1855), and had been construed to include the right of civilian law enforcement to call upon military personnel to aid civil enforcement efforts. *See, e.g.*, 16 Op. Att. Gen. 162, 163 (1878) ("It has been the practice of the Government since its organization . . . to permit the military forces of the United States to be used in subordination to the marshal of the United States when it was deemed necessary that he should have their aid in order to the enforcement of his process."); *United States v. Thompson*, 33

5

M.J. 218, 220 (C.M.A. 1991) ("The *Posse Comitatus* Act is a century-old law that was passed to prevent the then-common use of military forces to help civilian authorities enforce civil laws."). Thus, the portion of the Act prohibiting use of the military as a "posse comitatus" is a limitation on the power of civil law enforcement to call on military forces to serve as part of a "posse" – *i.e.*, to include the military within the forces available for domestic law enforcement.

Limiting the application of the Act's prohibitions to domestic law enforcement is consistent with the legislative history and historical context of the Act, *see generally* Major H.W.C. Furman, Restrictions on the Use of the Army Imposed by the Posse Comitatus Act, 7 MIL. L. REV. 85, 93-94, 111-112 (1960), as well as constitutional principles relating to the use of military forces abroad.

> On foreign soil or the high seas – unlike in the domestic situation – military personnel may constitute the only means at the executive branch's command to execute the laws.  Giving extraterritorial effect to the Posse Comitatus Act thus could, in many circumstances, deprive the executive branch of any effective means to fulfill this constitutional duty.

Extraterritorial Effect of the Posse Comitatus Act, 13 U.S. Op. O.L.C. 321, 334, 1989 WL 59859 (1989)).  (This is especially applicable in this case, since Libya's law enforcement apparatus has very limited capabilities in the current civil war environment, particularly in the eastern region of Libya, including Benghazi.)  Courts have, therefore, regularly viewed the Act's prohibitions as being limited to the territorial jurisdiction of the United States.

In *Chandler*, an American citizen was apprehended by the army in Germany and returned to the United States to face treason charges.   171 F.2d at 927-28.   In response to Chandler's claim that his arrest and return to the United States by the military violated the Act, the court held "[the Act] is the type of criminal statute which is properly presumed to have no extraterritorial

application in the absence of statutory language indicating a contrary intent . . . ."   *Id.* at 936 (holding such in the context of military occupation of post-World War II Germany); *see id.* ("[Chandler's] arguments involve the conclusion, which we deem unacceptable, that there was no way in which a court of the United States could obtain lawful jurisdiction over Chandler unless he should choose to relinquish his asylum in Germany and voluntarily return to the United States"); *see also Gillars v. United States*, 182 F.2d 962, 972-73 (D.C. Cir. 1950) ("The use of our Army of Occupation in Germany could not be characterized as a 'posse comitatus' since it was the law enforcement agency in Germany at the time of appellant's arrest.").

The defendant attempts to distinguish this authority by arguing (at 9-10) that it precludes the extraterritorial application of the Act only in situations where the United States already had a military presence in the subject foreign nation and was exercising some sort of domestic control there.   No court has so held, and there is no reason to do so here.   Rather than create a vague test for the application of a criminal statute that turns on whether there is a "military presence" in the country and whether the military is exercising "some sort of domestic control," the better reading of this statute, based on its language and purpose, is that it "is the type of criminal statute which is properly presumed to have no extraterritorial application in the absence of statutory language indicating a contrary intent."   *Chandler*, 171 F.2d at 936.   Accordingly, the defendant's motion should be denied on the ground that the Act does not apply outside of the territorial jurisdiction of the United States.

**C.       Even if the Posse Comitatus Act applied here, it was not violated.**

The regulations enacted by the Department of Defense ("DoD") pursuant to 10 U.S.C. § 375 provide for the military's involvement in a number of different law enforcement activities.

The regulations authorize the military's "active participation in direct law-enforcement-type activities (*e.g.*, search, seizure, and arrest) that are not restricted by law or DoD policy." Specifically, this includes the following activities:   (i) "[a]ctions taken for the primary purpose of furthering a DoD or foreign affairs function of the United States, regardless of incidental benefits to civilian authorities"; and (ii) "[a]ctions taken under express statutory authority to assist officials in executing the laws," including "[a]ssistance in the case of crimes against . . . internationally protected persons pursuant to 18 U.S.C. 112 and 1116." 32 C.F.R. § 182.6.[5]  Both of these categories are applicable here.   First, apprehending an individual, such as the defendant, who is responsible for killing an ambassador and destroying a diplomatic mission clearly furthers the "foreign affairs function of the United States."   Second, the defendant is charged with the Murder of an Internationally Protected Person, in violation of 18 U.S.C. § 1116.   (*See* Superseding Indictment, Count Three.)   Moreover, 18 U.S.C. § 1116 itself explicitly provides for the intervention of the armed forces to assist in the enforcement of § 1116.   Specifically, subsection (d) of § 1116 provides:   "In the course of enforcement of this section and any other sections prohibiting a conspiracy or attempt to violate this section, *the Attorney General may request assistance from . . . the Army, Navy, and Air Force, any statute, rule, or regulation to the contrary notwithstanding*." *Id.* (emphasis added).

### D.      Even if the Posse Comitatus Act applied here and it was violated, the remedy sought by the defendant would not be available.

The defendant alleges (at § V) that the military's involvement in his apprehension violated the Posse Comitatus Act, and he argues further that, based on this alleged violation, the Court

---

[5]      The defendant's reliance (at 8) on 32 C.F.R. § 182.6(a)(iii)(A)(3) is misplaced, as that section places restrictions on the military's involvement in civil law enforcement "*[e]xcept as authorized in this part* (*e.g.*, in paragraphs (a) and (b) of this section) . . . ." 32 C.F.R. § 182.6(a)(iii)(A) (emphasis added).   And the exceptions applicable to this case, as set forth above, are found in "paragraph[] (a) . . . of this section."

should divest itself of personal jurisdiction.   The defendant, however, does not cite a single case,

nor is the government aware of any, where a court has afforded such relief based on a violation of

the Act.   To the contrary, the weight of authority rejects the application of the exclusionary rule as

a remedy for violating the Act.   *See, e.g.*, *United States v. Mullin*, 178 F.3d 334, 342-43 (5th Cir.

1999) (assuming the Act was violated and declining to apply the exclusionary rule); *United States

v. Al-Talib*, 55 F.3d 923, 930 (4th Cir. 1995) ("As a general matter, the exclusionary rule is not a

remedy for violations of the [Act]."); *United States v. Hartley*, 796 F.2d 112, 115 (5th Cir. 1986)

("It should also be noted that, even where a violation of the Posse Comitatus Act is found or

suspected, courts have generally found that creation or application of an exclusionary rule is not

warranted . . . ."); *United States v. Wolffs*, 594 F.2d 77, 85 (5th Cir. 1979) (assuming that the use of

military personnel in the investigation was unauthorized and finding the application of

exclusionary rule inappropriate); *United States v. Walden*, 490 F.2d 372, 376-77 (4th Cir. 1974)

("we do not find present in this case at this time the same considerations which required an

exclusionary rule in the Fourth Amendment cases or in other instances where an exclusionary rule

has been fashioned and applied"); *cf. United States v. Dreyer*, 767 F.3d 826, 836 (9th Cir. 2014)

(applying exclusionary rule to violation of Posse Comitatus) *reh'g en banc granted*, 782 F.3d 416

(9th Cir. 2015) ("The three-judge panel opinion shall not be cited as precedent by or to any court of

the Ninth Circuit.").

Likewise, courts have consistently declined to dismiss indictments where jurisdiction over

the defendant was obtained through military activity that allegedly violated the Act. *See, e.g.*,

*Yunis II*, 924 F.2d at 1093-94 ("dismissal of all charges against Yunis might well be an

inappropriate remedy if violations of the Posse Comitatus Act were found"); *Al Liby*, 23 F.Supp.3d

at 201 ("[T]here is no authority to support dismissing an indictment for a violation of the [Posse Comitatus] Act.   Nothing on the face of the statute or in the legislative history supports such relief, and al Liby has not cited a single instance in which an indictment was dismissed based on a violation of the Act. . . . The Court therefore cannot conclude that it lacks jurisdiction over al Liby so as to require dismissal of the indictment."); United *States v. Cotten*, 471 F.2d 744, 749 (9th Cir. 1973) (rejecting dismissal as remedy for alleged violation of Posse Comitatus Act).   As explained more fully below (*see* §VII, *infra*), these findings regarding the Act are in accord with the well-settled *Ker-Frisbie* doctrine:   "the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction,'" *Frisbie v. Collins,* 342 U.S. 519, 522 (1952) (footnote omitted), a rule applied by the Supreme Court even if a federal statute was violated in the course of a "forcible abduction."   *See also id.* at 522-23 (assuming that officers violated Federal Kidnaping Act, rule of *Ker* is not changed).   Accordingly, because the Posse Comitatus Act does not apply extraterritorially, it was not violated in any event, and the relief sought by the defendant is simply unavailable, his motion should be denied.

## V.      The apprehension of the defendant did not violate international law.

The defendant argues (at 11-12) that his capture and subsequent detention violated treaties of the United States, specifically the U.N. Charter and the Hague Convention;[6] thus, the Court should divest itself of personal jurisdiction over the defendant.   He is incorrect.   The defendant's argument rests entirely on the truism (at 12) that the Constitution provides that ratified treaties are

---

[6]       There are actually multiple Hague Conventions.   The defendant cites (at 11) the Hague Convention on the Law of War: Rights and Duties of Neutral Powers and Persons in Case of War on Land, adopted by the United States on November 27, 1909, which is commonly referred to as the Hague Convention V.   For purposes of terminology, all references in this brief to the "Hague Convention" will be to the Hague Convention V, unless otherwise noted.

to be regarded as the law of the land.   The defendant's argument, however, is incomplete in that it ignores the fact that the treaties he cites are not self-executing and the fact that the treaties do not provide for individual rights.

As a threshold matter, the apprehension of the defendant violated neither the U.N. Charter nor the Hague Convention.[7]   Even if the U.N. Charter or the Hague Convention were construed to prohibit certain apprehensions – and there is nothing in either treaty that specifically prohibits such conduct – they are not self-executing treaties that may be directly enforced in court.   Moreover, the defendant fails to identify any provision of these international agreements which creates rights enforceable by a private individual.   Last, even assuming, *arguendo*, that defendant had alleged a cognizable violation of international law, he identifies neither any precedent suggesting that divestiture of personal jurisdiction is an appropriate remedy nor any other reason the *Ker-Frisbie* doctrine should not apply.

**A.     Neither the U.N. Charter nor the Hague Convention may be enforced by this Court to sanction the Executive for the apprehension of the defendant.**

In order for the U.N. Charter or the Hague Convention to be directly enforced by this Court, they would have to be "self-executing."   As the Supreme Court explained in *Medellin v. Texas*, 552 U.S. 491, 505 (2008), "a treaty is 'equivalent to an act of the legislature,' and hence self-executing, when it 'operates of itself without the aid of any legislative provision. When, in contrast, [treaty] stipulations are not self-executing they can only be enforced pursuant to legislation to carry them into effect.'"   (Citation omitted.)

The treaty provisions on which the defendant relies are not self-executing.   First,

---

[7]     Notably, Libya is not even a party or a signatory to the Hague Convention.   As provided in Article 20 of that Convention, "[t]he provisions of the present Convention do not apply except between Contracting Powers and then only if all the belligerents are Parties to the Convention."   Therefore, the United States has no treaty obligations to Libya under this Convention and the provisions of this treaty have no bearing on the apprehension of the defendant.

numerous courts, including the D.C. Circuit, have examined various provisions of the U.N. Charter and found them not to be self-executing.  *See, e.g.*, *Comm. of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 938 (D.C. Cir. 1988) (finding U.N. Charter Art. 94 not to be self-executing); *Flores v. Southern Peru Copper Corp.*, 414 F.3d 233, 250 n.24 (2d Cir. 2003) ("although the Charter of the United Nations has been ratified by the United States, it is not self-executing'); *Frolova v. U.S.S.R.*, 761 F.2d 370, 374 & n. 5 (7th Cir. 1985) (collecting cases)). The provision of the U.N. Charter on which the defendant relies (at 11), Article 2, also should be viewed as not self-executing.

Section 4 of Article 2 of the U.N. Charter, on which the defendant apparently relies, provides that "[a]ll members shall refrain in their international relations from the threat or use of force against the territorial integrity or political independence of any state, or in any other manner inconsistent with the Purposes of the United Nations."  This Section, therefore, relates to one of the most fundamentally political questions that faces a nation – when to use force in its international relations, including when to wage war.  It also is phrased extremely broadly, prohibiting the "threat or use of force . . . in any other manner inconsistent with the Purposes of the United Nations."  The defendant has cited nothing, and the government is aware of nothing, to suggest that this rule – or, in fact, any other rule established under Article 2 – was intended, standing alone, to be directly enforceable in the courts of the United States.   To the contrary, the breadth of the Article's language suggests that carefully crafted legislation would be required before such a provision, or any part of it, would be directly enforceable in United States courts.

As noted in *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 809 (D.C. Cir. 1984) (Bork, J., concurring):   "Articles 1 and 2 of the United Nations Charter are likewise not self-executing."

*See also Al Liby*, 23 F.Supp.3d 201-02 ("[T]he provisions on which al Liby relies in Article 2 of the [U.N.] Charter—including the 'sovereign equality' of states and that '[m]embers shall refrain in their international relations from the threat or use of force against the territorial integrity or political independence of any state'—are only general principles.  None of those principles al Liby references can reasonably have been intended to be enforceable in U.S. courts.") (footnote omitted).

The same is true of the Hague Convention.  While the defendant appears to invoke the Hague Convention V (*see* n.6, *supra*), by analogy, multiple courts have found the Hague Convention IV[8] to be not self-executing.   For example, the Fourth Circuit so held, noting that:

> Article 1 of the Hague Convention [IV] states, "[t]he Contracting Powers shall issue instructions to their armed land forces which shall be in conformity with the Regulations . . . ."  Hague Convention, art. 1, 36 Stat. at 2290.  This language must be taken as further evidence that the Hague Convention is not self-executing, and that, instead, the signatories contemplated that individual nations would take subsequent executory actions to discharge the obligations of the treaty.   In sum, we hold that the Hague Convention is not self-executing and, therefore, does not, by itself, create a private right of action for its breach.

*Goldstar (Panama) S.A. v. United States,* 967 F.2d 965, 968-69 (4th Cir. 1992); *see also Al Liby*, 23 F.Supp.3d at 202 (concluding that the Hague Convention [IV] is not enforceable on its own in U.S. courts); *Dreyfus v. Von Finck,* 534 F.2d 24, 30 (2d Cir. 1976) (holding that the Hague Convention [IV] is not self-executing); *United States v. Kelly,* 676 F.3d 912, 915 (9th Cir. 2012) (reaching the same result in *dicta*).   As far as we are aware, no court has ever held that the Hague Convention V is self-executing.   This is not surprising in that the Convention provision on which the defendant appears to rely, Article 1, which states only that "the territory of neutral Powers is

---

[8]      The Hague Convention IV refers to the Hague Convention respecting the Laws and Customs of War on Land and its Annex: Regulations concerning the Laws and Customs of War on Land, which was adopted by the United States on November 27, 1909, the same date as the United States adopted the Hague Convention V.

inviolable," like Article 2 of the U.N. Charter, reflects only a general principle that could not have

reasonably been intended to be enforceable in U.S. courts.   *See Al Liby*, 23 F.Supp.3d at 202.

      **B.**      **Neither the U.N. Charter nor the Hague Convention creates privately enforceable rights.**

Treaties do not generally create rights that are privately enforceable in the federal courts:

> Even when treaties are self-executing in the sense that they create federal law, the background presumption is that international agreements, even those directly benefiting private persons, generally do not create private rights or provide for a private cause of action in domestic courts.   Accordingly, a number of the United States courts of appeals have presumed that treaties do not create privately enforceable rights in the absence of express language to the contrary.

*Medellin*, 552 U.S. at 505 n.3; *see, e.g., Gara v. Lappin*, 253 F.3d 918, 924 (7th Cir. 2001) ("[A]s

a general rule, international agreements, even those benefitting private parties, do not create

private rights enforceable in domestic courts.").   Therefore, the defendant must demonstrate, not

only that the U.N. Charter and the Hague Convention are self-executing, but also that the treaties

create privately enforceable rights.   The defendant has not and cannot do so as the text and

negotiating and legislative history of the provisions at issue give no indication that they were

intended to create privately enforceable rights.

Defendant appears to rely on the following portion of Article 2 of the U.N. Charter:

> The Organization and its Members, in pursuit of the Purposes stated in Article 1, shall act in accordance with the following Principles.

> 1.  The Organization is based on the principle of the sovereign equality of all its Members.

> 2.  All Members, in order to ensure to all of them the rights and benefits resulting from membership, shall fulfill in good faith the obligations assumed by them in accordance with the present Charter.

> 3.  All Members shall settle their international disputes by peaceful means in such a manner that international peace and security, and justice, are not endangered.

4. All Members shall refrain in their international relations from the threat or use of force against the territorial integrity or political independence of any state, or in any other manner inconsistent with the Purposes of the United Nations.

Similarly, the defendant's Hague Convention argument appears to rely on Article 1 of the Convention, which also addresses relations among states. These provisions do not speak of individual rights. Moreover, there is no suggestion elsewhere in the treaties that these provisions were intended to be privately enforceable. Indeed, the treaties do not speak of private rights at all:

[Articles 1 and 2 of the United Nations Charter] do not speak in terms of individual rights but impose obligations on nations and on the United Nations itself. They address states, calling on them to fulfill in good faith their obligations as members of the United Nations. Sanctions under article 41, the penultimate bulwark of the Charter, are to be taken by states against other states. Articles 1 and 2, moreover, contain general "purposes and principles," some of which state mere aspirations and none of which can sensibly be thought to have been intended to be judicially enforceable at the behest of individuals. These considerations compel the conclusion that articles 1 and 2 of the U.N. Charter were not intended to give individuals the right to enforce them in municipal courts, particularly since appellants have provided no evidence of a contrary intent.

*Tel-Oren,* 726 F.2d at 809; *Al Liby*, 23 F.Supp.3d at 202-03 ("Al Liby has not identified any provision of the United Nations Charter . . . that created judicially enforceable private rights.").

Furthermore, the government is aware of nothing, and the defendant points to nothing, in the drafting history of the provisions or in their consideration by the President and Senate to support a conclusion that the provisions were intended to create privately enforceable rights. Thus, the language and negotiating and legislative history of the U.N. Charter and the Hague Convention do not support a construction that confers individual rights that could in turn be judicially enforced by private parties.

The lack of any such individual right, when considered in conjunction with the fact that the treaties in question are not self-executing, further underscores why the Court should deny the

15

defendant's claim for relief pursuant to these agreements.   Even if his apprehension constituted a violation of these treaties (and it did not), the defendant has not shown that the Court should even consider that he has an individual right to enforce them.

>C.   **Even if the defendant had a private right to enforce the treaties upon which he relies, divestiture of personal jurisdiction would not be the appropriate remedy.**

Even if the treaties upon which the defendant relies were directly enforceable in federal court and he had a private right to enforce them, the remedy he seeks – divestiture of personal jurisdiction – would not be appropriate because these treaties provide for no such remedy.   Courts will not, and should not, infer such a drastic remedy as divestiture of personal jurisdiction for violation of an international agreement absent clear language in the text of the treaty providing for such a remedy:   "If we were to require suppression for Article 36 violations without some authority in the [Vienna] Convention, we would in effect be supplementing those terms by enlarging the obligations of the United States under the Convention.   This is entirely inconsistent with the judicial function."   *Sanche-Llamas v. Oregon*, 548 U.S. 331, 346 (2006); *see also United States v. Li*, 206 F.3d 56, 61 (1st Cir. 2000) ("we will infer neither an entitlement to suppression nor an entitlement to dismissal absent express, or undeniably implied, provision for such remedies in a treaty's text."); *Al Liby*, 23 F.Supp.3d at 203 ("even assuming that the international treaties were self-executing and created judicially enforceable private rights, dismissal of the indictment would not be appropriate").   The defendant has cited to no such language, and the government is aware of none.

The defendant's legal argument is akin to that of the defendant in *Alvarez-Machain*, a citizen and resident of Mexico who had been indicted for his participation in the kidnaping and

murder of a Drug Enforcement Administration ("DEA") agent in Mexico, and who was "forcibly kidnaped" from Mexico and flown to Texas, where he was arrested by the DEA.   *Id.* at 657.   The district court found that the DEA was "responsible" for the abduction, *id.*, and the Supreme Court acknowledged that the defendant's abduction might be "'shocking' and . . . in violation of general international law principles."   *Id.* at 669 (citation omitted).   Nonetheless, the Supreme Court concluded that so long as the U.S.-Mexico extradition treaty did not expressly prohibit forcible abduction, the *Ker-Frisbie* doctrine applied, "and the court need not [even] inquire as to how [the defendant] came before it."   *Id.* at 662.   After concluding that abduction did not run afoul of the extradition treaty, the Supreme Court thus stated:   "[T]he rule of *Ker v. Illinois* is fully applicable to this case.   The fact of [the defendant's] forcible abduction does not therefore prohibit his trial in a court in the United States for violations of the criminal laws of the United States."   504 U.S. at 670.

The same is true here.   There is no extradition treaty between the United States and Libya that prohibits apprehension.   Indeed, there is no extradition treaty at all between the United States and Libya.   *See* Notes following 18 U.S.C.A. § 3181.   And the international agreements to which the defendant cites in support of his motion (at 11-12) neither prohibit the specific conduct about which he complains (*i.e.*, forcible abduction) nor explicitly (or impliedly) provide for the remedy he seeks (*i.e.*, dismissal of the indictment).   Thus here, as in *Alvarez-Machain*, the *Ker-Frisbie* rule applies.   504 U.S. at 664, 671 (holding that the "fact of respondent's forcible abduction does not [] prohibit his trial in a court in the United States" where the "Treaty says nothing about the obligations of the United States and Mexico to refrain from forcible abductions of people from the territory of the other nation, or the consequences under the Treaty if such an abduction occurs.");

*see also United States v. Umeh*, 762 F. Supp. 2d at 664 ("allegations that the United States violated international law in effectuating his transfer to the United States are irrelevant"), *aff'd*, 527 Fed. App'x 57 (2d Cir. 2013).

## VI.     The defendant's apprehension did not violate his constitutional rights.

The defendant claims (at 12-16) that by being apprehended in Libya and transported to the United States for trial, (1) he was denied prompt presentment; (2) he was denied the right to remain silent and the right to counsel; and (3) his statement was coerced.   On the contrary, none of these fundamental rights was violated.   And, even if the defendant's rights had been violated, such violations would not mandate his return to Libya, an unprecedented remedy utterly unconnected to the claimed violations.   Although these claims seem more a preview of the defendant's planned motion to suppress his statements than a basis for a dispositive legal motion, the government addresses the legal aspects of his claims below.[9]

### A.     The defendant's presentment was not unduly delayed.

There was no undue delay in defendant's presentment.   In *Corley v. United States*, 556 U.S. 303, 322 (2009), the Supreme Court held that 18 U.S.C. § 3501(c) eliminated the *McNabb-Mallory* rule for confessions given within six hours of arrest but, that when a confession comes later, the exclusionary rule applies, and courts have to decide whether the delay was unnecessary or unreasonable.   Here, as will be established by the government at an evidentiary hearing held at the appropriate time after evidentiary motions have been filed and briefed, any delay in defendant's presentment was reasonable.   *See, e.g.*, *United States v. Purvis*, 768 F.2d

---

[9]        In this Opposition, the government is not attempting to provide the Court with a full briefing regarding the admissibility of the defendant's custodial statements, as we anticipate that these issues will be fully litigated in the future.

1237, 1239 (11th Cir. 1985) (in determining reasonableness of delay, court considers distance of arrest to U.S. territory, any reasons for delay in transport, and whether defendant was improperly interrogated); *United States v. Odom*, 526 F.2d 339, 343 (5th Cir. 1976) (no undue delay in presentment, where defendant was arrested abroad and sea transport was more feasible than air transport); *United States v. Greyshock*, 719 F. Supp. 927, 933 (D. Hawaii 1989) (rejecting defendant's claim that his presentment was untimely because he was transported by sea – not air).[10]

Even if, assuming *arguendo*, the defendant's presentment had been unduly delayed, the appropriate relief would not be divestiture of personal jurisdiction.  The remedy for tardy presentment is suppression of any statements made during the period of inappropriate detention. *See, e.g.*, *Corley,* 556 U.S. at 322 ("If the confession occurred before presentment and beyond six hours, however, the court must decide whether delaying that long was unreasonable or unnecessary under the *McNabb–Mallory* cases, and if it was, *the confession is to be suppressed*.") (emphasis added); *United States v. Crews*, 445 U.S. 463, 474 (1980) (defendant is "not himself a suppressible fruit and the illegality of his detention cannot deprive the government of the opportunity to prove his guilt through the introduction of evidence wholly untainted by the police misconduct").

### B.     Neither the defendant's right to remain silent nor his right to counsel was violated.

The defendant claims that his right to remain silent and his right to counsel were violated.

---

[10]     As set forth above (*see* n.3, *supra*), this aspect of the defendant's purported dispositive legal motion relies on factual assertions gathered from the Internet.   In particular, we note that the article cited by the defendant regarding delay in his presentment (at 5) relies on an anonymous source for the defendant's inaccurate claim that his transportation to the United States was purposely delayed in order to provide additional time for interrogation. (http://www.cnn.com/2014/06/18/us/benghazi-khatallah-what-next).

His claims are baseless, as he never invoked either of those rights, as will be established by the government at an evidentiary hearing held at the appropriate time after evidentiary motions have been filed and briefed.   Furthermore, even if either of these rights had been violated, suppression of any custodial statements – not divesture of personal jurisdiction – would be the appropriate remedy.

> **1.    The defendant's *Miranda* waiver was valid.**

Unwarned questioning of the defendant prior to administering *Miranda* warnings does not necessarily violate the rule of *Miranda v. Arizona*, 384 U.S. 436 (1966).   In *Oregon v. Elstad*, 470 U.S. 298, 318 (1985), the Supreme Court held that a *Miranda* waiver was valid, even though it had been preceded by unwarned questioning.   Subsequently, the Supreme Court has identified five factors that should be considered in determining the validity of a *Miranda* waiver following unwarned questioning:   (1) "the completeness and detail of the questions and answers in the first round of interrogation"; (2) "the overlapping content of the two statements"; (3) "the timing and setting" of the two respective interviews; (4) "the continuity of police personnel"; and (5) "the degree to which the interrogator's questions treated the second round as continuous with the first." *Missouri v. Siebert*, 542 U.S. 600, 615 (2004) (plurality opinion).

In a concurring opinion, Justice Kennedy stated that when a "deliberate two-step strategy" is used, post-warning statements that are related to the substance of pre-warning statements must be excluded unless curative measures adopted before the post-warning statements were taken.   *Id.* at 622.   Justice Kennedy identified a "substantial break in time and circumstances" and "an additional warning that explains the likely inadmissibility of the pre-warning custodial statement" as curative steps.   *Id.*   Here, as will later be established at an evidentiary hearing, there was

sufficient attenuation between the defendant's unwarned and warned statements to render his *Miranda* waiver valid.   Even if there were insufficient attenuation, the proper remedy would be suppression of the warned statement.   *See, e.g.*, *United States v. Capers*, 627 F.3d 470, 483 (2nd Cir. 2010) (suppressing warned statement that was not sufficiently attenuated from unwarned statement).

### 2.      The defendant's right to counsel was not violated.

A defendant must unambiguously invoke his Sixth Amendment right to counsel:

> [I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning. . . . Rather, the suspect must unambiguously request counsel.   As we have observed, "a statement either is such an assertion of the right to counsel or it is not."

*Davis v. United States*, 512 U.S. 452, 459 (1994).   After receiving his *Miranda* warnings, as will be established at an evidentiary hearing, the defendant waived his rights and asked if a lawyer was present.[11]   Courts have consistently found statements less ambiguous than the defendant's to be insufficient to invoke the right to counsel.   S*ee, e.g. United States v. Oquendo-Rivas*, 750 F.3d 12, 19 (1st Cir. 2014) ("'I do not understand this, my lawyer speaks'" not invocation of right to counsel); *Clark v. Murphy*, 331 F.3d 1062, 1070 (9th Cir. 2003) ("'I think I would like to talk to a lawyer'" not invocation of right to counsel); *Coleman v. Singletary*, 30 F.3d 1420, 1423 (11th Cir. 1994) ("I don't know.   But if [attorney] said to stop it I don't want to do what he said not to do" not invocation of right to counsel).   If, nevertheless, the defendant's invocation of his right to the assistance of counsel were valid, the remedy would be suppression of his custodial statements.

---

[11]       The defendant claims (at 6) that he actually requested a lawyer.   This is inaccurate.   But it is of no moment, as set forth above, even if the defendant had unambiguously requested the assistance of counsel and his request was not honored, the appropriate remedy would be suppression of statements – not for the Court to divest itself of personal jurisdiction.

*Miranda*, 384 U.S. at 492 ("Without these warnings the statements were inadmissible.")

### C. The defendant's statement was not coerced.

Contrary to the defendant's claim (at 14-15), he was not coerced into making a statement. A statement is involuntary in violation of due process if, based on the totality of circumstances, the declarant's will was overborne. *Dickerson v. United States*, 530 U.S. 428, 434 (2000). "If his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961).

The focus is on whether the statement was obtained in a manner "so offensive to a civilized system of justice that they must be condemned." *Miller v. Fenton*, 474 U.S. 104, 109 (1985). Simply interrogating the defendant over the course of multiple days, while at sea, is not inherently coercive. *See, e.g.*, *United States v. Yunis*, 859 F.2d 953 (D.C. Cir. 1988) ("*Yunis I*") (intensive questioning, seasickness, broken wrists, unfamiliarity with legal system not coercive); *Carter v. Thompson*, 690 F.3d 837, 844 (7th Cir. 2012) (juvenile questioned over fifty-five hour period not coercive); *United States v. Williams*, 612 F.3d 417 (6th Cir. 2010) (questioned 24 hours, with breaks not coercive); *United States v. Stokes*, 631 F.3d 802 (6th Cir. 2011) (placed in a small room, handcuffed to a chair, and interviewed over the course of several hours in the very early morning, promise to relay cooperation to the prosecutor not coercive); *United States v. New*, 491 F.3d 369, 374 (8th Cir. 2007) ("influence of medications, the 'psychological implications' of his circumstances, and his physical helplessness in a strange location" not coercive); *Abela v. Martin*, 380 F.3d 915 (6th Cir. 2004) (intoxication, broken nose, pain medication not coercive). If, however, the defendant's statement were deemed to have been coerced, suppression of the statement – not divesture of personal jurisdiction – would be the proper remedy. *Chavez v.*

*Martinez*, 538 U.S. 760, 767 (2003) (plurality opinion) ("Statements compelled by police interrogations of course may not be used against a defendant at trial").

**VII.   Even if the apprehension of the defendant violated any law or treaty, he should not be returned to Libya.**

Even if the defendant's allegations were supported by competent evidence and true,[12] under well-established precedent, each of his arguments is meritless as a matter of law.

### A.   Pursuant to the *Ker-Frisbie* doctrine, a defendant may be forcibly apprehended and brought to the United States to stand trial.

More than a century ago, in *Ker v. Illinois*, 119 U.S. 436 (1886), the Supreme Court rejected a claim that the due process clause of the Fourteenth Amendment was violated by the claimed kidnaping of Ker in Peru by an emissary of the President of the United States.   Ker alleged that he had been arrested in Peru "forcibly and with violence," kept a "close prisoner" on a ship that transported him to Honolulu, then transferred "in the same forcible manner" to another ship that brought him to San Francisco.   From San Francisco he claimed he was transferred as a prisoner to Illinois, where he was tried and convicted in the criminal court of Cook County.   *Id.* at 437-39.   Ker also claimed that from the time of his arrest in Peru until he was delivered to the authorities in Cook County, he was refused any opportunity to communicate with anyone or seek any advice or assistance.   *Id.* at 439.   The Supreme Court held that the apprehension and detention of Ker did not violate the due process clause, which "is complied with when the party is regularly indicted by the proper grand jury in the state court, has a trial according to the forms and modes prescribed for such trials, and when, in that trial and proceedings, he is deprived of no rights to which he is lawfully entitled."   *Id.* at 440.

---

[12]      The government does not concede the accuracy of the defendant's factual allegations, but assumes *arguendo* that they are accurate for purposes of the legal discussion in this section of the Opposition.

> [F]or mere irregularities in the manner in which [a prisoner] may be brought into custody of the law, we do not think he is entitled to say that he should not be tried at all for the crime with which he is charged in a regular indictment.
>
> *          *          *
>
> There are authorities of the highest respectability which hold that . . . forcible abduction is no sufficient reason why the party should not answer when brought within the jurisdiction of the court which has the right to try him for such an offense, and presents no valid objection to his trial in such court.

*Id.* at 440, 444.

During the next 66 years, the Supreme Court "never departed from the rule announced in *Ker*, that the power of a court to try a person for the commission of a crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.'" *Frisbie v. Collins*, 342 U.S. 519, 522 (1952) (footnote omitted).   Then, echoing *Ker*, the Supreme Court in *Frisbie* explained that "due process of law is satisfied when one present in court is convicted of crime after having been fairly apprised of the charges against him and after a fair trial in accordance with constitutional procedural safeguards.   *There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will*."   *Id.* at 522 (emphasis added).

## B.     There is no exception to the *Ker-Frisbie* doctrine authorizing the divestiture of personal jurisdiction.

The defendant claims (at 16) that the manner in which he was seized and detained "shock[s] the conscience."   Accordingly, he argues (at 17) that his seizure falls within an exception to the *Ker-Frisbie* doctrine.   The claimed exception is based on the Second Circuit's opinion in *United States v. Toscanino*, 500 F.2d 267 (2nd Cir. 1974).   Our circuit, however, has expressed skepticism as to whether such an exception even exists:

Principally, [the appellant] relies on *United States v. Toscanino*, 500 F.2d 267 (2d

24

Cir.1974), in which the court held that due process requires courts to divest themselves of personal jurisdiction acquired through "the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights."   *Id.* at 275.   *Toscanino* establishes, *at bes*t, only a very limited exception to the general rule (known as the "*Ker–Frisbie* doctrine") that "the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.'" [citation omitted] *Toscanino's* rule has, moreover, *been limited to cases of "torture, brutality, and similar outrageous conduct*," [citation omitted], and the Supreme Court *has since reaffirmed the Ker-Frisbie doctrine* [citation omitted].

*Yunis II*, 924 F.2d at 1092-93 (emphasis added); *see also United States v. Rezaq*, 134 F.3d 1121, 1130 (D.C. Cir. 1998) ("we have suggested that there may be a 'very limited' exception for certain cases of 'torture, brutality, and similar outrageous conduct.'").

In *Toscanino*, the "Second Circuit, faced with particularly gruesome facts, blurred the bright line rule of *Ker-Frisbie*."   *United States v. Yousef*, 08 Cr. 1213 (JFK), 2011 WL 2899244, at *6 (S.D.N.Y. June 30, 2011).   *Toscanino*, an Italian citizen convicted in federal court of a drug conspiracy charge, alleged that he had arrived in court after being forcibly abducted in Uruguay by paid agents of the United States, who lured him from his home, knocked him unconscious with a gun, placed a gun to his head during the abduction, and took him to Brazil where he was tortured and interrogated before being drugged and placed on a plane to the United States.   *Toscanino*, 500 F.2d at 268-70.   Toscanino claimed that his torture and interrogation lasted for 17 days, during which electrodes were attached to his genitals, toes and earlobes, and he was shocked into unconsciousness.   *Id.*   He also claimed that alcohol was flushed into his eyes and nose and other fluids were forced up his anus.   *Id.*   In addition, he said, his fingers were pinched with metal pliers, and he was forced to walk for seven or eight hours at a time then kicked and beaten when he could no longer stand.   *Id.*   During this period of torture and interrogation, Toscanino claimed, he was denied sleep and all forms of nourishment for days at a time; moreover, only enough

nourishment was provided, intravenously, to keep him alive.   *Id.*   Toscanino further alleged that a member of the Bureau of Narcotics and Dangerous Drugs of the U.S. Department of Justice was present at times and "actually participated in portions of the interrogation," and the federal prosecutor handling the case was aware of the interrogation and received reports as to its progress. *Id.*

The Second Circuit recognized that under "the so-called '*Ker-Frisbie*' rule, due process was limited to the guarantee of a constitutionally fair trial, regardless of the method by which jurisdiction was obtained over the defendant.   Jurisdiction gained through an indisputably illegal act might still be exercised, even though the effect could be to reward police brutality and lawlessness in some cases."   *Toscanino*, 500 F.2d at 272.   Nevertheless, the *Toscanino* court reasoned that other Supreme Court decisions had "expanded the interpretation of 'due process' . . . to bar the government from realizing directly the fruits of its own deliberate and unnecessary lawlessness in bringing the accused to trial."   *Id.* (citations omitted).   *Toscanino* relied principally on the decision in *Rochin v. California*, 342 U.S. 165 (1952), which although decided before *Frisbie* appeared to the *Toscanino* court to have "anticipated" the "erosion of *Frisbie* . . . ," *Toscanino*, 500 F.2d at 273, and the decision in *Mapp v. Ohio*, 367 U.S. 643 (1961).   Those decisions, the *Toscanino* court wrote, "unmistakably contradict [the Supreme Court's] pronouncement in *Frisbie* that 'due process of law is satisfied when one present in court is convicted of crime after being fairly apprised of the charges against him and after a fair trial in accordance with constitutional procedural safeguards.'"   500 F.2d at 274.   *Toscanino* also viewed the "force of *Rochin*" as "continu[ing] to be recognized" in the Supreme Court's *dictum* in *United States v. Russell*, 411 U.S. 423 (1973), that it "'may someday be presented with a situation

in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction . . . .'" *Toscanino*, 500 F.2d at 274 (quoting *United States v. Russell*, 411 U.S. at 431-32 (citing *Rochin*, 342 U.S. at 165)).   The Second Circuit remanded the case for an evidentiary hearing with respect to Toscanino's allegations, *id.* at 281, and on remand, the defendant's motion to dismiss was denied.   *United States v. Toscanino*, 398 F. Supp. 916 (E.D.N.Y. 1975).

Less than one year later, the Second Circuit retreated from the broad holding of *Toscanino*, essentially restricting it to its unique facts.   In *United States ex rel. Lujan v. Gengler*, 510 F.2d 62, 65 (2d Cir. 1975), the Second Circuit wrote that "[i]n recognizing [in *Toscanino*] that *Ker* and *Frisbie* no longer provided a *carte blanche* to government agents bringing defendants from abroad to the United States by the use of torture, brutality and similar outrageous conduct, we did not intend to suggest that any irregularity in the circumstance of a defendant's arrival in the jurisdiction would vitiate the proceedings of the criminal court."   Further, the *Lujan* court noted, *Toscanino* "scarcely could have meant to eviscerate the *Ker-Frisbie* rule, which the Supreme Court has never felt impelled to disavow.   Although we cited other cases in *Toscanino* as evidence of the partial erosion of *Ker* and *Frisbie*, the twin pillars of our holding were *Rochin v. California*, 342 U.S. 165 (1952), and *dictum* in *United States v. Russell*, 411 U.S. 423, 431-32 (1976), both of which dealt with government conduct of a most shocking and outrageous character."   *Id.* (footnote omitted).   The *Lujan* court was "forced to recognize that, absent a set of incidents like that in *Toscanino*, not every violation by prosecution or police is so egregious that *Rochin* and its progeny requires nullification of the indictment."   *Id.* at 66.

Lujan, a citizen of Argentina, alleged that he was lured by someone paid by American

agents from Argentina to Bolivia where he was taken into custody by Bolivian police, who were acting as paid agents of the United States. *Id.* at 63. He claimed to have been held *incommunicado* for six days in Bolivia until he was placed, by Bolivian police and American agents, on a plane to New York, where he was arrested. *Id.* These allegations, the court held, were not the "complex of shocking governmental conduct sufficient to convert an abduction which is simply illegal into one which sinks to a violation of due process," *id.* at 66, and it affirmed the dismissal without a hearing on Lujan's petition for a writ of *habeas corpus*. *Id.* at 63-64.

Since *Toscanino* was decided, the Supreme Court has reaffirmed the *Ker-Frisbie* doctrine at least five times, most recently in *United States v. Alvarez-Machain*, 504 U.S. 655 (1992). In *Alvarez-Machain*, a Mexican national was brought to federal court in the United States for trial on kidnaping and murder charges after being forcibly kidnaped himself in Mexico. Although they did not participate personally in the abduction, DEA agents were found to be responsible for it because they had offered to pay a reward for the delivery of the defendant to the United States. *Id.* at 657 & n.2. The Supreme Court held that although the defendant's abduction "may be . . . 'shocking'" and "may be in violation of general international law principles," since it was not in violation of the extradition treaty between the United States and Mexico, "the rule of *Ker v. Illinois* is fully applicable to this case. The fact of respondent's apprehension does not therefore prohibit his trial in a court in the United States for violation of the criminal laws of the United States." *Id.* at 669-70 (citation omitted); *see also INS v. Lopez-Mendoza*, 468 U.S. 1032, 1039-40 (1984) ("[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred") (citing *Frisbie*; other citations omitted); *United States v. Crews*,

28

445 U.S. 463, 474 (1980) ("[a]n illegal arrest, without more, has never been viewed as a bar to subsequent prosecution") (citing *Frisbie* and *Ker*; other citation and footnote omitted); *Stone v. Powell*, 428 U.S. 465, 484-85 (1976) (court rejects argument in part because it "would require . . . retreat from the proposition that judicial proceedings need not abate when the defendant's person is unconstitutionally seized") (citing *Frisbie*; other citation omitted); *Gerstein v. Pugh*, 420 U.S. 103, 119 (1975) ("[n]or do we retreat from the established rule that illegal arrest or detention does not void a subsequent conviction") (citing *Frisbie* and *Ker*).

In sum, "[s]ubsequent decisions of the Supreme Court indicate that there is reason to doubt the soundness of the *Toscanino* exception, even as limited to its flagrant facts . . . .   In light of these cases, it appears clear that the *Ker-Frisbie* doctrine has not eroded and that the exception described in *Toscanino* rests on shaky ground."   *United States v. Best*, 304 F.3d 308, 312-13 (3d Cir. 2002) (citations omitted); *see also United States v. Matta-Ballesteros*, 71 F.3d 754, 763 (9th Cir. 1995) ("[i]n the shadow cast by *Alvarez-Machain*, attempts to expand due process rights into the realm of foreign abductions, as the Second Circuit did in [*Toscanino*], have been cut short"); *United States v. Mitchell*, 957 F.2d 465, 470 (7th Cir. 1992) ("we have declined to follow the exclusionary rule grounds of *Toscanino* and have questioned its continuing constitutional vitality") (citation omitted); *United States v. Darby*, 744 F.2d 1508, 1531 (11th Cir. 1984) ("the continuing validity of the *Toscanino* approach is questionable after the intervening decision in [*Gerstein*], in which the Supreme Court refused to 'retreat from the established rule that illegal arrest or detention does not void a subsequent conviction'") (quoting *Gerstein v. Pugh*, 420 U.S. 103, 119 (1975)) (footnote omitted).

The Second Circuit, itself, has cast doubt on the sturdiness of the "twin pillars" on which it

said, in *Lujan*, that *Toscanino* rested.   In *Brown v. Doe*, 2 F.3d 1236 (2d Cir. 1993), the Second

Circuit noted that the *dictum* in *Russell* was "brought into question by *Hampton v. United States*,

425 U.S. 484 (1976)," (*id.* at 1242), and also noted that "viewed in light of the Supreme Court's

subsequent exclusionary rule decisions, *Mapp v. Ohio*, 367 U.S. 643 (1961), and *Wong Sun v.

United States*, 371 U.S. 471 (1963), *Rochin* stands at most for the proposition that a prosecution

may effectively be foreclosed by exclusion of evidence tainted by a Fourth Amendment violation."

2 F.3d at 1243 (citing *United States v. Crews*, 445 U.S. 463, 474 n.20 (1980)).[13]

### C.   Even if the purported *Toscanino* exception to the *Ker-Frisbie* doctrine still exists, the defendant has failed to allege conduct that would "shock the conscience."

Even if a very narrow exception to the *Ker-Frisbie* doctrine exists, it would surely require

conduct significantly more outrageous than that alleged by the defendant.   The defendant

complains (at 4) that he was handcuffed, gagged, and a hood was placed over his head for

transport.   During his capture, the defendant claims that he received a cut on his head and

"injuries to his wrist, face, and arm."   *Id.*   He then argues (at 16) that this Court should divest

itself of personal jurisdiction because "his abduction was the product of a year-long government

conspiracy to use the most elite of the U.S. military forces to illegally arrest him, violate Libyan

sovereignty, and circumvent the Constitution."   Based on this, the defendant claims (at 7) that the

"government's tactics and behavior 'shocks the conscience . . . .'"   Even if the defendant's

---

[13]      Even district courts in the Second Circuit have recognized that *Toscanino* likely is no longer good law. *See, e.g.*, *Al Liby,* 23 F.Supp.3d at 198 ("It is reasonably clear that *Toscanino* no longer is good law.   To the extent, if any, that it survives, its holding is restricted to the outrageousness of its facts."); *United States v. Ghailani*, 751 F. Supp. 2d 502, 507 (S.D.N.Y. 2010) ("it is doubtful that *Toscanino* remains authoritative"); *Yousef*, 2011 WL 2899244 at *7 (referring to "the unlikely event that *Toscanino* remains good law"); *United States v. Umeh*, 762 F. Supp. 2d 658, 663 (S.D.N.Y. 2011) ("while the Second Circuit has never explicitly overruled *Toscanino*, the fact that both of the pillars on which it rests have been removed suggests that all that remains is a rhetorical facade wholly lacking in legal foundation"), *aff'd*, 527 Fed. App'x. 57 (2nd Cir. 2013).

allegations were true, they do not come close to shocking the conscience.

The defendant's allegations come nowhere near the "'torture, brutality and similar outrageous conduct,'" *Yunis II*, 924 F.2d at 1093, required to fall within whatever may remain of the *Toscanino* exception. In *Yunis*, the D.C. Circuit was confronted with an overseas apprehension. Yunis was lured to a meeting on a boat. *Yunis I*, 859 F.2d at 954. Upon his arrival, the American agents "grabbed [Yunis's] arms and kicked his feet out from under him, so that he ended up face down on the deck of the boat." Yunis was handcuffed so forcibly that his wrists were broken. He was then taken to a United States Navy ship, where he was placed in a "small" "poorly ventilated" room. *Id.* And for two days, while being interrogated, Yunis experienced seasickness, which caused nausea, and "dry heaves." *Id.* at 955-56. Finally, Yunis was "sedated for a long confining flight" to the United States. *Id.* at 957. After reviewing these circumstances, the D.C. Circuit held, "we now find nothing in the record suggesting the sort of intentional outrageous government conduct necessary to sustain [Yunis's] jurisdictional argument." *Yunis II*, 924 F.2d at 1093.[14] *See also United States v. Matta-Ballesteros*, 71 F.3d 754, 761, 764 (9th Cir. 1996) (allegations that defendant was beaten and burned with a stun gun at the direction of United States Marshals while bound and with a black hood over his head on the floor of a car, and then beaten and tortured by a stun gun applied to various parts of his body, including his feet and genitals during his flight to the United States, alleged acts that "were not nearly as egregious as those committed in *Toscanino*"); *United States v. Cordero*, 668 F.2d 32, 37 (1st Cir. 1981) (evidence that defendants, while in Panamanian jails, were insulted, pushed, slapped, poorly fed, required to sleep on the floor and huddle in a corner to avoid the splashing of

---

[14] The defendant's reliance (at 15) on *Yunis I*, 859 F.2d at 969, regarding what he characterizes as "(barely) acceptable standards" for an "international arrest," is misplaced, as the passage relied upon by the defendant addresses the admissibility of a custodial statement – not the propriety of an overseas arrest.

urine coming from prisoners in other cells shows conditions that "are a far cry from deliberate torture" and "does not show the outrageous conduct involved in *Toscanino*") (Breyer, C.J.); *United States v. Ceja*,  543 Fed. App'x. 948, 954 (11th Cir. 2013) (claims that Mexican agents pointed rifles at defendant's face, hit him and stole his personal property when they arrested him before bringing him to the Mexican-American border and turning him over to an American immigration officer "do not assert the kind of cruelty and inhumane treatment necessary to prompt [the Eleventh Circuit] to consider carving out an exception to the *Ker-Frisbie* doctrine"); *United States v. Cournoyer*, No. 12 Cr. 65 (SLT), 2012 WL 6539659, at *1-3 (E.D.N.Y. Dec. 14, 2012) (claims that Mexican authorities acting at the direction of the U.S. government choked defendant to a near loss of consciousness, "stomped" on his hand, made threats he believed meant he would be killed if he failed to get on a plane to the United States, denied him food, drink, and bedding for more than 32 hours, and, while he was on the plane, covered his head with a hood and shackled his hands and feet together and to the floor so he was forced to hunch over so his head was in his lap are not "remotely comparable to the deliberate and prolonged torture alleged in *Toscanino*"); *United States v. Awadallah*, 202 F. Supp. 2d 17, 42 (S.D.N.Y. 2002) ("'no court, including the *Toscanino* court which remanded the case for factual findings, has ever found conduct that rises to the level necessary to require the United States to divest itself of jurisdiction'") (quoting *Matta-Ballesteros v. Henman*, 896 F.2d 255, 261 (7th Cir. 1990)) (footnote omitted).

Nor does the alleged conduct during the defendant's interrogation come anywhere close to "torture, brutality and similar outrageous conduct," "cruel, inhuman and outrageous treatment," or "truly disturbing facts."   Indeed, the defendant does not allege physical torture or cruelty during the interrogation at all.   Instead, he claims (at 13-14) that he was questioned without being given

*Miranda* warnings and that his request for counsel was ignored.   The defendant has cited no case, and the government is aware of none, in which such complaints have been deemed to be even close to sufficient to fall within a supposed exception to the *Ker-Frisbie* doctrine.   *See Al Liby*, 23 F.Supp.3d at 200 ("This Court … concludes that *Toscanino,* to whatever extent it survives, does not support al Liby here.   Al Liby's counsel has not alleged torture or brutality, nor has he asserted other outrageous conduct of the sort asserted in *Toscanino.*   Al Liby's apprehension rests squarely within the well-established *Ker–Frisbie* rule.   The motion to dismiss the indictment based on the asserted "inhumane treatment" would be denied without a hearing even if there were competent evidence to support al Liby's factual assertions."); cf. *Ker*, 119 U.S. at 439 (the plea in abatement "is very full of averments that the defendant protested, and was refused any opportunity whatever . . . of communicating with any person or seeking any advice or assistance . . .").[15]

Last, the defendant argues (at 17) that the *Ker-Frisbie* doctrine does not apply here because the defendant's capture involved planning at the highest levels of the Executive Branch, as opposed to being carried out by a few "rogue" agents.   Notwithstanding defendant's hyperbolic characterization of his apprehension as an "invasion" of Libya,[16] the fact that the defendant's capture may have been well planned does not violate the *Ker-Frisbie* doctrine.

---

[15]     The defendant purports (at 18) to be seeking his return to Libya (*i.e.* divestiture of personal jurisdiction) rather than dismissal of the indictment.   This distinction does not affect the analysis.   First, *Toscanino* itself involved divesture of personal jurisdiction.   *Yunis II*, 924 F.2d at 1092 ("*United States v. Toscanino*, 500 F.2d 267 (2d Cir.1974), in which the court held that due process requires courts to *divest themselves of personal jurisdiction*") (emphasis added).   More importantly, divestiture would not be the appropriate remedy for a due process violation, in any event.   *See, e.g.*, *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984) ("The 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred."); *United States v. Crews*, 445 U.S. 463, 474 (1980) ("Respondent is not himself a suppressible "'fruit'").

[16]     *See* Dkt. #89 at 4 ("the United States launched a full-scale military operation to invade Libya and execute the arrest of Mr. Abu Khatallah without Libya's permission or knowledge); *see also Id*. at 3, 9, & 19.

For example, on December 15, 1989, then-President Bush actually ordered a full-scale invasion of a sovereign country to effectuate the arrest of a criminal defendant. *United States v. Noriega*, 746 F. Supp. 1506, 1511 (S.D. Fla. 1990), *aff'd*, 117 F.3d 1206 (11th Cir. 1997). Like the defendant here, General Noriega claimed that "the manner in which he was brought before the district court (*i.e.*, through a military invasion) was [] unconscionable . . . ." *United States v. Noriega*, 117 F.3d 1206, 1214 (11th Cir. 1997). The Eleventh Circuit, however, rejected that claim, finding that the invasion of Panama in order to apprehend Noriega did not violate the *Ker-Frisbie* doctrine. *Id.*; *cf. Alvarez-Machain*, 504 U.S. at 668 ("it cannot seriously be contended that an invasion of the United States by Mexico would violate the terms of the Extradition Treaty between the two nations").

In sum, if *Toscanino* retains any vitality at all, the defendant's allegations – even if true – come nowhere near the truly disturbing conduct required to fall within its reach.[17] The defendant's motion, therefore, should be denied without a hearing. *See, e.g., United States v. Law,* 528 F.3d 888, 903-04 (D.C. Cir. 2008) ("A defendant is entitled to an evidentiary hearing on his motion to suppress 'only upon factual allegations which, if established, would warrant relief.'"), quoting *United States v. Thornton*, 454 F.2d 957, 967 n.65 (D.C. Cir. 1971); *United States v. Lewis*, 40 F.3d 1325, 1332 (1st Cir. 1994) (defendant not entitled to a hearing unless he alleges "facts that, if proven, would entitle him to relief"); *United States v. Harrelson*, 705 F.2d 733, 737 (5th Cir. 1983) ("Evidentiary hearings are not granted as a matter of course, but are held only when the defendant alleges sufficient facts which, if proven, would justify relief."); *United*

---

[17]     Furthermore, as discussed above, neither violating the Posse Comitatus Act (*see* § IV.D, *supra*), treaties (*see* §V.B, *supra*), nor constitutional rights (*see* § VI, *supra*), would constitute grounds for the Court to divest itself of personal jurisdiction over the defendant.

*States v. Migely*, 596 F.2d 511, 513 (1st Cir. 1979) (in order to merit a hearing, the defendant's

"factual allegations must be such that, if proved, would require the grant of relief motion"); *United*

*States v. Yousef*, 2011 WL 2899244 at *8 (S.D.N.Y June 30, 2011) ("[s]ince the allegations, taken

entirely at face value and in the light most favorable to the defense, reveal no conduct that shocks

the conscience, there is no need for an evidentiary hearing on this motion").[18]

---

[18]     The defendant also claims (at 21-22) that he lacks recourse via a civil remedy for the alleged violations of his rights, and, therefore, the Court should divest itself of personal jurisdiction.   The government takes no position on the viability of any civil action contemplated by the defendant, but the unavailability of such remedy has no bearing on the application of the *Ker-Frisbie* doctrine.   While in *Ker*, the Supreme Court noted that the defendant may have had a basis for a civil action, it did not base its decision on the availability of a civil remedy.   Instead, the Supreme Court held that the Constitution did not prohibit the prosecution of an individual who was "forcibl[y] seiz[ed] in another country, and transfer[ed] by violence, force, or fraud to this country."   119 U.S. at 444.   The defendant cites no cases which hold that the *Ker-Frisbie* doctrine does not apply if civil recourse is unavailable.   This is not surprising, as it would be a strange logic if the application of a constitutional protection turned on the availability of a civil remedy.

## VIII.   Conclusion.

Inasmuch as the apprehension of the defendant and his transportation to the United States to stand trial was completely consonant with controlling Supreme Court precedent and violated neither the Posse Comitatus Act, any treaty, nor the Constitution, the defendant's motion for return to Libya should be denied.

Respectfully submitted,

VINCENT H. COHEN, JR.
ACTING UNITED STATES ATTORNEY
D.C. Bar Number 471489

_____/s/_____
Michael C. DiLorenzo
MD Bar No. 931214 0189
Julieanne Himelstein
D.C. Bar No. 417136
Opher Shweiki
D.C. Bar No. 458776
John Crabb Jr.
N.Y. Bar No. 2367670
David Goodhand
D.C. Bar No. 438844
Assistant United States Attorneys
National Security Section
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7809
michael.dilorenzo@usdoj.gov