## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **14-cr-141 (CRC)** |
| | : | |
| **AHMED ABU KHATALLAH** | : | |

### DEFENDANT'S REPLY TO GOVERNMENT'S OPPOSITION TO
### MOTION TO DISMISS FOR LACK OF EXTRATERRITORIAL JURISDICTION

Defendant submits this reply in support of Defendant's Motion to Dismiss for Lack of Extraterritorial Jurisdiction [Dkt. 91] ("Motion").  The government opposes the Motion, arguing that, despite the fact that none of the disputed criminal statutes reflect a clear intent to be applied extraterritorially, because there are various U.S. interests at issue, the Court should find jurisdiction here.  This framework turns governing law on its head.  Any decision on whether the statutes upon which Mr. Abu Khatallah's indictment stands must apply the law of this Circuit, and of course, the Supreme Court, which has repeatedly-- and recently-- declared that a statute is presumed not to apply extraterritorially unless there is a "clear indication" to the contrary. *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1669 (2013).  "When a statute gives no clear indication of an extraterritorial application, it has none." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010); *United States v. Ali*, 718 F.3d 929, 935 (D.C. Cir. 2013) (same; finding laws regarding piracy apply extraterritorially because the crime occurs on the high seas). While the government appears exasperated that Defendant made this standard a common refrain in his brief, it is, in fact, the law of the land, and must be applied here to dismiss all but Count Three of the superseding indictment.

The government pushes for a looser interpretation of the law, grounded primarily in a 2000 decision of the Southern District of New York and subsequent Second Circuit decisions in which the court has been willing to apply statutes extraterritorially if the "nature of the offense" permits such an inference.[1]  The District of Columbia Circuit has never embraced this framework; if it examines the "character of the offense," it always relies on "specific textual evidence" in support of any finding of extraterritorial jurisdiction.  *United States v. Delgado-Garcia*, 374 F.3d 1337 (D.C. Cir. 2004).  The government nevertheless argues that there is no conflict between Second Circuit and D.C. Circuit law, even while acknowledging that some of the Second Circuit's foundational principles are patently wrong.  For instance, in *United States v. Siddiqui*, the Second Circuit cites one of its own decisions for the point that "the ordinary presumption that laws do not apply extraterritorially has no application to criminal statutes."  699 F.3d 690, 701 (2d Cir. 2012), *as amended* (Nov. 15, 2012).  This is inconsistent with the clear rulings of the Supreme Court and D.C. Circuit, which hold that the presumption against extraterritoriality is applicable in *all* cases.  *Kiobel*, 133 S. Ct. at 1659, 1669; *Morrison*, 561 U.S. at 261; *United States v. Philip Morris USA, Inc.*, 783 F. Supp. 2d 23, 27 (D.D.C. 2011).  To salvage its argument, the government weakly points to the remainder of the *Siddiqui* analysis as similar to the D.C. Circuit's, but the court cannot eliminate inconsistencies in the jurisprudence by simply ignoring them.  Opp. at 6 n. 4.  It is true, as the government points out, that the court in *Delgado-Garcia*, while rebutting a point made by the dissent, cited to *Kollias v. D&G Marine*

---

[1] The Second Circuit based its "nature of the offense" standard on *United States v. Bowman*, 260 U.S. 94, 98, 43 S. Ct. 39, 41, 67 L. Ed. 149 (1922), in which the Court examined a statute that specifically prohibited a consul from certifying a false invoice and or forging a ship's papers, both of which naturally occur outside the United States.  The Court therefore found that the "nature of the crime" supported a finding of extraterritorial application; it did not discuss the presumption against extraterritoriality which has since become the cornerstone of all jurisdictional analyses.

*Maintenance*, 29 F.3d 67 (2d Cir. 1994), it did so only for the point that the presumption applies

unless a contrary intent appears.  374 F.3d at 1344.  Moreover, the fact that the D.C. Circuit cited

a Second Circuit case from the 1990s does not mean that the court has subsequently adopted the

last two decades of Second Circuit jurisprudence.  If anything, opinions issued within this Circuit

since then shows that the court has been steadfast in its adherence to the Supreme Court's

mandatory presumption against extraterritoriality.

      Unsurprisingly, using the incorrect standard, the government wrongly concludes that each

of the criminal statutes at issue applies extraterritorially.  The government offers transparently

results-oriented legal arguments, gladly relying on legislative history in some instances, and

disparaging Mr. Abu Khatallah's reliance on the same where congressional reports cut against

the government's stance.  This is emblematic of the Supreme Court's concern in *Morrison*:

"This disregard of the presumption against extraterritoriality has occurred over many decades in

many courts of appeals and has produced a collection of tests for divining congressional intent

that are complex in formulation and unpredictable in application.  The results demonstrate the

wisdom of the presumption against extraterritoriality."  *Morrison*, 561 U.S. at 248.  To avoid this

confusion, this Circuit demands that "courts must find clear and independent textual support --

rather than relying on mere inference -- to justify the nature and extent of each statutory

application abroad."  *Validus Reinsurance, Ltd. v. United States*, 786 F.3d 1039, 1047 (D.C. Cir.

2015).  The government's unfounded, inferential leaps of reasoning do not suffice to rebut the

presumption against extraterritoriality.

**1.  The Government Offers No Basis for Finding that § 1114 Applies Extraterritorially.**

      The government fails to provide any basis for concluding that § 1114 -- which prohibits

killing or attempting to kill any officer or employee of the United States -- applies

extraterritorially. First, it claims that because the statute applies to "any" officer, it must apply abroad, because there are U.S. officers and employees abroad. The Supreme Court in *Kiobel* specifically found that "generic terms like 'any' or 'every' do not rebut the presumption against extraterritoriality." 133 S. Ct. at 1665. The use of the word "any" thus has no bearing on whether § 1114 applies extraterritorially.

Second, the legislative history does not support a finding of intent to apply § 1114 abroad. The government selectively -- if not misleadingly -- quotes from the House Report concerning Pub. L. No. 104-132, which contained § 1114 and a number of other statutes. The government notes that the legislature observed the need to prohibit terrorist acts that "transcend national boundaries." Opp. at 8. That is true, but § 1114 was not the mechanism by which the legislature did so. Instead, this quotation seems to be a rather plain reference to the part of the statute entitled "Acts of terrorism transcending national boundaries" to be codified at 18 U.S.C. § 2332. That statute contains a specific provision stating "[t]here is extraterritorial Federal jurisdiction." H.R. REP. NO. 104-383, at 5 (1995). Conversely, § 1114 does not.

Nor does the general purpose of the legislation point to a broad intent for the laws therein to apply abroad. Rather, the report made it clear that the focus of the legislation was domestic: "Title I of H.R. 1710 establishes new federal criminal offenses directed at terrorist activities inside the United States." *Id.* at 38. The government notes that the report cites examples of international terrorism, but it neglects to acknowledge that the report also condemns the 1993 World Trade Center bombing, and observed that "[w]ith the bombing of the Alfred P. Murrah Federal Building in Oklahoma City, on April 19, 1995, the need for this legislation was dramatically and tragically reinforced." *Id.* at 37. Where Congress intended to authorize extraterritorial application of a law, as with § 1116 and § 2332, it explicitly said so. To accept

4

the government's contention that Congress nevertheless silently intended for § 1114 to have the same application would violate the long-standing "canon against interpreting any statutory provision in a manner that would render another provision superfluous." *Bilski v. Kappos*, 561 U.S. 593, 607-608 (2010). There is simply no "independent textual support" for § 1114's extraterritorial application (*Validus*, 786 F.3d at 1047); the existence of pre-*Kiobel* precedent outside this Circuit does not change that. Accordingly, the court should dismiss Counts Five through Nine of the indictment.

**2. The Government Has Not Rebutted the Presumption against the Extraterritorial Application of § 930(c).**

The government makes no attempt to point to independent textual evidence or any clear indication in support of its argument that § 930 applies extraterritorially. It is the burden of the party seeking to apply U.S. law to events abroad to overcome the presumption of extraterritoriality. *E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, 249 (1991); *Labor Union of Pico Korea, Ltd. v. Pico Prods., Inc.*, 968 F.2d 191, 194 (2d Cir. 1992).

With respect to § 930, the government relies on a "natural inference" that the prohibited acts -- killing a person in the course of an attack on a federal facility -- "would occur in an extraterritorial location." Opp. at 12. It so concludes because there are federal facilities abroad. This reasoning falls far short of the standard in this Circuit, which does not allow courts to "rely[] on mere inference [] to justify the nature and extent of each statutory application abroad." *Validus*, 786 F.3d at 1047. In the absence of a clear indication supporting its assertion of § 930's extraterritoriality, Counts Ten through Thirteen must be dismissed.

Nothing in the legislative history supports a Congressional intent to make § 930(c) apply abroad. The amendment to § 930(c) was passed as part of a series of laws targeting murder committed by escaped prisoners, murder of state or local officials assisting federal law

enforcement officials, the protection of court officers and jurors, and the retaliatory killings of witnesses, victims, and informants.  H.R. REP. NO. 103-711, at 184-187 (1994) (Conf. Rep.). Not only is the legislative history silent on the extraterritorial application of § 930(c), any such "natural inference" (Opp. at 12) based on context would lead a reasonable person to conclude that the section was intended to be exclusively domestic.

### 3.  The Government Has Not Rebutted the Presumption Against the Extraterritorial Application of § 844(f).

The government similarly declines to meet its burden to overcome the presumption with respect to the extraterritorial application of § 844(f) -- which penalizes the destruction of U.S. property and causing the death of a person while doing so.  The government cites no independent textual support, and offers no "clear indication" that Congress intended the statute to apply extraterritorially.  Instead, the government protests that it is "inconceivable" that U.S. property located in a foreign country would be excluded from this statute.  Opp. at 13.  Yet, nothing on the face of the statute forces the conclusion that § 844(f) has global reach.  The government again cites *United States v. Bin Laden*, 92 F. Supp. 2d 189, 198 (S.D.N.Y. 2000), in which the court found that the statute applied extraterritorially because its punishment was not confined to U.S. citizens, but applied "irrespective of the nationality of the offender."  This is an absurd conclusion.  With the exception of perhaps treason, every criminal law in the United States applies to everyone regardless of his or her nationality.  In any event, *Bin Laden* is of no use here, where conclusory assertions do not meet this Circuit's requirements for a finding of extraterritorial application of a law.

Again, the government declines to make even a passing effort to offer any legislative history or other contextual support for its bare declaration that § 844(f) applies extraterritorially. The legislative history of the provision would not buttress that conclusion.  Rather, the related

congressional investigation clearly evidences the intent to address property within the United States that had become vulnerable to a rash of domestic bombings on account of protests against the Vietnam War.  "Hearings conducted as part of an investigation led by Senator John L. McClellan, Democrat of Arkansas, concluded that from January 1969 to April 1970, the United States sustained 4,330 bombings -- 3,355 of them incendiary, 975 explosive -- resulting in 43 deaths and $21.8 million in property damage."  Bobby Allyn, *1969, A Year of Bombings, City Room*, N.Y. TIMES, Aug. 27, 2009, *available at* http://cityroom.blogs.nytimes.com/2009 /08/ 27/1969-a-year-of-bombings/?_r=0.  The relevant House Report accordingly reflects the domestic nature of this problem:

> In addition, in view of the growing and widespread number of bombing outrages, the committee has recommended expanded federal investigative and prosecutive authority. For example, a new penalty provision proscribes malicious damage or destruction by means of explosives of any property owned, possessed or used by or leased to the United States (proposed sec. 844(f)). This section also protects real and personal property belonging to institutions and organizations receiving federal financial assistance such as universities, hospitals, and police stations. These provisions are designed to enable the federal government to participate more directly in the investigation and prosecution of such offenses. However, it is not the intention of the proposed statute that the federal government substitute for the enforcement activities of state and local authorities.

H.R. REP. NO. 91-1549, at 4014 (1970).  It would be highly unusual, if not downright bizarre, for Congress to characterize concerns about intrusions on foreign sovereignty as an issue of the federal government versus state authorities.  Plainly, the statute is talking about property within the United States, and the investigative duties of law enforcement organized under state and county government within the United States.  Section 844(f) does not apply extraterritorially, and so Counts Fourteen and Fifteen must be dismissed.

**4. The Government Has Failed to Rebut the Presumption Against Extraterritoriality for § 924(c).**

The government falls far short of showing that § 924(c) -- which penalizes the use of a firearm during "any" crime of violence -- has extraterritorial application. Instead, it bases its conclusion on the Eleventh Circuit's finding that "[o]n its face, there is simply no limitation in the language of [924(c)] concerning its application to crimes committed outside the United States." *United States v. Belfast*, 611 F.3d 783, 814 (11th Cir. 2010). This is the opposite of what the D.C. Circuit requires to find extraterritorial application; its courts do not recognize extraterritorial jurisdiction based on a lack of restrictions, but rather on a demonstrated, affirmative intent. *E.g., United States v. Yakou*, 428 F.3d 241, 252 (D.C. Cir. 2005). The statute itself does not indicate any such intent. It applies to "any crime of violence . . . for which the person may be prosecuted in a court of the United States." 18 U.S.C. § 924(c)(1)(A). The government stresses the clause "court of the United States" as evidence that the statute "surely" includes crimes "with extraterritorial application." Opp. at 15. But that phrase is not a geographical signifier; it is referencing the distinction between state government and federal government. As one court explained when examining the language of § 924(c):

> Put simply, outside of the District of Columbia, the phrase "crime of violence ... for which the person may be prosecuted in a court of the United States" is susceptible to only one meaning -- a federal, U.S. Code offense. This is true for two reasons. First, a federal district court is "a court of the United States," and there is no dispute that in the context of criminal jurisdiction, the phrase "may be prosecuted in a court of the United States" limits the application of § 924(c) to crimes of violence which can be charged in a federal district court. *See* Gov't's Opp'n at 2; 18 U.S.C. § 3231 ("The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States."). Second, it is axiomatic that federal courts do not have jurisdiction over state criminal offenses.

*United States v. Brown*, 58 F. Supp. 3d 115, 120 (D.D.C. 2014) *appeal dismissed sub nom.*

*United States v. Hicks*, No. 14-3052, 2014 WL 4627805 (D.C. Cir. Aug. 7, 2014). Accordingly,

the phrase "court of the United States" does not support the government's theory that the statute necessarily encompasses all crimes wherever they are committed. And, again, the use of the word "any" in a statute does not convert it into one with extraterritorial application. *Kiobel*, 133 S. Ct. at 1665. To the extent that courts outside this Circuit have held otherwise, their holdings have no application here, for there is no independent textual support to be found in favor of the contention that the statue applies extraterritorially.

The government chides the defense for citing "snippets" of legislative history -- although the government does the same in its own brief -- which prove that the focus of the Omnibus Crimes Control and Safe Streets Act of 1968, in which § 924(c) has its origin, was on gun violence in the United States. Opp. at 13. However, the government does not offer any evidence that the "snippets" misrepresented the legislative history, and it submits no alternative context or history signifying a different congressional intent. Should the Court find that § 924(c) is an ancillary offense, it would still have no application here, as none of the other charges at issue in the Motion has extraterritorial application. *United States v. Ali*, 718 F.3d 929, 939 (D.C. Cir. 2013) (ancillary offense jurisdiction is coterminous with that of the underlying offense). Count Eighteen should be dismissed.

### 5.  The Court May Draw the Legal Conclusion that § 1363 Does Not Apply Here.

The government obfuscates the Motion by claiming that the dispute over the applicability of 18 U.S.C. § 1363 in Count Seventeen is a factual one, citing *Yakou* for the proposition that if the government objects to the defendant's pretrial challenge of factual sufficiency of the indictment, then the Court is precluded from analysis. 428 F.3d at 247. But Mr. Abu Khatallah is not challenging factual sufficiency; he challenges the legal sufficiency of the indictment. And as stated in *Yakou*, a court may dismiss "counts of an indictment based on a question of law." *Id.*

None of the material facts needed to resolve the applicability of § 1363 are in dispute. Mr. Abu Khatallah alleges, and the government does not deny, that the Mission and Annex were established without the prior consent of the government of Libya.  *See* Opp. at 19.  And, the indictment reveals on its face that the location of the Annex was a secret; at paragraph 20(h), the government alleges that conspirators acquired "sensitive information about the location of the Annex."  Nor has the government disputed that the Annex was host to a covert team of CIA agents, as has been widely reported.

The special maritime and territorial jurisdiction of the United States is defined at 18 U.S.C. § 7.  The government identifies the most relevant language at paragraph (9), which after listing the entities included, states that "nothing in this paragraph shall be deemed to supersede any treaty or international agreement with which this paragraph conflicts."  The locations include "the premises of United States diplomatic, consular, military or other United States Government missions or entities in foreign States."  18 U.S.C. § 7(9).  The Vienna Convention on Diplomatic Relations expressly states that "[t]he sending State may not, without the *prior express consent* of the receiving State, establish offices forming part of the mission in localities other than those in which the mission itself is established."  April 18, 1961, art. 12, 23 U.S.T. 3227, 3244 ("Vienna Convention") (entered into force with respect to the United States on December 13, 1972) (emphasis added).  According to the language of the Vienna Convention, which is the "supreme law of the land," without prior consent, neither the Annex nor the Special Mission may comprise part of the mission, and thus there is no territorial jurisdiction under § 7(9).  U.S. Const. Art. VI; *Slater v. Biehl*, 793 A.2d 1268, 1272 (D.C. 2002) (enforcing terms of Vienna Convention on Diplomatic Relations).  Accordingly, the Court may rule now, on these undisputed facts, whether two entities in Libya -- one a "Special Mission" and the other a covert operation in a building,

10

neither of which were established with Libya's consent -- fit within the parameters of §7(9) if they violate a controlling treaty.  Concluding that they do, would recognize U.S. territorial jurisdiction where the Vienna Convention expressly says there can be none.

   *United States v. Passaro*, 577 F.3d 207 (4th Cir. 2009) provides no help to the government here.  While the court did articulate a list of factors to aid its determination of whether the entity at issue comported with the statute, that list related to whether an area constituted premises of a "military mission."  The court edified the limited application of these factors by remarking that the statute's inclusion of military missions would not include everywhere a "solider . . . pitches his pup tent"; the context was plainly military.  *Id*. at 214.  As to ordinary missions, *Passaro* forecloses a finding of territorial jurisdiction with respect to the Special Mission, having found that "[e]very other  'mission' encompassed within this statutory list uses the word as a foreign relations term of art signifying a particular type of fixed place."  *Id.* at 213-14.  It is impossible to characterize the Special Mission or Annex in Benghazi as the kind of diplomatic mission contemplated by the statute when the United States did not engage in the prerequisite diplomacy to legally establish it, and it appears that the activities at the Annex, at a minimum, were illegal under the Vienna Convention.[2]

**6.  § 2339A Does Not Give Underlying Statutes Extraterritorial Application.**

   The government and defense appear to agree on the application of § 2339A.  Each concurs that it is an ancillary offense.  An ancillary offense cannot bootstrap an underlying offense into having extraterritorial application.  The doctrine works in reverse: "the

---

[2] Nor does the Vienna Convention permit a mission to conduct covert espionage as part of its operations.  A mission may only "ascertain[] by all *lawful* means conditions and developments in the receiving State, and report[] thereon to the Government of the sending State."  Vienna Convention, art. 3(d).  Where intelligence officials serve in a mission, they are often identified to the receiving State.  Simon Chesterman, *The Spy Who Came in from the Cold War: Intelligence and International Law*, 27 MICH. J. INT'L L. 1071, 1088 (2006).

extraterritorial reach of an ancillary offense like aiding and abetting or conspiracy is coterminous with that of the underlying criminal statute." *Ali*, 718 F.3d at 939.  Thus, where the substantive offense applies extraterritorially, the court will extend application of the ancillary statute to acts abroad.  *United States v. Ballestas*, 795 F.3d 138, 144 (D.C. Cir. 2015).  Counts One and Two are contingent upon the extraterritoriality of the offenses set forth in Counts Three through Seventeen.  As discussed herein and in the Motion, none of the charged offenses applies extraterritorially with the exception of Count Three.  Thus, Counts One and Two must be dismissed, except with regard to Count 3.

## CONCLUSION

For the reasons set forth above, and in the Motion, Mr. Abu Khatallah respectfully requests that the Court to grant the Motion and dismiss Counts Four through Eighteen, and dismiss, in part, Counts One and Two.

<div style="margin-left: 40%;">

Respectfully submitted,
A.J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____
MICHELLE M. PETERSON
MARY MANNING PETRAS
Assistant Federal Public Defenders
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500
shelli_peterson@fd.org
mary_petras@fd.org

RICHARD JASPER (N.Y. Bar # 1975739)
276 Fifth Avenue, Suite 501
New York, New York  10001
(212) 689-3858 (voice)
(212) 689-0669 (facsimile)
ricjasp@aol.com

</div>

ERIC L. LEWIS (D.C. Bar #394643)
JEFFREY D. ROBINSON (D.C. Bar #376037)
LEWIS BAACH PLLC
1899 Pennsylvania Avenue, N.W., Suite 600
Washington, D.C.  20006
(202) 833-8900 (voice)
(202) 466-5738 (facsimile)
eric.lewis@lewisbaach.com
jeffrey.robinson@lewisbaach.com

Counsel for Ahmed Abu Khatallah