**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | : |
| | : |
| **v.** | : **Crim. No.: 14-cr-141 (CRC)** |
| | : |
| | : |
| **AHMED ABU KHATALLAH,** | : |
| | : |
| | : |
| | : |
| **Defendant.** | : |
| | : |

## MOTION TO SUPPRESS STATEMENTS OF DEFENDANT ABU KHATALLAH

Defendant Ahmed Abu Khatallah, through undersigned counsel, respectfully moves this

Honorable Court, pursuant to Federal Rules of Criminal Procedure 5(a) and 12(b)(3) and the

Fifth and Sixth Amendments to the United States Constitution, to suppress any and all statements

allegedly made by him to law enforcement agents in the course of a custodial interrogation as

well as any evidence gathered as a result of those statements. Defendant requests an evidentiary

hearing on this motion.

In deciding whether the government's conduct warrants the suppression of his alleged

statements, Mr. Abu Khatallah submits that the Court should consider that the government had

every opportunity to get this right. It planned this operation          and clearly intended

that it happen as it did.

The government *intended* that Mr. Abu Khatallah's presentment be delayed for thirteen

days. There is no question that Mr. Abu Khatallah could have been transported to the United

States in a matter of hours, rather than days. The government deliberately set the defendant's

capture and transportation by slow boat in order to permit his extensive interrogation as well as to bypass third countries that may have made foregoing the death penalty a condition of using their territory.

The government intended that no lawyer would be available to Mr. Abu Khatallah. The government clearly planned for Mr. Abu Khatallah's interrogation, including two teams of questioners and translators. Numerous people came and went from the ship. The omission of a lawyer from the ship's complement was deliberate and intended to create a fait accompli that would increase the likelihood that he would talk.

The government chose to provide translators who did not speak the same dialect of Arabic as the defendant. The *Miranda* warnings he was allegedly given were not the standard waivers given to similarly situated defendants, perhaps because they failed to bring the proper warning form with them, despite the year of planning. The government also decided not to maintain tapes or videos of the interviews – in contravention of the Department of Justice's recently announced policy -- so that the question of whether Mr. Abu Khatallah understood what he was being told about his rights or whether his statements were being accurately translated could be assessed. In addition, had the government wanted Mr. Abu Khatallah to be informed of his rights in a clear, direct and ascertainable manner, it could have had Arabic language materials prepared in advance.

The government deliberately planned that Mr. Abu Khatallah would be questioned first by the ▮▮▮▮▮ Inter-Agency ▮▮▮▮▮ group for a period of days without having been advised of his *Miranda* rights, and, subsequently, by FBI investigators, without adequate attenuation that could possibly have cured his unconstitutional questioning. The government was well aware that attenuation would be required, but did nothing real to effect that attenuation.

2

Given these deliberate steps, there is little question that the government cared more about interrogating Mr. Abu Khatallah than obtaining admissible testimony. That is a decision that the government is entitled to make. But having taken this gambit, the government should not now be allowed to have it both ways, by seeking the admission of Mr. Abu Khatallah's statements. It made its choice to ignore Mr. Abu Khatallah's constitutional rights in an attempt to gather intelligence while trying to maintain the illusion that his rights were honored. This Court should hold the government to the consequences of its decision.

## Factual Background

The government contends that Mr. Abu Khatallah conspired to and did execute a plot to murder United States citizens at the U.S. Special Mission and Central Intelligence Agency ("CIA") Annex in Benghazi, Libya on September 11, 2012. The indictment further charges that Mr. Abu Khatallah provided material support to terrorists resulting in death, among other charges. The government contemplated trying Mr. Abu Khatallah in the United States for these crimes for quite some time; it filed its initial criminal complaint against him in July 2013. It was not until nearly a year later, on June 15, 2014, however, that the United States government arrested him. The government did not make the arrest in the course of its involvement in an armed conflict, nor did it fortuitously intercept him during travels to the United States. Rather, the United States launched a well-planned military operation off the coast of Libya designed to capture Mr. Abu Khatallah, and as part of a comprehensive plan approved at the highest levels of government, to ensure maximum time to pressure him into divulging information.

As part of this plan, the government transported Mr. Abu Khatallah from Libya to the United States by boat at a glacial pace over the course of a thirteen-day period rather than by airplane, which could have been achieved in less than a day. This was planned and executed for

3

the purpose of allowing U.S. personnel to perform extensive interrogations purposefully designed to apply maximum pressure on the disoriented prisoner without access to counsel for the maximum amount of time before landing on U.S. shores and being presented to this Court. While the government recognized the requirement of a prompt presentment even before capturing Mr. Abu Khatallah, the government made no real efforts to meet that requirement. In fact, internal deliberations demonstrate conclusively that the only real consideration was making it appear that they had tried. For that reason, the government purposefully delayed requesting permission from other countries for authority to transport Mr. Abu Khatallah by air, until days after his arrest when he was already on the high seas, and by that time, the government had already decided his transport would be completed by ship. Within 24 hours of his capture, the government acknowledged that the plan was to sail across the Atlantic, but also to create a paper trail suggesting that they tried other options. Within 48 hours, the State Department directed that even the pretense of seeking other alternatives be stopped. The government deliberately rejected more rapid options which might have required transportation through countries that possibly would require an agreement not to seek the death penalty.

To effectuate Mr. Abu Khatallah's arrest, the Department of Defense ▮▮▮▮▮ ▮▮ and the FBI conducted a raid in Benghazi, Libya, where Mr. Abu Khatallah had openly resided before, during and after the 2012 attack on the U.S. Special Mission. Mr. Abu Khatallah was beaten badly in the course of his apprehension. Photos taken of him at the time of his arrest show that his face was swollen, his eye blackened and swollen shut and his head lacerated, an injury that required three staples to close. He also sustained injuries to his wrist and arm. He was shackled, hooded, gagged, and deafened with sound eliminating headphones. He was deprived of all sensory information to maximize his disorientation and helplessness, a strategy

4

that is the same as that used at Guantanamo Bay and has been condemned by the United Nations. *See Investigators for the U.N. Urge U.S. to Close Guantanamo*, New York Times, February 17, 2006.

After his arrest, Mr. Abu Khatallah was forcibly taken to the Libyan coast and placed aboard the USS New York. There was no genuine consideration given to any plan to fly him from Libya or from a third country to the United States. The plan all along was to bring Mr. Abu Khatallah to the United States by boat to maximize interrogation time and to remove any barriers to capital prosecution.

Once on board the USS New York, Mr. Abu Khatallah was placed in a tiny cell that maintained around the clock artificial lighting to keep him disoriented. Mr. Abu Khatallah did not know where he was, where he was being taken, or whether it was day or night. He was not given *Miranda* warnings and was first interrogated by the ▓▓▓▓▓ Inter-Agency ▓▓▓▓▓

▓▓▓▓▓ multiple times over the course of at least four days. Pursuant to the plan approved by the President, the government agents made the deliberate choice not to read Mr. Abu Khatallah his *Miranda* rights, let alone have an attorney available during these first days in custody. U.S. officials themselves admit that he was interrogated extensively before he was read his *Miranda* rights. He was brought to each session handcuffed, leg-shackled and hooded.

The government was aware that any statements made during those first five days would not be admissible, but counted on a strategy of then introducing a new "untainted" group of FBI agents who would read him his *Miranda* rights and continue the interrogation, no doubt seeking to create confusion on behalf of Mr. Abu Khatallah. The FBI allegedly read *Miranda* rights to Mr. Abu Khatallah after the first five days of non-*Mirandized* interrogation.

5

Mr. Abu Khatallah was allegedly told he had a right to a lawyer. In response, Mr. Abu Khatallah asked if there was a lawyer available and was told that there was not. At best, Mr. Abu Khatallah said he would proceed without a lawyer only because there was no lawyer available. He made clear he wanted a lawyer as soon as it was possible to have one. His repeated reference to the lack of an available lawyer each time he was questioned clearly demonstrates that he wanted a lawyer. However, the government made sure there was no lawyer available and told him as much. In light of the totality of circumstances, telling him he had the right to a lawyer, but that he could not avail himself of that right, rendered the right meaningless.

The government assumed, correctly, that Mr. Abu Khatallah, who had never left Libya, did not speak English and spent a major portion of his adulthood in Muammar Qaddafi's torture prisons, would not understand what the *Miranda* warnings meant or discern any difference between the two teams of Americans questioning him. The government also assumed, correctly, that after being told in response to his request for a lawyer that none was available on the ship, he would keep talking, as he allegedly did for a further seven days. There was only a minimal, wholly inadequate and superficial attempt to attenuate the second set of interviews. Mr. Abu Khatallah remained on the USS New York for a full thirteen days with his captors and interrogators.

In sum, after a year of planning Mr. Abu Khatallah's apprehension, the government made a series of conscious decisions, approved by the President of the United States, all of which had the intent and effect of maximizing the likelihood of obtaining statements from Mr. Abu Khatallah's in violation of his rights against self-incrimination, his right to counsel, and his right to a prompt presentment. The government chose to bring him to the United States by boat, requiring thirteen days, rather than by airplane from Libya, which would have taken less than

6

one day. The government chose not to transfer him to a third country for onward air transport, because the would limit interrogation and might force the government to forego the option of capital punishment. The government chose not to have a defense lawyer available aboard the ship. The government chose not to make an audio or videotape of any of the interrogation sessions or the warnings. None of these choices was made on the fly. This was the plan all along and the government merely attempted to create an illusion that there were no other options, when in fact the government specifically considered and rejected options that might have resulted in real protection of Mr. Abu Khatallah's rights.

All of this was specifically choreographed precisely to maximize the chances that he would speak without a lawyer. All of this was designed to allow two weeks of unrecorded and continuous interrogation. All of this was designed to promote an argument that a Libyan who spoke no English with a ninth grade education, who endured torture and imprisonment for more than a decade by the Qadaffi regime, would know the difference between "the taint team," which had been interrogating him in a "no rights-no use" setting, and the "no taint team" in a "you have a right *now* to silence and to a lawyer, (not that we have one for you)" setting. The United States constructed the "slow boat to D.C." strategy while orchestrating the narrative that it was endeavoring in good faith to move as quickly as possible and this was the best it could do. On June 28, 2014, after the ship finally arrived in the United States, Mr. Abu Khatallah was presented before the Magistrate in Washington, D.C.

## Argument

The statements allegedly obtained from Mr. Abu Khatallah during the thirteen-day period of detention between his arrest and his first appearance before this Court must be suppressed

7

because they were obtained in violation of Mr. Abu Khatallah's right to a prompt presentment and his constitutional rights under the Fifth and Sixth Amendments.

## I.   VIOLATION OF RIGHT TO A PROMPT PRESENTMENT.

Criminal defendants are entitled to a prompt presentment before a federal magistrate. *See Corley v. United States*, 556 U.S. 303, 306 (2009) (prompt presentment requirement designed to prevent secret detention and inform suspect of charges); Fed. R. Crim. P. 5(a). The Supreme Court has made clear that the government may not delay a defendant's presentment before a magistrate judge for the purpose of interrogating him and extracting a confession. *Upshaw v. United States*, 335 U.S. 410, 414 (1948) (30-hour delay before presentment impermissible). This is precisely what happened here.

The right to a prompt presentment "stretches back to the common law" and is "'one of the most important' protections 'against unlawful arrest.'" *Corley,* 556 U.S. at 320 (citation omitted). As the Court noted in *Corley*, "The history of liberty has largely been the history of observance of procedural safeguards." *Id.* at 321 (citation omitted); *Mallory v. United States*, 354 U.S. 449, 453 (1957) ("police detention of defendants beyond the time when a committing magistrate [is] readily accessible constitute[s] willful disobedience of law") (internal citations omitted) (superseded by statute, Omnibus Crime Control and Safe Streets Act of 1968, PL 90-351 § 701, 18 U.S.C. § 3501, as stated in *Corley*); *McNabb v. United States*, 318 U.S. 332, 343-44 (1943) (the purpose of Rule 5(a) is to prevent oppressive police interrogations and other "reprehensible ... third degree" tactics before bringing the accused before an officer of the court) (superseded by statute, Omnibus Crime Control and Safe Streets Act of 1968, PL 90-351 § 701, 18 U.S.C. § 3501, as stated in *Corley*); *United States v. Mendoza*, 473 F.2d 697, 702 (5th Cir.

1973) (the purpose of Rule 5(a) "is to have a judicial officer advise the defendant of his constitutional rights and thereby to ... reduce the opportunity for third-degree practices.").

The thirteen-*day* delay in presentment that took place here was well-beyond the six-*hour* delay that Congress has determined is permissible. *See* 18 U.S.C. § 3501(c) (voluntary statements admissible "if such confession was made or given by such person within six hours immediately following his arrest or other detention"). Statements made outside of the six-hour window approved by Congress must be suppressed, unless the Court finds that the delay was reasonable and necessary. *See Corley*, 556 U.S. at 313-14. Section 3501(c) permits the admission of statements obtained during a delay that was greater than six hours, only if the delay was reasonable considering the means of transportation and the distance to be traveled. The government bears the burden of demonstrating that the delay was reasonable and necessary. The government cannot come close to meeting that burden in this case.

In determining the reasonableness and necessity of a delay, the Court should consider the distance between the arrest site and the United States, the reasons for the delay in transport, and whether the defendant was mistreated or improperly interrogated. *See United States v. Purvis*, 768 F.2d 1237, 1239 (11th Cir. 1985)). Where, as here, there is evidence that the government purposely chose a slow mode of transportation over a faster one, or that the mode of transportation used traveled at a slower speed than normal, the Court must suppress any statements made during the period of the pre-presentment detention. *See Corley*, 556 U.S. at 322; *United States v. Yunis*, 859 F.2d 953, 968-69 (D.C. Cir. 1988) (overturning district court's finding of deliberate delay upon examination of government evidence regarding lack of alternatives).

9

The thirteen-day delay in bringing Mr. Abu Khatallah before a magistrate was neither reasonable nor necessary. The evidence at the hearing on this motion will demonstrate that the government failed at every juncture to meet the requirement of necessity and reasonableness, and that this was not an inadvertent failure. The government planned at least as early as September 2013, to capture and transport Mr. Abu Khatallah to the United States. An integral part of that plan was to interrogate him for intelligence purposes as long as possible. The government recognized that Mr. Abu Khatallah would be in FBI custody from the moment of his capture, thereby triggering the requirement of prompt presentment. The government went to great lengths to work around this requirement while maintaining a veneer of attempting in to meet it. In the Government's Opposition to Defendant's Motion for Return to Libya [Dkt. #103], at 18-19, the government claimed that any delay in the defendant's presentment was reasonable, and that this would be established at an evidentiary hearing. However, the defense has found no case that has held a thirteen-day delay reasonable, and it was not reasonable here. *See Upshaw* 335 U.S. at 414 (30 hour delay before presentment impermissible). Rather than reasonable and necessary, the delay in presentment here was part of a deliberate strategy approved at the highest levels of government and engineered to create the illusion that there were no other alternatives to a two-week delay, when in fact Mr. Abu Khatallah, as the government knew, could have been transported by air from Libya or numerous other nearby countries and presented within hours of his arrest.

What the delay in presentment was intended to and did enable was continuous interrogation. Two teams were employed not only to obtain intelligence, but also to create a "tag team" approach. Such an approach or multiple interrogations over a prolonged period of time using different teams is a hallmark of a coercive interrogation. *See Missouri v. Seibert*, 542 U.S.

10

600, 609-11 (2004); *Edwards v. United States*, 923 A.2d 840 (D.C. 2007). Mr. Abu Khatallah's prolonged transport to the United States was calculated to elicit a confession. This is precisely the kind of conduct on the part of the government that the right to prompt presentment is designed to prevent. Indeed, as the Supreme Court noted in *Corley*, without the right to prompt presentment "federal agents would be free to question suspects for extended periods before bringing them out in the open, and we have always known what custodial secrecy leads to. . . . No one with any smattering of the history of 20th-century dictatorships needs a lecture on the subject, and we understand the need even within our own system to take care against going too far." *Corley*, 556 U.S. at 320 (citing *McNabb*, 318 U.S. 332).

The significance of the right to prompt presentment cannot be overstated. "[P]resentment is the point at which the judge is required to take several key steps to foreclose Government overreaching: informing the defendant of the charges against him, his right to remain silent, his right to counsel, ... giving the defendant a chance to consult with counsel; and deciding between detention or release." *Corley*, 556 U.S. at 320 (citing Fed. R. Crim. P. 5(d)). In this case, by intentionally detaining and interrogating the defendant for an unjustifiably extended period of time before bringing him out into the open, the government denied the defendant his right to a prompt presentment – his right to be informed of the charges against him, his right to remain silent, his right to counsel, the chance to consult with counsel and the right to have a magistrate decide whether he would be detained or released. The government grossly overreached. Mr. Abu Khatallah's statements impermissibly obtained during the course of the unreasonable and unnecessary delay must be suppressed.

11

## II. VIOLATION OF *MIRANDA*.

The Supreme Court also has held that, "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the [Fifth Amendment] privilege against self-incrimination is jeopardized." *Miranda v. Arizona*, 384 U.S. 436, 478 (1966). To protect the privilege, the Court set forth procedural safeguards required by the Constitution. *Dickerson v. United States*, 530 U.S. 428, 432 (2000) (*Miranda* is constitutional rule). The safeguards require that, prior to custodial interrogation, an individual must be warned "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 479. The Constitution requires law enforcement to communicate these rights to any person subject to interrogation and to ensure that they are understood. *Id.* Statements made prior to the issuance of warnings, or coerced through impermissible interrogation after the rights have been invoked, must be suppressed. *See Missouri v. Seibert*, 542 U.S. 600 (2004). In addition to a violation of Mr. Abu Khatallah's right to a prompt presentment, the plan approved by the President for the abduction, transportation, and interrogation of Mr. Abu Khatallah included a calculated violation of *Miranda's* safeguards – the deliberate interrogation of Mr. Abu Khatallah for at least four days without notifying him of his constitutional rights.

Courts have observed that the *Miranda* safeguards are especially important where the defendant is a foreign national and "not likely to have known of his constitutional rights without being advised of such." *United States v. Shou Mei*, No. 00 CR 128, 2000 WL 1029207, at *2 (N.D. Ill. July 25, 2000). The place of arrest has no bearing on whether *Miranda* warnings are

12

required; they must also be provided to foreign nationals apprehended abroad, and law enforcement officials who neglect to provide them risk suppression of statements made before the warning was issued and understood. *See In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 177, 203 (2d Cir. 2008) (relating to custodial statements obtained by the U.S. from individual detained by foreign governments). The government cannot seriously contend that Mr. Abu Khatallah, given his lack of education and his lack of any meaningful life experience outside Benghazi or Muammar Qadaffi's torture prisons, would have been aware of his rights under the United States Constitution. Mr. Abu Khatallah did not grow up watching *Law and Order*, but instead was subjected to repeated televised executions of Qaddafi's political opponents. His only experience with governmental authorities was of one of unending cruelty, unlimited arbitrariness and unimaginable brutality.

Here, it is indisputable that a violation of *Miranda* occurred. Following Mr. Abu Khatallah's arrest, government agents questioned him for at least four days without issuing the *Miranda* warnings. This was a deliberate violation of Mr. Abu Khatallah's constitutional rights and requires the suppression of all statements obtained from Mr. Abu Khatallah. The government does not dispute that a violation occurred and does not seek to admit the statements extracted during the first five days of Mr. Abu Khatallah's detention. Rather, the government seeks to admit the statements obtained after *Miranda* warnings allegedly were issued on Mr. Abu Khatallah's seventh day of detention, claiming that there was sufficient attenuation after the *Miranda* violation and that Mr. Abu Khatallah subsequently waived his rights. *See* Government's Opposition to Defendant's Motion for Return to Libya [Dkt. #103], at 20-21. The government's argument that these statements are admissible is untenable. There was neither sufficient attenuation, nor a valid waiver.

13

## A. Insufficient Attenuation to Permit Admission of Statements Obtained After *Miranda* Violation.

The Supreme Court has held that "[w]hen an interrogator uses [a] deliberate, two-step strategy, predicated upon violating *Miranda* during an extended interview, post-warning statements that are related to the substance of pre-warnings statements must be excluded absent specific, curative steps." *Missouri v. Siebert,* 542 U.S. 600, 621 (2004) (Kennedy, J., concurring). Here, as in *Siebert,* the tactic used by the government was designed to impermissibly drain *Miranda* of its substance and "thwart *Miranda's* purpose of reducing the risk that a coerced confession would be admitted." *Siebert,* 542 U.S. at 617.

The government cannot demonstrate "sufficient attenuation" between statements allegedly made by Mr. Abu Khatallah prior to *Miranda* warnings and those made following *Miranda* warnings. Changing the face of his American interrogators cannot constitute sufficient attenuation when the defendant continued to be detained incommunicado aboard a U.S. warship. Both the unwarned and the post-warning interrogations that comprise the government's "two-step strategy" took place on the same ship, during the same journey, over a single period of thirteen days, and in essentially identical settings that unmistakably established "the authoritative nature of the questioning." *United States v. Capers,* 627 F.3d 470, 484 (2d Cir. 2010). Especially from the viewpoint of Mr. Abu Khatallah, and indeed of any reasonable person in his position, there was no "meaningful difference between the circumstances surrounding [his] two interrogation sessions, and there was certainly no 'substantial break' that would have restored his *Miranda* rights." *Id.* He was brought to each session in handcuffs, shackled and hooded. There was no lawyer present or available at either session. The faces may have changed, but the reality remained the same. Mr. Abu Khatallah was a disoriented prisoner trapped in a freezing cold,

14

brightly lit room on a journey of uncertain duration or destination, and there was no lawyer to help him.

At the evidentiary hearing, the government will seek to establish the appearance of curative measures, but this Court must not test the voluntariness of the alleged waiver based on a formulaic "check-the-box" methodology. The true issue will be whether, as a matter of substance, the government can meet its burden of establishing that the four days of unwarned interrogation, along with all the other circumstances concomitant with being held prisoner, incommunicado, on a military ship, without available counsel, did not undermine the voluntary nature of the subsequent alleged waiver. The government cannot meet this burden.

## B. No Knowing and Voluntary Waiver.

Absent a valid waiver, Mr. Abu Khatallah's statements are inadmissible. For an effective waiver to allow the admission of an accused's statement into evidence, there must be facts to corroborate that such a waiver was voluntarily and intelligently made. "Waivers of constitutional rights not only must be voluntary, but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970). Moreover, alleged waivers of fundamental constitutional rights, such as the right to counsel and the privilege against self-incrimination, will be upheld only after careful inquiry into the factual basis for the alleged waiver. *Miranda* established that a "heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda*, 384 U.S. at 475.

The question of whether the accused waived a constitutional right "is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in

15

the *Miranda* case." *North Carolina v. Butler*, 441 US. 369, 373 (1979). When performing this inquiry, courts must "indulge in every reasonable presumption against waiver." *Brewer v. Williams*, 430 U.S. 387, 404 (1977). Moreover, courts must take into account the totality of the circumstances surrounding the case. *See Fare v. Michael C.*, 442 U.S. 707, 725 (1979). A suspect's relinquishment of the rights established in *Miranda* "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). In addition, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* The government cannot establish that Mr. Abu Khatallah knowingly, intelligently and voluntarily waived his constitutional rights with full awareness of the consequences of such a waiver.

### i. Mr. Abu Khatallah did not Waive his Right to Counsel.

Approximately six days after his interrogation began, government agents finally made an attempt to advise Mr. Abu Khatallah of his rights. In response, Mr. Abu Khatallah asked if a lawyer was present on the ship, and was told that "there was not." In other words, the agents told Mr. Abu Khatallah that he had the right to have a lawyer present, but no ability to invoke that right while being interrogated on the ship. This was not an adequate advisement of the right to counsel. Rather, this was a deliberate and strategic decision by the government that was designed to, and did, thwart Mr. Abu Khatallah's exercise of his right to counsel. Mr. Abu Khatallah made clear to interrogators that *he wanted a lawyer,* but "since there was none," he had no choice but to proceed, making clear he wanted a lawyer as soon as it was possible to have one. Mr. Abu Khatallah repeated this request at every opportunity.

16

███████

The government will not be able to establish at an evidentiary hearing that Mr. Abu Khatallah had any understanding of the role that a defense counsel plays in a U.S. court proceeding, or that the government made even a rudimentary attempt to explain that role, so that Mr. Abu Khatallah would have been in a position to make a knowing waiver. Nor can the government explain away the decision not to have a lawyer present on the USS New York– after all, it had a year to plan for Mr. Abu Khatallah's arrest and to arrange for a defense lawyer to be present onboard the transport vessel or flown onboard subsequently, but chose not to have a lawyer available at any point. That was not a mistake; it was a considered strategy to maximize the chances that the government would be able to extract intelligence *and* get admissible evidence. It was a stratagem utterly inconsistent with the requirements of due process and should not be sanctioned by this Court.

The Supreme Court has explained that a waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Put another way, the waiver of rights must reflect "an uncoerced choice and the requisite level of comprehension." *Id.* At its most basic, the agents should have explained to Mr. Abu Khatallah that in a U.S. court proceeding, the defendant has a right to be represented by an individual who is not an agent of the U.S. government, and who has a role that includes taking steps to see that the defendant's rights are protected. *See, e.g., U.S. v. Yunis,* 859 F.2d 953, 967 (D.C. Cir. 1988) (FBI agent made a particular effort to explain to defendant the role of lawyers in the American justice system and Yunis' entitlement to one free of charge.). Absent this type of simple, non-burdensome explanation, the government cannot meet its burden to establish that an alien defendant in Mr. Abu Khatallah's position had the ability to waive a right. How can a defendant  ·

17

███████

waive a right without having a modicum of knowledge about what is being waived? How can a defendant understand, having asked for a lawyer on the high seas and told there is no lawyer, that there is any meaningful right to counsel?

The government will seek to establish the mere form of waiver, while ignoring the substance and meaning of waiver. This is not supposed to be a ritual, where the government agent need only recite a rote phrase and obtain a signature. In these circumstances, there must be some facts, beyond a merely formulaic shibboleth, that would serve to establish a knowing and meaningful waiver. That manifestly did not occur here.

Mr. Abu Khatallah asked if counsel was present. The government argued, in its Opposition to Defendant's Motion for Return, that Mr. Abu Khatallah did not sufficiently and unequivocally request the assistance of counsel. Opp. at 21-22 (citing *United States v. Oquendo-Rivas*, 750 F.3d 12, 19 (1st Cir. 2014); *Clark v. Murphy*, 331 F.3d 1062, 1070 (9th Cir. 2003); *Coleman v. Singletary*, 30 F.3d 1420, 1423 (11th Cir. 1994)). The cases cited by the government do not support its position here. In *Oquendo-Rivas*, the defendant stated only "my lawyer speaks." 750 F.3d at 19. In *Clark*, the defendant said "I think I would like to talk to a lawyer," and the interrogator told him "if he wanted a lawyer [the interrogator] would call him one." 331 F.3d at 1065. After leaving the defendant alone for a while "to make a decision," the interrogator returned, and the defendant said he decided he did not want a lawyer. *Id.* There was no question about whether a lawyer was available; the only uncertainty was whether the defendant wanted one. First he did and then he changed his mind. By contrast, Mr. Abu Khatallah wanted a lawyer, expressed it at each session, and the government made sure there was none available. Mr. Abu Khatallah made clear he wanted one as soon as it was possible to have one. And he did so repeatedly.

18

In contrast to *Coleman*, where the defendant said he did not know if he wanted a lawyer, Mr. Abu Khatallah specifically asked whether there was a lawyer on the ship with whom he could consult. The interrogators did not offer to call a lawyer, as in *Clark*, but told Mr. Abu Khatallah that having a lawyer on the ship was not possible. In fact, that was a lie. It *was* possible, but the government decided not to permit it. The interrogation teams were taken to and from the USS New York by helicopter. Nothing about the logistical circumstances precluded having a defense lawyer available. The government decided otherwise. Rather than telling Mr. Abu Khatallah that it was not possible to have a lawyer, all questioning should have ceased until counsel was provided. *See Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). Instead, by having no defense lawyer aboard the ship where the interrogation took place, by not offering to call a lawyer and by telling Mr. Abu Khatallah that no lawyer was available, the government isolated him from any possibility of obtaining counsel for 13 days and purposefully prevented him from invoking his Sixth Amendment right. This was a deliberate and outrageous choice and vitiates any basis for finding a knowing waiver.

A key circumstance that distinguishes this case is the government's absolute control over the situation on the ship. This mission, including the thirteen-day journey on the USS New York, was the result of careful and purposeful planning. Plainly, the government could have arranged for the presence of defense counsel, either in person or via Skype or other electronic means. Personnel could readily have been flown to the ship or electronic communication established. When the government agent mentioned a right to a lawyer, but then said no lawyer was available, that was a mere charade, intended to tick a box. It certainly was not an honest, good-faith effort to ensure that Mr. Abu Khatallah's right to counsel was honored in substance, rather than merely in form. The question for the Court is not whether the government has an

19

obligation to make counsel present in these circumstances. But when the government makes the conscious decision not to have counsel present, and the prisoner inquires about the presence of counsel, at that point, in these circumstances, all of which are created and controlled by the government, questioning should cease. The government should not be permitted to have it both ways. Either treat the Fifth and Sixth Amendment as serious rights, or forego the interrogation. The government's disrespect for those rights must have consequences.

### ii. Coercive Conditions Vitiated the Voluntariness of Any Waiver.

Under the circumstances of Mr. Abu Khatallah's detention and interrogation, the government cannot demonstrate a valid waiver. Mr. Abu Khatallah, a foreign national, was forcefully abducted and transported to an American warship, where under coercive conditions, he was held incommunicado and interrogated for five days before any attempt was made to advise him of his rights. The attempt to advise him of his rights was made as he continued to be held incommunicado by American authorities on an American warship. He speaks no English, and the interpreter used by the government to convey the *Miranda* warnings spoke a widely varying dialect of Arabic than he does. The government could have had written warnings in Arabic to give to Mr. Abu Khatallah but failed to do so. With no knowledge or understanding of the American legal system, under these conditions, he did not make a knowing and intelligent waiver. *See, e.g., Gov't of Canal Zone v. Gomez*, 566 F.2d 1289, 1292 (5th Cir. 1978) (defendant who did not speak English and was unfamiliar with American customs or Bill of Rights and was told if he requested counsel, he was guilty, did not knowingly and intelligently waive right to counsel); *United States v. Fung*, 780 F. Supp. 115, 116 (E.D.N.Y. 1992) (defendant with poor language skills, a lack of knowledge of American legal system and under stress did not make "uncoerced choice" with "requisite level of comprehension").

20

Citing *United States v. Yunis*, 859 F.2d 953 (D.C. Cir. 1988), in its Opposition to

Defendant's Motion For Return, the government argued that the conditions of Mr. Abu

Khatallah's detention were not coercive, but the facts of this case go beyond those in *Yunis*. In

*Yunis*, the defendant, who was arrested in international waters, was transported by ship and then

by plane to court. *Id*. at 955-57. His transportation took only four days, not thirteen. *Id* He

was questioned during this time period, but prior to any questioning, was advised of his *Miranda*

rights. *Id.* Although he was seasick and it was later determined that small fractures occurred to

his wrist during his arrest, the court found a valid *Miranda* waiver and no unreasonable delay,

noting that -- unlike in this case -- there was no evidence that the government purposefully

delayed the defendant's transportation. *Id.* at 966, 969. The court noted that "[d]espite a valid

waiver, prolonged interrogation might render an eventual confession involuntary," but did not

address that issue because the issue raised was the voluntariness of the *Miranda* waiver. *Id.* at

961. Despite upholding the admissibility of the statements obtained from the defendant, the D.C.

Circuit cautioned that the interrogation "hardly qualifie[d] as a model for law enforcement

behavior." *Id* at 969. Rather than heed that warning and conform its practices, here, the

government tripled down. It executed a plan that purposefully included incommunicado

detention aboard a ship for more than three times as long as the detention in *Yunis* (13 days,

rather than 4 days) and included a decision not to advise Mr. Abu Khatallah of his rights for the

first several days of his interrogation, and not to have counsel available to him. If the

interrogation in *Yunis* "hardly qualifie[d] as a model for law enforcement behavior," the

interrogation in this case goes far beyond *Yunis*, to be a difference not just in degree but in

substance. If *Yunis* was close to the line, this interrogation goes way beyond it.

21

The government cannot meet its burden to establish that any waiver was not a result of coercion. To be sure, there could have been a type of evidence that might have assisted the Court in moving toward such a finding – that, obviously, would be an audio or videotape of the interrogations. The purposeful planned absence of audio or videotape by the government, however, is a cloud that hangs over every aspect of this suppression proceeding. President Obama himself understood the necessity of recording interrogations, having sponsored a 2003 Illinois bill that passed unanimously, requiring the videotaping of interrogations in capital cases to deter the very same types of heavy-handed tactics as was used against Mr. Abu Khatallah here. S.B. 15, 93rd Gen. Assemb. (Ill. 2003). This recording policy was also implemented on a national level under the Obama administration, as in 2014 the Department of Justice adopted a policy creating a presumption that statements made by individuals in federal custody following arrest, but prior to their first appearance in court, will be electronically recorded even in non-capital cases. Press Release, Dep't of Justice, Attorney General Holder Announces Significant Policy Shift Concerning Electronic Recording of Statements (May 22, 2014),

https://www.justice.gov/opa/pr/attorney-general-holder-announces-significant-policy-shift-concerning-electronic-recording. Commenting on this expansion, Attorney General Eric Holder stated "[c]reating an electronic record will ensure that we have an objective account of key investigations and interactions with people who are held in federal custody. . . It will allow us to document that detained individuals are afforded their constitutionally protected rights. And it will also provide federal law enforcement officials with a backstop, so that they have clear and indisputable records of important statements and confessions made by individuals who have been detained." *Id.* Just as the decision not to have a lawyer on the ship, the government's decision not to take such a basic step that they themselves have championed is unfathomable. The

government knew that the admissibility of Mr. Abu Khatallah's statements would be a contested issue and had the ability to record the interrogations. The government consciously chose to forego this technique, on an issue as to which it has the burden of proof. That decision speaks volumes.

## III. INVOLUNTARY STATEMENTS.

The statements obtained from Mr. Abu Khatallah also must be suppressed because they were not made voluntarily and, therefore, were obtained in violation of his Fifth Amendment rights. The government bears the burden of proving that any statement made by a defendant was voluntary. *See Lego v. Twomey*, 404 U.S. 477 (1972). The test for voluntariness is whether a statement is the "product of an essentially free and unconstrained choice by its maker." *See, e.g., Culombe v. Connecticut*, 367 U.S. 568, 602 (1961). The determination of whether a statement was made voluntarily "requires a careful evaluation of all the circumstances of the interrogation." *See Mincey v. Arizona*, 437 U.S. 385, 401 (1978). The Court must consider the "totality of the circumstances" in deciding whether the defendant made his statement voluntarily. *Fikes v. Alabama*, 352 U.S. 191, 197 (1957). *See also Gallegos v. Colorado*, 370 U.S. 49, 52 (1962) (determination of whether an accused's statement was made involuntarily so as to render it inadmissible requires close scrutiny of the facts of each individual case); *Clewis v. Texas*, 386 U.S. 707 (1967).

Specifically, the Court must examine the efforts to overbear Mr. Abu Khatallah's free will in relation to his capacity to resist those efforts. *Davis v. North Carolina*, 384 U.S. 737 (1966); *Culombe v. Connecticut*, 367 U.S. 568(1961). The Court must examine his "background, experience, and conduct," *North Carolina v. Butler*, 441 U.S. 369, 374-75 (1979), to determine whether his statement was the product of a rational intellect and a free will.

23

*Blackburn v. Alabama*, 361 U.S. 199, 207-8 (1960). *See Hopkins v. Cockrell*, 325 F.3d 579, 584-85 (5th Cir. 2003) (confession involuntary when detective misled defendant to believe their conversation was confidential); *Hart v. Attorney Gen. of Fla.*, 323 F.3d 884, 894-95 (11th Cir. 2003) (confession involuntary despite careful explanation of *Miranda* warnings and signed waiver because detective contradicted warnings when he said "honesty will not hurt you" and deceptively told defendant disadvantage of having a lawyer present was that the lawyer would tell him not to answer the incriminating questions). Under the circumstances of this case, as described above, the government cannot meet its burden of demonstrating that Mr. Abu Khatallah voluntarily made the statements at issue.

24

**Conclusion**

For the foregoing reasons, and such other reasons as may be presented at a hearing on

this motion, Mr. Abu Khatallah respectfully requests that the Court grant this motion and

suppress the use as evidence of all statements allegedly made by Mr. Abu Khatallah.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____

MICHELLE M. PETERSON
MARY MANNING PETRAS
Assistant Federal Public Defenders
625 Indiana Avenue, N.W.
Suite 550
Washington, D.C. 20004
(202) 208-7500

ERIC L. LEWIS (D.C. Bar #394643)
JEFFREY D. ROBINSON (D.C. Bar #376037)
WALEED NASSAR
LEWIS BAACH PLLC
1899 Pennsylvania Avenue, N.W., Suite 600
Washington, D.C. 20006
(202) 833-8900 (voice)
(202) 466-5738 (facsimile)

Counsel for Ahmed Abu Khatallah