## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|                                   |   |                            |
|-----------------------------------|---|----------------------------|
| **UNITED STATES OF AMERICA**      | : |                            |
|                                   | : |                            |
| **v.**                            | : | **Crim. No.: 14-cr-141 (CRC)** |
|                                   | : |                            |
| **AHMED ABU KHATALLAH,**          | : |                            |
|                                   | : |                            |
| **Defendant.**                    | : |                            |

## DEFENDANT'S REPLY IN SUPPORT OF MOTION TO SUPPRESS STATEMENTS

Mr. Ahmed Abu Khatallah, through undersigned counsel, respectfully submits the

following in reply to the Government's Opposition to Defendant's Motion to Suppress

Statements. ("Gov't. Op.")

The government had nearly a year and apparently unlimited resources to plan the

operation that resulted in the abduction of Mr. Abu Khatallah from Libya and his fourteen-day

journey on the "slow ship"[1] to the United States. The government claims to have put in place a

process "that carefully balanced the government's legitimate national security interests and the

defendant's constitutional rights." Gov't. Op. at 1. That contention is demonstrably inaccurate.

At every phase of the planning and execution, the government made choices which, far from

taking Mr. Abu Khatallah's rights seriously, created a constitutional Potemkin village, seeking to

"be[] able to tell the judge that they tried to speed his return,"[2] when the process was conceived

and structured to do no such thing. The government similarly tried to create the illusion of a

---

[1] PE_FBI_002050. The FBI documents cited herein are attached for the Court's convenience in numerical order as Exhibit 1.

[2] PE_DOS_000043. The Department of State documents cited herein are attached for the Court's convenience in numerical order as Exhibit 2.

valid provision and waiver of Miranda rights, despite making a conscious decision not to have counsel available for fourteen days and despite a multi-million dollar operation to equip a destroyer with helicopters and fixed wing aircraft that could, and did, fly teams of Federal Bureau of Investigation ("FBI") agents on and off the ship. The government's motivation was clearly articulated: the Department of Justice ("DOJ") recognized it had an obligation to advise the Court of Mr. Abu Khatallah's arrest and to bring him before the Court, but "DOJ want[ed] to hold that off as long as possible"[3] to maximize interrogation time not just for intelligence debriefing, but also for interrogating Mr. Abu Khatallah about ████████ Similarly, with respect to attenuation, the government cites the different décor in the interview room, i.e., changing the posters in the same room,[4] and different questioning, without making clear that *both* teams were directed "to address ████████ with Khatallha [sic] during ongoing interrogations," after "extensive consultation" with the Deputy Director of the FBI.[5] Thus, the government manifestly and deliberately: (i) undertook to delay prompt presentment while creating a veneer of reasonableness; (ii) engineered that no lawyer would be available so that if Mr. Abu Khatallah asked whether there was a lawyer available (which he did) he could be told, no; and (iii) tried to create the illusion of attenuation when Mr. Abu Khatallah was interrogated for four days *un-Mirandized* and then examined for a further week in a materially identical pod, under nearly identical circumstances, and at least in significant part, on the ████████
████████

The circumstances of this case are like no other. Mr. Abu Khatallah was held for fourteen days, a period of time that exceeds the 6 hour baseline of 18 U.S.C. § 3501 by

---

[3] PE_DOS_000109.
[4] PE_DOS_000819-820.
[5] PE_FBI_001981-83.

approximately 330 hours, or more than 5000%. Mr. Abu Khatallah asked during questioning if a lawyer was available, yet there was no effort to make a lawyer available for fourteen days; tens of millions of dollars were spent on a massive logistical operation with dozens of military personnel, guards and interrogators, but not a penny for a lawyer. The Director of the FBI made the decision to interrogate an un-Mirandized defendant about

This was a planned and intentional "two-step" interrogation for which, under any construction of *Missouri v. Seibert*, 542 U.S. 600 (2004) there was inadequate attenuation.

This Court must consider the "totality of the circumstances" in assessing whether the government acted reasonably and in conformance with the defendant's constitutional rights. The government controlled the situation completely and created each of the relevant circumstances. And while doing so, the government was trying to create enough of the appearance of due process to convince the Court of its sincerity, when the reality was that there was never any serious effort or intention to do anything other than send Mr. Abu Khatallah to the United States via the "slow boat." As the government candidly conceded in an internal email, "[t]he FBI [was] mostly interested in being able to tell the judge that they tried to speed his return."[7] This attempt to fashion the illusion of due process should not be accepted by this Court.

---

[6] PE_FBI_001981-83.
[7] PE_DOS_000043.

## I. VIOLATION OF RIGHT TO PROMPT PRESENTMENT.

### A. The Delay in Presentment was Deliberate and Unreasonable.

Perhaps recognizing its vulnerability, the government saves its brief presentment argument for the very end of its long brief. Gov't. Op. at 56. It accurately sets out the *McNabb-Mallory* rule, *see McNabb v. United States*, 318 U.S. 332, 341(1943); *Mallory v. United States*, 354 U.S. 449, 455 (1957); and the modification of that rule in 18 U.S.C. § 3501(c). The government asserts that the burden of proof with respect to unreasonableness of delay is on the defendant, citing a 1956 case from the District of Columbia Circuit, which of course predates the enactment of 18 U.S.C. § 3501. Gov't. Op. at 56. The better argument is that the burden of proof on the elements going to the admissibility of a confession should be on the government. *See, e.g., United States v. Ollie*, 442 F. 3d 1135, 1142-43 (8th Cir. 2006) (government's burden to prove admissibility of confessions). In any event, the government's conduct here was patently unreasonable, irrespective of who has the burden of proof.

The government also suggests in its cursory analysis that its conduct should be judged under a low standard, asserting that "courts should be circumspect about finding [causes of delay other than trying to obtain a confession] to be unreasonable." Gov't. Op. at 58. First, as set forth below, extending the interrogation period to get a confession was one of the drivers of the "slow boat" strategy used here. But even if it were not, the government's *laissez faire* approach to unreasonableness understates the importance of the prompt presentment requirement. While delay for purposes of interrogation is "the epitome of 'unnecessary delay,'" *Corley v. United States*, 556 U.S. 303, 308 (2009) (internal citation omitted), it is by no means the only relevant inquiry. The importance of prompt presentment is more than a mere "administrative nicety." *Id* at t 320. The government's appeal for this Court to be "circumspect" in its analysis of

4

reasonableness is an unwarranted invitation to skew its analysis of reasonableness and is at odds

with a long line of Supreme Court precedent that counsels a vigilant inquiry with respect to this

critical juncture for criminal proceedings. As the Court explained:

> One might not care if the prompt present requirement were just some administrative
> nicety, but the fact the rule has always mattered in very practical ways and still does. As
> we said, it stretches back to common law, when it was "one of the most important"
> protections "against unlawful arrest." *McLaughlin*, 500 U.S., at 60-61 (Scalia, J.,
> dissenting). Today presentment is the point at which the judge is required to take several
> key steps to foreclose Government overreaching: informing the defendant of the charges
> against him, his right to remain silent, his right to counsel, the availability of bail, any
> right to a preliminary hearing; giving the defendant a chance to consult with counsel; and
> deciding between detention or release.

> In a world without *McNabb-Mallory*, federal agents would be free to question suspects
> before bringing them out in the open, and we have always known what custodial secrecy
> eads to. *See McNabb*, 318 U.S. 332. No one with any smattering of the history of 20th-
> century dictatorships needs a lecture on the subject, and we understand the need even,
> within our own system to take care against going too far. "[C]ustodial police
> interrogation, by its very nature, isolates and pressures the individual." Dickerson, 530
> U.S. at 435, and there is mounting empirical evidence as these pressures can induce a
> frighteningly high percentage to confess to crimes they never committed, *see, e.g.*
> Driziin & Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C. L.
> Rev., 891, 906-07.

> Justice Frankfurter's point is as fresh as ever: "The history of liberty has largely been the
> observance of procedural safeguards."

*Id.* at 320-21. The Supreme Court's jurisprudence in this area was intended precisely to prevent

what occurred here.

The first factor to consider is the objective question of how long was the delay. While

countless shorter delays have been found to be unreasonable, a fourteen-day delay has *never*

been found to be reasonable -- the government identifies no case where a 14-day delay was held

to be reasonable for the purpose of a suppression analysis, because there is none. The cases

cited by the government in which courts found that shorter delays were not unreasonable are

distinguishable and do not support its arguments here. *See* Gov't Opp. at 61 n.30 (citing *United*

*States v. Savchenko,* 201 F.R. D. 503, 506 (S.D. Cal. 2001); *United States v. Zakharov,* 468 F.3d 1171, 1180 (9th Cir. 2006); *United States v. Vilches-Navarrete,* 413 F.Supp.2d 60, 67 (D.P.R. 2006), *aff'd,* 523 F.3d 1 (1st Cir. 2008); *United States v. Purvis,* 768 F.2d 1237, 1238-39 (11th Cir. 1985); *United States v. Odom,* 526 F.2d 339 9(5th Cir. 1976); *United States v. Greyshock,* 719 F. Supp. 927, 933 (D. Haw. 1989)).

The district court opinion in *Savchenko* and the Ninth Circuit's opinion in *Zakharov* arose out of the same arrest of multiple defendants after a United States Navy ship conducted a boarding of a Belizian fishing vessel off the coast of Acapulco, Mexico, and found 12 metric tons of cocaine. *Savchenko,* 201 F.R.D. at 504; *Zakharov,* 468 F.3d at 1175-76. The ten crewmen were detained by the Navy and taken to San Diego. *Id.* According to the district court opinion in *Savchenko* -- which did not address a suppression motion, but a motion to dismiss -- the trip took sixteen days. 201 F.R.D. at 504. However, as the opinion in *Zakharov,* explains, the trip took eleven days -- the ship was boarded by the Navy on April 28, 2001, but the cocaine was not found (and the crew not detained), until the fifth day of the search; the defendants arrived and were presented in San Diego on May 13, 2001, eleven days after the crew was detained. 468 F.3d at 1175. In *Savchenko,* the district court denied the defendants' motion to dismiss the indictment based on a violation of Rule 5. 201 F.R.D. at 504. The court did not address the admissibility of any statements and did not analyze the delay under the *McNabb/Mallory* rule or 18 U.S.C. § 3501.

In *Zakharov,* the Ninth Circuit upheld the district court's subsequent decision admitting one of the defendant's statements at trial, finding that, with the Belizian fishing boat in tow, the naval ship proceeded directly to the nearest U.S. port, making no stops along the way and the defendant was presented before a magistrate the same day. *Zakharov,* 468 F.3d at 1180. The

circumstances in *Zakharov*, like all of the other cases that the government cites involving shorter delays, are distinguishable not only because they involved shorter delays, but also because they involved an *unplanned* apprehension off the shores of the United States. *See Vilches-Navarrete*, 413 F. Supp. 2d at 66-67 (motion to dismiss denied where defendants not under arrest during 5-day voyage from ship's interception on high seas to port); *Purvis*, 768 F.2d at 1238-39 (defendants arrested on high seas after Coast Guard boarded and searched vessel); *Odom*, 526 F.2d at 343 (same); *Greyshock*, 719 F. Supp. at 933 (same).

The government also cites *United States v Yunis,* 859 F.2d 953 (D.C. Cir. 1988), where a terror suspect was apprehended in the Eastern Mediterranean, put on a smaller ship, the USS Butte, for *four* days, and never questioned without *Miranda* warnings. *Id.* The next morning, Yunis was transferred to the USS Saratoga, an aircraft carrier, and flown directly off the carrier to Washington D.C., a thirteen- hour flight. *Id.* at 957. Yunis argued unreasonable delay, both because the USS Butte traveled at less than maximum speed, and because the government did not "seriously consider[]" faster alternatives. *Id.* at 968. He asserted that his arrest should have been delayed until the USS Saratoga was closer to the place of arrest. *Id.* Alternatively, he suggested a sea plane or flight from another Mediterranean country should have been arranged. *Id.* The Court rejected these alternatives, noting there was no evidence that the USS Butte was purposely slowed down to increase interrogation time. *Id.* at 969. The Court also credited the government's argument that there was a narrow window for arrest, so that delay until the USS Saratoga was closer was not feasible. *Id.* at 968. In addition, the Court accepted the government's assertions that there were no nearby government seaplanes, commercial seaplanes were not secure, and a flight from a third country would raise unspecified "extradition problems." *Id.* The Court held, in overruling the trial judge, that "the record does not add up to a

finding that the government purposely chose a slow mode of transportation over a faster one. Indeed the trial judge did not point to any available mode of transportation that the government rejected." *Id.*

Despite its reversal of the trial court on the reasonableness of presentment, the court noted that "[t]he interrogation of Yunis hardly qualified as a model for law enforcement behavior." Id. at 969. And, as illustrated below, the conduct in this case fell so far short in both intent and execution from *Yunis* that it must be found unreasonable.

Here, the government devised its plan in order to maximize interrogation time and never seriously considered faster alternatives. From its earliest stages of planning, the government's focus was on interrogation and on creating conditions for transport that would maximize the time and conditions for interrogation. The government tried to create the illusion of seeking other options after it was too late to do so and after recognizing that these options would fail. The government's assertions that it "attempted to acquire access to facilities in a nearby country to which the defendant could be flown from the USS New York, and then transferred to an airplane possessing sufficient range to fly him to the United States" and "components of the government carefully considered them," Gov't. Op. at 7, are belied by the email traffic discussed below. The efforts made were explicitly undertaken solely to allow the Justice Department to assert before this Court that other options were attempted but proved infeasible. The "slow boat" was always the plan.

Although some consideration was given to an air transfer at some point, the earliest planning documents indicate that the government's priority was to maximize the window for interrogation. A flow chart prepared in 2013 noted                            intelligence screening with possible extensions," but

8

The chart noted the option of bringing the

defendant to the United States via a United States Naval vessel taking seven to ten days or by

transfer to FBI aircraft in a third country, presumably a considerably shorter trip.[9] The FBI

understood that Mr. Abu Khatallah (referred to in the emails by the code name **Khatllah** or

**Khatallah** would be in its custody from the point of capture, and noted "we need to be able again

to articulate that we [the FBI] are moving by the most direct route available to ensure he is

presented. While there will be an intel phase, it possibly will be shorter in duration [than that

planned for Anas Al-Libi, codename **AL-Liby** as we need to attenuate and again, would like a

FBI mirandized interview starting aboard the **ship** if at all possible."[10] The FBI clearly

recognized the need to create the illusion of "moving [the defendant] directly to presentment by

the most expeditious route possible."[11] Nevertheless, there were no real efforts to actually bring

the defendant to court in a prompt fashion.

In 2013, while planning the capture of Al-Libi and Abu Khatallah, government agents

understood that a third country transfer should be considered, and it was noted that there had

been some success in the past with **G-18** .[12] Nonetheless, the FBI made a conscious decision

not to explore this and other options until after the capture, thereby making the chances of

success remote.[13] By the time of Mr. Abu Khatallah's abduction in Libya, a decision had been

made at the highest levels that the fourteen-day boat trip would be the method of transport.

Nevertheless, lower level officials were still laboring under the mistaken belief that there was a

genuine interest in finding a third country in which to transfer Mr. Abu Khatallah to an airplane.

---

[8] PE_FBI_001962.
[9] Id.
[10] PE_FBI_002175.
[11] Id.
[12] See e.g., PE_FBI_001984.
[13] See e.g., PE_FBI_000096.

9

For example, on May 30, 2014, approximately two weeks before the capture of Mr. Abu Khatallah, Agent ▮ of the ▮ FBI listed thirteen potential countries, five labeled "Considerations with death penalty option" and eleven labeled "Consideration without the death penalty option."[14] In assessing the five countries that were believed to be options that would still allow the government to seek the death penalty, ▮ noted that G-21 was ideally located and had a good bilateral relationship with the United States; G-18 was generally receptive to United States operations and the United States government had recently assisted G-18 when the ▮ G-38 had designated ▮ and had a good relationship with the FBI; G-24 was geographically a good location; and G-1 was not a member of the EU, thus not a party to the no death penalty pledge.[15] There were many more options available if the death penalty was not going to be pursued.[16] And ▮ noted that he could "expand the list for consideration if needed."[17]

Section Chief Paarman of the FBI also believed as late as the date of apprehension that this strategy might be implemented. He wrote to other colleagues "as soon as the packages [sic] feet touch the deck of the ship IOD and DoS will be messaging all pertinent Legats with a [sic] immediate/priority request to ask the question of those affected host nations in conjunction with respective USEMB."[18]

That never happened because a quicker trip to the United States was never really contemplated by those in charge. It was merely a ruse. As discussed below, no countries were

---

[14] PE_FBI_002244-45. Three of the countries are on both lists.
[15] PE_FBI_002244.
[16] PE_FBI_002244-45, noting G-9 G-6 , G-29 , G-13 G-8 G-4 , G-1 G-33 , G-24 G-18 and G-21
[17] PE_FBI_002244.
[18] PE_FBI_002243.

10

Case 1:14-cr-00141-CRC  Document 196  Filed 05/03/17  Page 11 of 34

contacted before Mr. Abu Khatallah was captured and no countries were contacted after Mr. Abu Khatallah was captured, with the exception of G-24 , which was not contacted until it was too late, and where no one believed the request would be granted. Moreover, well before G-24 was contacted, the plan to have Mr. Abu Khatallah arrive in the United States no earlier than June 26 had already been set.[19]

Once Mr. Abu Khatallah was captured, despite high level meetings on the subject, there were no efforts to promptly present him to a court. There were only efforts to make it appear that actions were being taken to do so and efforts to keep the movement via slow boat secret to avoid public scrutiny or judicial intervention. For example, based on an interagency meeting on the date of Mr. Abu Khatallah's arrest, a State Department official noted that "[b]ecause AK is in law enforcement detention, [DOJ has] certain requirements to inform the judge prior to the arrest being disclosed publicly ("unsealing the indictment"). *DOJ wants to hold that off as long as possible to allow for continued intel debriefing.*"[20]

The Justice Department's focus on secrecy in order to allow for continued interrogation made it impossible to reach out to third countries to expedite his arrival in the United States. On June 16, the FBI issued an order to "cease and desist on all efforts to discuss and/or request third country FTOC related to [Mr. Abu Khatallah] at this time."[21] That same day, word reached high levels of the State Department that the Legatt in G-29 "has sought or considered asking the government of G-29 "to offload [Mr. Abu Khatallah]" and instructions went out "trying to stop the chit chat."[22] Also that day, the Policy Advisor to the

wrote, "[j]ust got some further background on DOJ's position, which apparently is

---

[19] PE_DOS_000110; PE_DOS_000081-85.
[20] PE_DOS_000109 (emphasis added).
[21] PE_FBI_001943.
[22] PE_DOS_000108.

11

related to presenting Abu Khatallah to the court to be charged. I disagree with their reasoning and their/FBI's actions—uncoordinated with State, apparently, and running counter to the [redacted]nteragency-approved plan -- to try to identify a possible location to do a formal transfer of custody, should the judge demand K appear in court quickly."[23] As the evidence at the hearing on Mr. Abu Khatallah's motion to suppress will demonstrate, the Department of Justice valued keeping the operation secret over making any meaningful attempts to promptly present Mr. Abu Khatallah.

After many meetings at which transport was presumed to be by slow ship and after State Department officials were instructed not to reach out to third countries, on June 16, the FBI contacted the State Department, with a belated request to give the appearance of seeking a prompt presentment. As the State Department official reported:

> I just received a call from [FBI] following up [on possible third country transfer]. He told me that FBI needs a plan to reach out to a number of possible transit countries to transfer AK back to U.S. more expeditiously than his remaining on the USS NY. I noted that this hadn't been mentioned                    , nor in any previous meetings preparing for the operation. **FBI EAD** said that the DOJ/FBI are concerned that they may need to assure the judge in the case that all means of a more expeditious appearance before the court were being explored. Even if we try and fail with a number of countries, he said, that would at least show the court that we attempted.[24]

The country list previously disseminated by        included five Group A countries "assessed not to have death penalty objections" and eight Group B countries that "are assessed to have death penalty concerns."[25] Nonetheless, without approaching any third country, in response to the FBI's request, the State department advised, "just to be clear, State's position is that we do not have options to do third country transit. We'll see where this goes, but our strong preference remains that he stay on the boat. We have some standard language that we can make available if

---

[23] PE_DOS_000112.
[24] PE_DOS_000096-99.
[25] Id.

12

high level   we need to go out to governments, but for now we've been told high level to hold

off on notifications and the boat transit remains the plan."[26] Ultimately, the decision was made,

with the consent of the Department of Justice, to not contact any country but   G-24   days into

the operation.[27] Thus, having done nothing for forty-eight hours but sail eastward, not

surprisingly countries earlier considered as viable, were not approached because that would

require turning the ship around. Apparently, no consideration was given to either sailing or

flying a to an aircraft carrier, where airplanes had a range that could have flown non-stop to

Washington, as was done in *Yunis*. 859 F.2d at 957. Such options were not considered because

a faster transportation would interfere with the planned interrogation.

The timeline of the communications is critical. Mr. Abu Khatallah was captured on June

15, 2014. No efforts or plans were made prior to his arrest to present him promptly. The

interrogation began on June 16, 2014. No plans or efforts were made on June 16 or 17 to contact

third countries. The only third country contact,   G-24   was not contacted until at the earliest

the middle of the day on June 18, 2014. The   G-24   asked questions about the transfer on

June 19, and finally responded in the negative at 4 p.m. on June 19. In short, the government

approached only one third country.   G-24   , approached them too late, and moreover, knew

before asking that   G-24   would refuse.[28] The actions taken by the government were not

---

[26] PE_DOS_000079.

[27] PE_FBI_002247-48.

[28] PE_DOS_000005 (government "was clear that there was agreement high level that this was not
going to happen. That [Abu Khatallah] would sail to America. Option B was a second boat if
there was a problem. No one raised up the issue of what to say to the judge.").

genuine attempts to address Mr. Abu Khatallah's rights to a prompt presentment, but rather a
ruse to allow the government to claim it tried.[29]

The government asserts that after June 19th, the ship slowed down because it had
mechanical problems. There is at least some indication that the true reason was to conduct
additional interrogation. As the United States Ambassador to Libya stated, "it was not entirely
clear whether this was wholly due to mechanical failure or the fact that more of value was being
extracted on the intelligence side than had been anticipated."[30] Thus, the United States
Ambassador, who presumably was centrally involved, articulated the view that the initial plan—
to determine the length of the journey based upon the "quality and quantity" of intelligence--had
been implemented and this was why the ship slowed down.

As the evidence at the hearing in this matter will demonstrate, the emails tell the
unfiltered story of what really happened. First, it was clear from the beginning that the "slow
boat" strategy was selected with the intention of maximizing interrogation time. That is "the
epitome of 'unnecessary delay.'" *Corley*, 556 U.S. at 308 (internal citations omitted). Second,
there was never a serious effort to find a third country; the G-24 "hail Mary" pass was tried
only when the capture was reported and the FBI and DOJ became concerned that the Court
would disapprove of the "slow boat" strategy. It was never anticipated that G-24 would
cooperate. And by delaying any other efforts to reach out to third countries until four days after

---

[29] *See e.g.*, PE_DOS_000043 ("The FBI is mostly interested in being able to tell the judge that
they tried to speed his return."); PE_DOS_000023 (the question is asked "whether 1) we're
reaching out because DOJ/FBI has determined they want/need to effect such a transfer, or 2) this
is being done to present an option available should it subsequently be determined that we
need/want to return AK more expeditiously to the U.S. Can someone answer that question?"
and the answer is given "My sense from DOJ last night is not that they view this as essential but
rather they need to be able to say that we tried available options for quicker transfer to deal with
any challenges that AK might lodge in US court when he gets here.")

[30] PE_DOS_000059.

14

capture, the government assured that other more likely prospects would never be explored, because the government was not going to turn the boat around.[31]

The government states that the USS New York could not accommodate an airplane with the range to fly to the United States from the G-22 . Gov't. Op. at 59. However, the government had other options. For example, they could have flown a V-22 Osprey which could be re-fueled in mid-air[32], to an aircraft carrier in the region which does had planes that can fly trans-Atlantic. This onward transit from an aircraft carrier was what was done in *Yunis*.

The government asserts that "[t]he deployment of an aircraft carrier and the necessary auxiliary ships would have been a massive undertaking. In addition to being astronomically expensive, it would have interfered with the deployment of such forces on vital national security missions." Gov't. Op. at 60-61. The government turns the *Yunis* example on its head by arguing that "[i]n *Yunis,* the court found that it was not necessary to postpone the capture to coordinate with the scheduled presence of an aircraft carrier, the court thereby implicitly recognized that the government is not required to make an aircraft carrier available for transport." Gov't. Op. at 61. The government's argument says nothing about where aircraft carriers were at the time. In *Yunis*, the government had the smaller vessel steam to the aircraft carrier after *Yunis* was captured. *Yunis* argued that he should not have been arrested until the carrier was present. Although the Court did not accept that the arrest should have been delayed, even that delay waiting to arrive at the USS Saratoga was viewed as something less than "a model of law enforcement behavior." 859 F.2d at 969. And unlike the USS Butte in *Yunis*, the USS New York had aircraft that could have flown directly to an aircraft carrrer. Thus, the

---

[31] PE_DOS_000081-85.

[32] Boeing V-22 Osprey 2010 Guidebook, http://www.boeing.com/ospreynews/2011/issue_01/final_8jun2010_179638.pdf.

15

argument that this would require an "astronomically expensive" movement of a carrier group is wrong. An Osprey could have taken Mr. Abu Khatallah to a carrier, where he would have switched planes, and he could have been in Washington in a day or two. Certainly, this would have been obvious to planners had they been serious about a prompt transfer rather than just trying to create the illusion of an effort to attend to Mr. Abu Khatallah's rights. And, as for expense, the government spared none on the apprehension and transfer; it only raises costs when it comes to making rights meaningful. The government deliberately chose the slowest possible method to maximize its interests and deprive Mr. Abu Khatallah of his rights.

The government appears to concede that there might have been other third country options, but asserts that it had the right to rule them out so as to preserve its option to seek the death penalty, even at the cost of forgoing prompt presentment. The government argues, "[A]ny country in the European Union would have required the government to waive the death penalty....This would not have been reasonable." Gov't. Op. at 59. In support of this proposition, the government cites as its sole authority this Court's statement in its ruling on Defendant's Motion for Return to Libya. In that motion, the defense sought, as an alternative remedy for Mr. Abu Khatallah's unlawful abduction, to preclude the government from seeking the death penalty. This Court declined to order that remedy holding that the decision to seek the death penalty was a matter of prosecutorial discretion. This does not support a finding that it is reasonable for the government to violate a defendant's rights in order to preserve its option to exercise that discretion.

The government cannot justify a denial of a defendant's his right to a prompt presentment in order to preserve its ability to seek greater charges or a greater penalty. Rather, the government must accept the consequences of its decision to preserve its ability to seek the death

16

penalty over complying with the defendant's right to a prompt presentment. *Cf. United States v. Heshelman*, 521 Fed. Appx. 501 (6th Cir. 2013) (government's failure to seek extradition violated defendant's right to speedy trial). In *Heshelman*, when analyzing a Speedy Trial claim, the Sixth Circuit rejected the government's claim that a delay in prosecution caused by its failure to seek extradition was an excusable delay. 521 Fed. Appx. at 508. In that case, the government chose not to seek extradition based on a belief that Switzerland would not authorize extradition for some of the charged offenses. *Id.* Rather than risk the denial of extradition, the government "used a 'wait-and-see' strategy" and hoped to arrest the defendant after he left Switzerland. *Id.* at 506. Here, the government decided not to request assistance from a foreign country, seeking instead to preserve its prosecutorial option to seek the death penalty. *Id.* at 508. The court in *Hershelman* found that "the government deliberately chose not to extradite" so that it could ensure an opportunity to try the defendant on all of the charges, and "its willingness to wait for an indefinite period of time to fulfill that desire is inconsistent with the dictates of the Sixth Amendment." *Id.* at 508-09. Similarly, the government's willingness to violate Mr. Abu Khatallah's right to a prompt presentment in order to preserve its options is inconsistent with and does not excuse its failure to comply with the obligation to promptly present Mr. Abu Khatallah before a magistrate.

That the government has the option pursuant to statute to seek capital punishment does not mean that the government can override statutory and constitutional rights in order to allow it to have all the tools in its arsenal when the defendant finally arrives. Mr. Abu Khatallah had a right to a prompt presentment. While 18 U.S.C. § 3501 allows for delay beyond the six hour presumptive limit if the delay is *reasonable*, the case law is all directed at *logistical concerns*, not at maintaining prosecutorial advantage in the criminal process. The test for prompt

17

presentment is what is reasonably possible under the circumstances, not what allows prosecutors to retain the leverage of the ultimate penalty.

Of course, the foregoing issue is abstract because the government never had any real interest in approaching EU countries. That would have cut into interrogation time and precluded seeking the death penalty. And it could not approach non-EU countries

because the government waited four days to ask anyone and by that time, it did not want to turn the boat around. Instead, it sent a bound-to-fail, eleventh hour request to ████ G-24 ████ that was, as intended and expected, rejected, so that the interrogation teams could remain – in the words of the FBI -- "onboard a slow ship somewhere bringing our newest detainee to justice."[33] Such willful bravado, such deliberate attempt to maximize interrogation, such willful rejection of obvious solutions, such intentional papering of a phony record for this Court are not the stuff of reasonableness.

## B. Mr. Abu Khatallah did not Waive his Right to a Prompt Presentment.

The government asserts that Mr. Abu Khatallah waived his right to prompt presentment. He did not. In fact, Mr. Abu Khatallah was told that he "will be arraigned before a court in the United States without any undue delay." Gov't. Op. at 15. After being told that he would be promptly presented, he was not asked to waive his right to have that happen. The acknowledgment of rights and waiver form that was presented to Mr. Abu Khatallah did not address his right to a prompt presentment. In fact, fourteen days after Mr. Abu Khatallah's arrest, after the violation occurred, after he arrived in the United States, the government asked Mr. Abu Khatallah to waive his right to a prompt presentment, so that he could be taken to Virginia for

---

[33] PE_FBI_002050.

18

further interrogation, rather than to court. Mr. Abu Khatallah refused to waive his right to be taken to court.

Despite his specific refusal to waive his right to a prompt presentment, the government argues that after six days of detention, Mr. Abu Khatallah waived this right by waiving his *Miranda* rights, citing *Pettyjohn v. United States*, 419 F.2d 651 (D.C. Cir. 1969) and *United States v. Salamanca*, 990 F.2d 629, 634 (D.C. Cir. 1993). Gov't Opp. at 62. Because the facts of this case are significantly different, *Pettyjohn* and *Salamanca* do not support the government's argument.

In *Pettyjohn*, the court held that the time it took police officers to take a statement following a valid *Miranda* waiver cannot be considered an improper delay and that a *Miranda* waiver is necessarily a waiver of the right to a prompt presentment for the time it takes to obtain a statement. *Pettyjohn*, 419 F.2d at 656 ("Surely the law does not allow a person to voluntarily discuss the crime to which he has just confessed for a period of some twenty minutes and then claim on appeal that the twenty minute period during which they spoke constituted a prejudicial delay in violation of his right to rapid arraignment."). The statements given in *Pettyjohn* were given shortly after arrest and a valid *Miranda* waiver. Thereafter, any unnecessary delay could not vitiate the prior statement. *Id.* The court's holding that a *Miranda* waiver constitutes a waiver of prompt presentment was limited to the circumstances presented in *Pettyjohn*. *Id.* ("Thus, *in this case*, we hold that appellant waived any Mallory claim to immediate arraignment by voluntarily agreeing to speak with the police." (emphasis added)). The court found that statements were made prior to the period of unnecessary delay and therefore were not the product of a prompt presentment violation, and a subsequent period of unnecessary delay "cannot retroactively vitiate an otherwise valid confession." *Id.* The court in *Pettyjohn*

19

did not hold, as the government now suggests, that a right to a prompt presentment can be cured by a subsequent *Miranda* waiver or by a *Miranda* waiver that occurs during a period of unnecessary delay.

The government also misstates the D.C. Circuit's holding in *Salamanca*, suggesting that "a *Miranda* waiver [] functions as a waiver of speedy presentment" in all circumstances. Gov't Opp. 62. In *Salamanca*, the court found that there was no unreasonable delay due to the need to locate an interpreter and also noted that the defendant's *Miranda* waiver undercut the defendant's claim that his statements were "rendered involuntary by unlawful delays in presentment," citing *Pettyjohn*. *Salamanca*, 990 F.2d at 634. But, the court did not expand the holding in *Pettyjohn*, or hold that a *Miranda* waiver can cure an otherwise unreasonable delay -- because there was no unreasonable delay at issue in *Salamanca*.

Similarly, in each of the cases cited by the government, there was no unnecessary delay between the defendant's arrest and *Miranda* waiver. Gov't Opp. 62-63 (citing *United States v. Barlow*, 693 F.2d 954, 959 (6th Cir. 1982) (finding no prompt presentment violation where defendant interviewed by FBI and waived *Miranda* while in state custody and state custody not attributable to federal authorities); *United States v. Indian Boy X*, 565 F.2d 585, 591 (9th Cir. 1977) (citing *Pettyjohn* and similar cases in support of finding that juvenile could be questioned following *Miranda* waiver despite delay in presentment that resulted from questioning); *United States v. Howell*, 470 F.2d 1064, 1067, n.1 (9th Cir. 1972) (finding that defendant had no standing to raise alleged violation of witness's right to prompt presentment and noting witness's *Miranda* waiver as waiver of presentment); *O'Neal v. United States*, 411 F.2d 131, 136-37 (5th Cir. 1969) (finding no unnecessary delay and statement made shortly after arrest and after

20

*Miranda* waiver); *United States v. Duvall*, 537 F.2d 15, 24 n.9 (2d Cir. 1976) (noting, without relying on, *Pettyjohn* and similar cases)).

As the Supreme Court stated in *Miranda*, its decision in *Miranda* did not indicate that the *McNabb-Mallory* rules "can be disregarded." *Miranda,* 384 U.S. 436, 463, n. 32. Noting this statement in *Miranda,* the Eighth Circuit has held that the rule set forth in *Pettyjohn* and similar cases, applies only when there is a "short interval between the arrest and the statement," but a *Miranda* warning cannot cure a lengthy delay. *See United States v. Keeble*, 459 F.2d 757, 759 (8th Cir. 1972), *reversed on other grounds*, 412 U.S. 205 (1973) (*Miranda* waiver could not cure 25 1/2 hour delay that occurred prior to *Miranda* waiver). The government's expanded reading of *Pettyjohn* would obliterate the *McNabb-Mallory* rule, despite the specific statement in *Miranda* that it did not intend to do so, and the Court's *Corley* decision, affirming the *McNabb-Mallory* rule. A valid *Miranda* waiver is required for the admissibility of any in-custody statement. Under the government's theory, any statement during any period of delay prior to presentment – regardless of the reason for the delay or the timing of the waiver – would be admissible if a *Miranda* waiver occurred, and there would be no need to ever consider whether a delay was reasonable or unreasonable. This would effectively read an independent prompt presentment requirement out of the law. The Court's decision in *Corely* and 18 U.S.C. § 3501 preclude such a reading.

The government argues that *Corley* did not overrule the decision in *Pettyjohn* because the waiver issue was not before the Court. Gov't Opp. 63 (citing *Brown v. United States*, 979 A.2d 630, 637 (D.C. 2009) (holding that *Corley* did not expressly overrule precedents applying *Miranda* waiver as waiver of prompt presentment); *United States v. Hector*, 2013 WL 2898078 at *13 (N.D. Ga. Jan. 29, 2013) (same); *United States v. Phillips*, 2015 WL 2341981, at *9

(W.D. La. May 13, 2015), *aff'd* 2016 WL 4394554 (5th Cir. Aug. 17, 2016) (applying waiver post-*Corley*)). The waiver rule is, however, inconsistent with the *Corley* decision. While not addressing the waiver issue, the Court determined the continuing validity of the *McNabb-Malloy* rule without reference to Corley's *Miranda* waiver and, despite that waiver, remanded to the Third Circuit for consideration of whether Corley's statements were taken in violation of *McNabb-Mallory*. Nonetheless, this Court need not decide if *Corley* supersedes *Pettyjohn* because *Pettyjohn* does not apply to the facts of this case.

Here, even assuming there was a valid *Miranda* waiver, the delay in presenting Mr. Abu Khatallah did not occur out of a need to complete the questioning of Mr. Abu Khatallah, or following a *Miranda* waiver that took place shortly after arrest. Rather, the delay occurred based on the government's plan for transporting Mr. Abu Khatallah with as much delay as possible, and the government agents used the length of the transportation to repeatedly question Mr. Abu Khatallah. Notably, in *Yunis*, where the defendant was transported from the eastern Mediterranean to the United States via a four-day boat voyage, followed by a 13-hour flight on a military plane, the D.C. Circuit both independently examined, and found voluntary, a *Miranda* waiver and also considered a claim that the delayed transportation violated the defendant's right to a prompt presentment, yet there was no discussion of the *Miranda* waiver acting as a waiver of the right to a prompt presentment. *See Yunis*, 859 F.2d 953. Similarly, there is no possibility here that any *Miranda* waiver also constituted a prompt presentment waiver.

Finally, this case is also distinguishable from the waiver cases cited by the government because the lengthy violation of Mr. Abu Khatallah's right to a prompt presentment occurred long before any purported *Miranda* waiver. In a footnote, the government cites a D.C. Court of

Appeals case issued prior to *Corley* for the proposition that a *Miranda* waiver can constitute a waiver of a prior violation of the right to prompt presentment. Gov't Opp. 63 n.31 (citing *Everetts v. United States*, 627 A.2d 981, 985 (D.C. 1993). *Everetts* is not controlling and cannot be reconciled with *Corley.* Moreover, in *Everetts*, the court expressly recognized "that reliance on a *Miranda* waiver [to excuse a delay] becomes weaker as the length of pre-presentment detention grows [and] *at some point* unjustified delay in presentment may trump all other factors in the ultimate voluntariness determination." 627 A.2d at 985 (emphasis in original) (finding statements admissible despite eleven-hour delay). That "*some point*" is here – with a fourteen-day delay, including a six-day delay prior to issuance of the *Miranda* warnings.

## II.    VIOLATION OF *MIRANDA*.

The government concedes that is agents interrogated Mr. Abu Khatallah for four days, while he was in custody, without first advising him of his rights and obtaining a waiver pursuant to *Miranda.* The question before the Court is whether, following this four-day *Miranda* violation, Mr. Abu Khatallah could have and did knowingly and voluntarily waive his rights. Under the circumstances of this case, there was no effective *Miranda* waiver, and the admission at trial of any post-waiver statements would violate Mr. Abu Khatallah's Fifth Amendment rights.

### A.  Standard for Determining Whether Valid Waiver Possible following Unwarned Interrogation.

The Supreme Court addressed a two-step interrogation process, such as at issue here, in *Missouri v. Seibert*, 542 U.S. 600·(2004). The Court held that the statements taken during the two-step process used in *Seibert* were inadmissible, but the majority disagreed as to the appropriate standard to employ for determining whether a *Miranda* waiver could render admissible statements taken pursuant to similar two-step interrogation methods. *Id.* The

23

plurality found that the "issue is whether it would be reasonable to find that in these circumstances the [*Miranda*] warnings could function 'effectively.'" *Id.* at 611. In a concurring opinion, Justice Kennedy proposed a narrower test to be applied only when a two-step process is deliberately employed, and focusing on whether sufficient curative measures are taken before the postwarning statements are elicited. *Id.* at 622.

The government argues that the Court is required to follow Justice Kennedy's approach, and that this approach requires a showing that the two-step process was employed in order to undermine *Miranda.* Gov't Opp. The government is incorrect on both points. Under the law of this Circuit, Justice Kennedy's opinion is not controlling. Even if the Court chooses to use the Kennedy approach, evidence that the government agents intended to undermine *Miranda* is not required, and here, the government did not employ sufficient curative measures.

The government acknowledges that Justice Kennedy's approach does not represent a common denominator of the *Seibert* Court's reasoning. Gov't Opp. 29 n.10 ("We recognize that, in cases in which an impermissible intent is actually present, Justice Kennedy's opinion may provide a broader ground for exclusion [than the plurality's approach], as his approach would exclude a second related statement 'unless curative measures are taken before the post-warning statement is made,' *Seibert,* 542 U.S. at 622, while the plurality would permit the introduction of the second statement even in the absence of curative measures, so long as the *Miranda* warnings 'could function "effectively" as *Miranda* requires . . . .' *Id.* at 611-612."). Nonetheless, the government argues – based on *Marks v. United States,* 430 U.S. 188 (1977) – that Justice Kennedy's opinion is controlling, citing authority from the Ninth and Fourth Circuits. *Id.* at 29 (citations omitted). Under the law in this Circuit, however, Justice Kennedy's opinion is not controlling. *See United States v. Epps,* 707 F.3d 337 (D.C. Cir. 2013).

24

In *Epps*, the D.C. Circuit explained:

> This court has interpreted *Marks* to mean that the narrowest opinion "must represent a common denominator of the Court's *reasoning*; it must embody a position implicitly approved by at least five Justices who support the judgment." *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (*en banc*) (emphasis added). Stated differently, *Marks* applies when, for example, "the concurrence posits a narrow test to which the plurality must *necessarily agree as a logical consequence* of its own, broader position." *Id.* at 782 (emphasis added).

*Epps*, 707 F.3d at 348. Based on this Circuit's precedent, the court in *Epps* disagreed with every other circuit and found that the concurring opinion in *Freeman v. United States*, 564 U.S. 522 (2011), was not controlling authority because it did not represent a logical subset of the analysis of the plurality in *Freeman*. *Epps*, 707 at 348-50. Similarly, as the government acknowledges, Justice Kennedy's opinion is not a "subset" of the plurality opinion in *Seibert*. Justice Kennedy posits a different test, not simply a narrower one. Therefore, is not controlling in this Circuit. In light of *King* and *Epps*, in this Circuit, *Seibert* stands only for the proposition that a *Miranda* waiver may not be sufficient to render admissible statements taken during a two-step process of interrogation, such as that used here.

Even if Justice Kennedy's approach were controlling, Justice Kennedy focused on whether or not a two-step process was deliberately employed, rejecting the plurality's approach that would apply "in the case of both intentional and unintentional two-stage interrogations." *Seibert*, 542 U.S. at 620-21 (noting that in some cases an officer "may not realize that a suspect is in custody and warnings are required"). Justice Kennedy explained the danger that an intentional two-step process can allow the police to deliberately undermine *Miranda. Id.* However, Justice Kennedy's approach does not require evidence of the government agents' intent in employing a two-step approach, but rather only evidence that the agents employed the two-step approach deliberately. *Id.* at 622 ("The admissibility of postwarning statements should

25

continue to be governed by the principles of [*Oregon v.*] *Elstad*, 470 U.S. 298 (1985),] unless the deliberate two-step strategy was employed. If the deliberate two-step strategy has been used, postwarning statements must be excluded unless curative measures are taken before the postwarning statement is made.").[34] Thus, the government's argument that it undertook the two-step process not to thwart *Miranda*, but to "obtain any actionable, national security-related, intelligence information that [Mr. Abu Khatallah] might have," Gov't Op. 31, is irrelevant. The governments employed the two-step process deliberately with the explicit intent that both processes address the criminal act here charged.

## B. Under the Cirumstances here, the *Miranda* Warnings Could Not Function Effectively, and the Curative Measures were Not Sufficient.

The evidence at the hearing in this matter will demonstrate that regardless of whether the Court adopts the plurality's standard or the Justice Kennedy approach, the postwarning statements are inadmissible.

The plurality in *Seibert* laid out five factors to consider when determining whether a *Miranda* waiver could be effective during a two-step procedure: "[1] the completeness and detail of the questions and answers in the first round of interrogation; [2] the overlapping content of the two statements; [3] the timing and setting of the first and second interrogation; [4] the continuity of police personnel; and [5] the degree to which the interrogator's questions treated the second round as continuous with the first." *Seibert*, 542 U.S. at 615. The plurality did not, however, suggest that these factors are the only factors to consider. Rather, the issues are:

---

[34] As the government notes, the court in *United States v. Straker*, 800 F.3d 570, 618 (D.C. Cir. 2015), broadly stated that "Justice Kennedy's test applies only when police deliberately use a two-step interrogation to thwart *Miranda*." However, the holding in *Straker* was that no deliberate two-step process was undertaken because the Trinidadian police and the FBI agents who took the separate statements were not acting jointly. *Id.* The *Straker* court did not address whether there must be evidence of the purpose for employing the two-step procedures.

"Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that junction? Could they reasonably convey that he could choose to stop talking even if he had talked earlier?" *Id.* at 612. As the plurality explained, "unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment." *Id.*

It is not surprising that the government asks this Court to ignore the plurality test, as it is clear that Mr. Abu Khatallah could not have believed he was in a position to make an informed choice. *See Id.* at 621 (Kennedy, J. concurring) (plurality's test "envisions an objective inquiry from the perspective of the suspect"). The first group of interrogators questioned Mr. Abu Khatallah without warnings not for a few minutes, but for four days, for a total of somewhere between 21 and 28 hours. This was an extremely protracted interrogation by any standard.

Both interrogation teams were specifically directed to ask about ▮▮▮▮▮▮▮▮▮ so there was clear and deliberate overlap. The government argues that the there was little overlap between the questioning and cites a case where "defendant asked only one question in unwarned interview statement and thus there was 'almost no overlap' between the unwarned statement and the full confession." Addendum to Op. at 7-8. That was not the case here. The government fails to note that the first group of interrogators was specifically tasked with interrogating Mr. Abu Khatallah regarding ▮▮▮▮▮▮▮▮ In an email dated June 17, 2014, the Executive Assistant Director of the FBI, ▮▮▮▮▮▮▮, directed:

To all concerned:

After extensive consultation with the Deputy Director FBI as well as the Director, **IA** I am authorizing the **IA** and the **IA** to address ▮▮▮▮▮▮▮▮ with Khatallhah [sic]

27

during ongoing interrogations. I have discussed the issue with DOJ as has the **IA**
Failure to address the issue will continue to serve as an impediment to intelligence
collection. Please ensure the issue addressed at the next possible opportunity.[35]

Interrogation by the first team continued until June 19 and included

with the interrogation that followed by the second team of interrogators. A

significant portion of the questioning by the first group of interrogators related to

The questions about the same

permeated each day of the interrogations by both

teams. The first team of interrogator's questioning about itself was closest in time to
when the second team began its work. Here, there was much more than "one overlapping
question," and the second interrogation team's questioning was a continuation of the last two
days of the first team's interrogation regarding

In addition, the place of interrogations by the first and second teams was the same –
changing a few posters does not create a new environment. While the specific personnel may
have changed, it was the FBI controlling the environment at all times, and Mr. Abu Khatallah
had no reason to distinguish one set of Americans from another. As in *Seibert*, and as will be
further demonstrated at the evidentiary hearing, "[t]hese circumstances must be seen as
challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a
reasonable person in [Mr. Abu Khatallah's] shoes would not have understood them to convey a
message that [he] retained a choice about continuing to talk [while on board the ship]." *Id.* at
617.

---

[35] PE_FBI_001982.

Even if the Court adopts Justice Kennedy's approach, the "curative measures" the government took were not sufficient to "ensure that a reasonable person in [Mr. Abu Khatallah's] situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Id.* at 622 (Kennedy, J. concurring). The first interrogation team interrogated Mr. Abu Khatallah seven times over four days, from the time he arrived on the ship late in the evening of June 15 until June 19 at 5:45 a.m. According to the Addendum filed by the government, the interviews were done in a detainee pod, and Mr. Abu Khatallah was provided with basic needs – food, prayer rug, Koran, shower and toilet facilities – and medical attention.

The government argues that "(1) the décor of the defendant's interview room was changed; (2) the defendant's living quarters were changed to include providing him a mattress, a prayer rug, a sweatshirt, a notebook, a pen, and a copy of the Koran; (3) the defendant was given increased shower access; and (4) the defendant was put on a different, increased meal schedule."[36] These minor changes – to the extent they were made -- were insignificant, and some were merely offered, not given.[37] The interrogations were conducted in rooms that were so similar that Mr. Abu Khatallah would have no reason to believe they were not the same room. The same military guards brought him from his pod to the interview rooms. He was blindfolded and handcuffed in the same manner for transport from his pod to the interview rooms. The only "décor" that appears to have been switched in the interview room was the addition of posters on the wall. Mr. Abu Khatallah's living quarters remained the same pod. Moreover, many of the additional items he was "offered," he already had. During the time he was interrogated by the first team, he was given a mattress, a prayer rug, a sweatshirt, a Koran, showers and meals. During the first set of interrogations, he was provided with a blanket to wrap around him when

---

[36] Op. at 9.

[37] FBI-302_02321, attached as Exhibit 3.

he was cold, juice, orange Gatorade, tea and snacks. There was no discernable increase in the number of showers he was given. The first team did not deprive Mr. Abu Khatallah of the same basic necessities that he was provide during the second set of interrogations. While the government would have the Court believe an attenuation period began immediately at the end of the pre-*Miranda* interrogations, Mr. Abu Khatallah was not moved to a different cell until approximately 18 hours later, and once moved, the surroundings were not materially different. His treatment was not materially different, and the questions asked were not materially different.

The presence of different Americans, and a two-day delay between sessions was not sufficient attenuation give the circumstances of Mr. Abu Khatallah's detention. Two days off within a fourteen day boat trip, after being abducted from your home country by foreign invaders, without any lawyers available, with a mere change of posters and foreign faces, does not allow for a meaningful waiver of *Miranda* rights. Mr. Abu Khatallah had no way to judge time or its passage, thus rendering the notion of 48 hours passing meaningless. The environment was orchestrated to create the illusion of due process, while creating a coercive, claustrophobic, hopeless environment on a boat to an unspecified destination – Guantanamo Bay? A black site prison? The United States? Common sense dictates that these circumstances did not ensure that a reasonable person in Mr. Abu Khatallah's situation could understand the *Miranda* warnings or that he could make a voluntary choice.

## C. Mr. Abu Khatallah did not Waive his Right to Counsel.

As set forth in our initial motion, when presented with the *Miranda* warnings, Mr. Abu Khatallah asked whether there was a lawyer on the ship and was told none was available. In these circumstances, there can be no meaningful waiver of the right to counsel. The government argues that asking if there was a lawyer on the ship was not adequate to trigger the right to

30

counsel. None of the cases it cites is remotely applicable. Mr. Abu Khatallah did not say,
"maybe I should talk to a lawyer," or ask "do I need a lawyer?" or "would you recommend that I
get a lawyer?" Rather Mr. Abu Khatallah knew he was on a ship, but had no idea where he was,
how long he would be on the ship, or where the ship was headed. He was being questioned in a
foreign language and was told he was entitled to a lawyer. He asked, is there a lawyer on this
ship for me? He was told no.

The government argues that it was perfectly appropriate not to have a lawyer on the ship
or to fly one onto the ship with the second team of interrogators. The government cites *Miranda*
and its progeny for the proposition that there does not need to be a "station house lawyer" or a
lawyer "producible on call." But there is a world of difference between requiring a lawyer to be
waiting in the lobby of the police station and telling a defendant that you will have no lawyer
available for a period of weeks. This again was a deliberate decision. A fair adversary, an
adversary that honored the Constitution, would have had a lawyer available to fly to the ship.
That could have been accomplished in a matter of hours, or a day at most. But Mr. Abu
Khatallah was never given that option. In these circumstances, he did not waive his right to
counsel, and his Sixth Amendment rights have been violated.

**III.    The Statements were not voluntary given the totality of the circumstances.**

Both the voluntariness of the *Miranda* waiver and the voluntariness of Mr. Abu
Khatallah's statements must be evaluated in light of Mr. Abu Khatallah's background and
experiences. Mr. Abu Khatallah's inability to comprehend the significance of his rights
extended far beyond his lack of exposure to the popular culture of the United States. At the time
of his abduction by the United States, not only was he unfamiliar with our legal system, culture
and constitutional protections, he also had been consistently exposed to tyrannical, intolerant,

31

and abusive government authorities that had tortured him and observed no recognized procedural norms.

Libyan media was tightly controlled by the Gaddafi regime for over forty years, from several years prior to Mr. Abu Khatallah's birth until he assisted in the overthrow of Gaddafi in 2011. During Mr. Abu Khatallah's coming of age, his exposure to western values, constitutional rights and democratic principles was nonexistent. Gadaffi was masterful at controlling the population of Libya through fear and intimidation. His methods including the televised public torture and execution of those the regime defined as criminals. Mr. Abu Khatallah's hometown, Benghazi, was the site of some of these executions, including a repeatedly-televised execution that occurred when Mr. Abu Khatallah was 13 years old. *See*

https://theguardian.com/world/2011/jul/18/gaddafi-brutl-regime-exposed-lost-archive.

In 1996, when Mr. Abu Khatallah was 25 years old and in custody in Libya, Gaddafi ordered the notorious massacre of 1200 inmates in Salim prison in Tripoli. This and many other atrocities committed by the Libyan government serve as the basis for the Libyan experience, and Mr. Abu Khatallah's understanding of "legal rights." Amnesty International and other human rights groups documented the plight of the Libyan people who were arrested and detained under the Gaddafi regime. As reported in 1997:

Torture is applied against detainees during interrogation to extract confessions which in turn are used to incriminate them. Methods include beating (including falaqa – beating on the soles of the feet), hanging by the wrists from a ceiling or high windows or being suspended from a pole inserted between the knees and elbows, electric shocks, burning with cigarettes and being threatened and exposed to aggressive dogs which result in bite wounds. Psychological torture and ill-treatment include death threats and threats of abuse against the prisoner and his family, particularly female relatives.

Libya: Gross human rights violations amid secrecy and isolation, Amnesty International, p. 12-13 (June 1997).

Mr. Abu Khatallah's experience of "legal rights" was not limited to Gaddafi's regime, but also reported abuses by the United States. Prior to Mr. Abu Khatallah's abduction by government agents, Human Rights Watch and other human rights organizations had reported on torture and abuse during United States' renditions. *See, e.g., Delivered into Enemy Hands: US-Led Abuse and Rendition of Opponents to Qaddafi's Libya,*

https://www.hrw.org/sites/default/files/reports/Libya0192webwcover_1.pdf. (fifteen Libyans subjected to extensive torture in U.S.-run secret prisons, allegedly including beatings, sexual humiliation, sleep-deprivation and starvation, being chained to walls naked—sometimes while diapered—in pitch dark, windowless cells, being restrained in painful stress positions for long periods of time, being forced into cramped spaces, being threatened and slammed into walls, being kept inside for nearly five months without ability to bathe, being denied food and being denied sleep by continuous deafeningly loud western music). This report was covered by Libyan press. *See e.g., New allegations surface of US torture of Libyans and collaboration with Qaddafi regime,* Sept. 6, 2012, https://www.libyaherald.com/?s=rendered+into+enemy+hands.

Mr. Abu Khatallah had no experience, knowledge or understanding of legal rights in any context even remotely similar to those at issue here. To argue otherwise is farcical. Mr. Abu Khatallah's experience of government authority was brutal force, sadistic torture, unexplained kidnappings, disappearances and public hangings. Given this background, after being abducted by U.S. agents, Mr. Abu Khatallah reasonably believed that in order to survive, he needed to comply with interrogators.

## CONCLUSION

For the reasons set forth in the Motion to Suppress Statements of Defendant Abu Khatallah, the foregoing reasons, and such other reasons as will be presented at the evidentiary

33

hearing in this matter, all custodial statements made by Mr. Abu Khatallah prior to his

presentment must be suppressed.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____

MICHELLE M. PETERSON
MARY MANNING PETRAS
Assistant Federal Public Defenders
625 Indiana Avenue, N.W.
Suite 550
Washington, D.C. 20004
(202) 208-7500

ERIC L. LEWIS (D.C. Bar #394643)
JEFFREY D. ROBINSON (D.C. Bar #376037)
LEWIS BAACH PLLC
1899 Pennsylvania Avenue, N.W., Suite 600
Washington, D.C. 20006
(202) 833-8900 (voice)
(202) 466-5738 (facsimile)

Counsel for Ahmed Abu Khatallah