███

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **Crim. No.: 14-141 (CRC)** |
| | : | |
| | : | |
| **AHMED SALIM FARAJ ABU** | : | |
| **KHATALLAH,** | : | |
| | : | |
|    also known as "Ahmed Abu Khatallah," | : | |
|    also known as "Ahmed Mukatallah," | : | |
|    also known as "Ahmed Bukatallah," and | : | |
|    also known as "Sheik," | : | |
| | : | |
|       **Defendant.** | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

███ The government respectfully submits this opposition to the defendant's motion to suppress.[1]

## I.    Introduction.

███ The defendant's custodial statements should not be suppressed. The statements were obtained through a process that carefully balanced the government's legitimate national security interests and the defendant's constitutional rights. At all points in the process, the defendant's

---

[1] ███ The defendant made two sets of statements to U.S. authorities: (1) statements to an intelligence team and (2) statements to a law enforcement team. The government's prosecution team was not involved with the intelligence interviews and does not know the content of any statements the defendant made during those sessions. Accordingly, the government's filter team is filing an addendum to this opposition, addressing any issues raised during the intelligence interviews that are germane to the admissibility of the defendant's statements to law enforcement. The filter team will also, with the Court's permission, handle any such issues that may be raised at the hearing on the defendant's motion to suppress.

███ For ease of reference, this opposition will refer to the defendant's statements to law enforcement as the defendant's "custodial statements."

███

rights were scrupulously upheld.

)First, the defendant's *Miranda*[2] rights were completely effectuated.  In light of the government's national security interests, an inter-agency team of intelligence officials conducted unwarned interviews of the defendant shortly after he was apprehended and before he was interviewed by law enforcement agents.  These interviews were designed to obtain information regarding current and ongoing threats to our national security; they were not, however, designed to circumvent the strictures of *Miranda*.  For example, more than 48 hours elapsed between the completion of these intelligence interviews and the initiation of the warned, law enforcement interviews that followed; an entirely different team was used for the law enforcement interviews; the intelligence interview team did not share any information gleaned from the defendant with the law enforcement team; and the defendant was told that the law enforcement team was unaware of what he might have said during the intelligence interviews.  Accordingly, more than adequate steps were taken to ensure that the defendant's subsequent *Miranda* waivers were voluntary, knowing, and intelligent.  Additionally, during the course of the warned interviews, the defendant never asked for the assistance of counsel – much less unambiguously invoked his right to counsel.

Second, the defendant's custodial statements were voluntary.  The defendant was not subjected to any coercive tactics.  On the contrary, the interviewing agents treated the defendant with respect and civility.  This included attending to his medical needs, providing him breaks, and affording him the opportunity to maintain his religious observances.  Significantly, the

---

[2]     )*Miranda v. Arizona*, 384 U.S. 436 (1966).

███████████████

defendant's own actions demonstrated the voluntary nature of the interviews, *e.g.*, he refused to answer certain questions, and chose to invoke certain rights.

██ Last, the defendant's presentment was not unreasonably delayed.  Due to logistical, regional, and diplomatic concerns, the only reasonable way to transport the defendant to the United States was by ship.  That ship took a direct course, steamed at an appropriate speed, and made no stops while transporting the defendant.  In any event, the defendant waived his right to speedy presentment.

## II.     Background.

██ The defendant, Ahmed Salim Faraj Abu Khatallah, a Libyan national, has been charged by indictment for his participation in the September 11-12, 2012, terrorist attack (the "Attack") on a U.S. compound in Benghazi, Libya, known as the U.S. Special Mission (the "Mission") and a second U.S. facility known as the Annex, which resulted in the deaths of four Americans.  The Attack was carried out by Libyan-based Islamist extremists, including members of Ansar Al-Sharia ("AAS") and Ubaydah Ibn Al Jarrah ("UBJ").  The defendant was the commander of UBJ, an extremist brigade that was absorbed into AAS.  AAS is an armed militia that holds anti-Western views and advocates the establishment of Sharia law in Libya.

██The defendant was a senior leader of AAS in Benghazi.  The United States Department of State ("DOS") designated AAS in Benghazi as a Foreign Terrorist Organization on January 13, 2014.  At the same time the DOS announced its designation, it explained that AAS Benghazi has been involved in terrorist attacks against civilian targets, assassinations and attempted assassinations of security officials and political actors in eastern Libya, as well as the

███████████████

██████████

Attack.   The defendant was also designated by the DOS as a Specially Designated Global Terrorist.

██ As set forth in the superseding indictment, in the days leading up to the Attack, the defendant voiced his opposition to the presence of an American facility in Benghazi and said he was going to do something about this facility.   On September 11, 2012, the defendant drove to the Mission with other attackers.   At approximately 9:45 p.m., a group of approximately twenty armed men, including close associates of the defendant, breached the main gate of the Mission. During the Attack, buildings within the Mission were set afire, resulting in the deaths of Ambassador J. Christopher Stevens and DOS Information Management Officer Sean Patrick Smith.   The defendant actively participated in the attack on the Mission by, among other things, coordinating efforts to turn away emergency responders.   After the remaining U.S. personnel had evacuated the Mission, the defendant entered the Mission compound and supervised the plunder of materials from the Mission's Office, including documents, maps and computers containing sensitive information about the location of the Annex.

██)Following the attack on the Mission, the defendant returned to an AAS camp in Benghazi, in possession of a vehicle and materials stolen from the Mission.   Beginning at approximately 12:30 a.m. on September 12, 2012, the defendant's co-conspirators attacked the Annex with small arms fire.   Later that morning, at approximately 5:15 a.m., the defendant's co-conspirators attacked the Annex with mortars, resulting in the deaths of Security Officers Tyrone Snowden Woods and Glen Anthony Doherty.

██████████

███████████████

## III.    Procedural History.

███ On July 15, 2013, the defendant was charged for his participation in the Attack by a sealed criminal complaint.  At that time, a warrant was issued for his arrest.  The defendant was captured on June 15, 2014, while in Benghazi.   On June 26, 2014, a federal grand jury in this district returned a one-count indictment, charging the defendant with conspiring to provide material support to terrorists.  On October 14, 2014, the same grand jury returned an eighteen-count superseding indictment, charging the defendant with additional offenses for his participation in the Attack, including offenses for which the maximum penalty is death.  After completion of the Department of Justice's death penalty review process, the Attorney General decided not to seek the death penalty in this case.  On May 10, 2016, the government notified the defendant and the Court of the Attorney General's decision.  [Dkt. #154].

## IV.    Facts.

███The government sets forth pertinent facts below.  At a hearing on this motion, we expect this record to be supplemented.

## A.    Apprehension of the defendant.

███ During the evening of June 15, 2014, ████████████████████ from the Department of Defense apprehended the defendant in Benghazi, Libya.  The defendant violently resisted:  he tried to hit, bite, and kick the ████ personnel.  The defendant was also armed with a loaded Taurus 9mm pistol.  Accordingly, the ████ personnel used physical force to restrain the defendant.  During the encounter, the defendant received a small cut on his head and several abrasions and bruises to his face.

███████████████

███████████████

███ Once the defendant was subdued, he was handcuffed behind his back and gagged. (The defendant was gagged in order to preserve the security of the operation.)  While still on the scene of the capture, the gag was removed and the defendant gave his full name:  "Ahmed Salim Faraj Al-Khatallah."   He said that he did not suffer from any serious medical conditions. Nevertheless, ████ medical personnel examined the defendant.  They observed the cut on his head and facial injuries, and they determined that he was capable of walking to the nearby beach.

███ After the medical exam, the defendant was again gagged, blindfolded, and his ears were covered.  (This was done for security – not punitive – purposes.)  He was also fitted with a life preserver.  Once the defendant reached the beach, his handcuffs were moved to the front of his body.  He was then told that he was being transported via boat.  The defendant boarded the awaiting boat without incident.

███ During the boat ride, the medical personnel periodically checked the defendant's medical condition; they noted no problems.  Eventually, the defendant was transferred to a second boat, which transported him to the USS *New York*, which was waiting off the coast of Libya.  During that leg of the trip, ██████████████████████, the defendant's medical condition was periodically checked and his gag was removed.  When the second boat arrived at the USS *New York*, the defendant was put ████████████ onboard.

███████████████



THE USS *NEW YORK*

The USS *New York* is an amphibious assault ship.  It has a flight deck that can accommodate helicopters and certain fixed wing aircraft.  It cannot, however, accommodate aircraft that have sufficient range to fly from the coast of Libya to the United States.

In order to preserve operational security, the mission to apprehend the defendant was closely held prior to its execution.  After the defendant was apprehended, the United States government attempted to acquire access to facilities in a nearby country to which the defendant could be flown from the USS *New York*, and then transferred to an airplane possessing sufficient range to fly him to the United States.  Based on logistics and geography, only a few countries were potential candidates for this transfer, and components of the government carefully considered them.  (No country in the European Union was an option due to issues arising from the potential applicability of the death penalty in this case and other political considerations.

████████████

(*See* § VII.B. *infra*).)   The list of potential countries through which the defendant could be transited was further reduced after consideration of a range of concerns, including diplomatic issues and those countries' domestic situations.   In the end, only one country[3] was a viable candidate.   That country's government was contacted regarding access to its facilities, but, due to their concerns about security and the potential domestic reaction, that government declined to grant access.

██)Accordingly, the USS *New York* was the only option available for transporting the defendant to the United States.   The ship steamed to the United States on the most direct course without making any port calls.   The USS *New York* steamed at its optimal speed, except for a period during which it experienced engine problems.   The engines were repaired as quickly as possible, and the USS *New York* returned to optimal speed for the balance of its passage.

**B.**   **Intelligence interviews of the defendant.**



████  The defendant was initially interviewed by ████████ Inter-Agency ████████

---

[3]   ████  That country was ██ G-24 ████████

███████████

the filter team's addendum to this brief.[4]

## C.   Law enforcement interviews of the defendant.

█████ After the ██ completed its interview process, at approximately 5:45 a.m.[5] on June 19, 2014, the law enforcement interview phase began.  Initially, the following steps were taken to separate the intelligence interviews from the subsequent law enforcement interviews: (1) the decor of the defendant's interview room was changed; (2) the defendant's living quarters were changed, to include providing him a mattress, a prayer rug, a sweatshirt, a notebook, a pen, and a copy of the Koran; (3) the defendant was given increased shower access; and (4) the defendant was put on a different, increased meal schedule.  During the days of June 19 and 20, 2014, the defendant was not interviewed at all.



DEFENDANT'S LIVING QUARTERS

███ The FBI began to interview the defendant on June 21, 2014.  The interviews were

---

[4]    █)Inasmuch as the government has no intention of seeking the admission in our case-in-chief of statements made by the defendant during the intelligence interviews, the defendant's claim that it is "indisputable that a violation of *Miranda* occurred" (Defendant's Motion to Suppress Statements ("Def. Mot.") at 13) is baseless. *See, e.g., United States v. Patane*, 542 U.S. 630, 641 (2004) (plurality opinion) ("[V]iolations [of the Fifth Amendment right against self-incrimination] occur, if at all, only upon the admission of unwarned statements into evidence at trial."); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990) (" [A] violation [of the Fifth Amendment right against self-incrimination] occurs only at trial."). *See also* Addendum.

[5]    ██)All times noted herein are Greenwich Mean or "Zulu" Time.  We note that Greenwich Mean Time is only two hours behind the defendant's local time zone.

███████████

████████████████

conducted by FBI Special Agents Michael Clarke and Justin O'Donnell.  They were assisted by

an FBI linguist.[6]  The law enforcement interviews were all conducted in the same room.  It was

8' x 7' with an 8' ceiling.  The room was furnished with a small table and four plastic chairs.

The room was kept at a comfortable temperature, and its lighting was akin to that found in a

normal office.



INTERVIEW ROOM

████During the interviews the agents and the linguist wore casual, civilian clothes, and they were unarmed.  Aside from greetings, such as handshakes, the agents never had any physical contact with the defendant during the interviews.  The interviews were conducted in a normal conversational tone of voice.

████As set forth in more detail below, the interview sessions lasted for several hours with

regular breaks taken.  The defendant was regularly offered food and drink and afforded the

---

[6]  ████The FBI linguist is a native Arabic speaker.  He has 11 years' experience as an FBI linguist, during which time he has interpreted in over 1,000 law enforcement interviews involving Arabic speakers – including over 100 that involved Libyan nationals.  Before working in the field, the linguist completed FBI training, which included testing and monitoring by another accomplished linguist.  The FBI linguist was recently named the FBI "Linguist of the Year," and, in addition to law enforcement interviews, the FBI linguist has interpreted for the United States ambassador to Libya.  The FBI linguist experienced no trouble communicating with the defendant.  In the rare instances when there was a miscommunication, the linguist would rephrase and confirm with the defendant that he understood.

████████████████

████████████

opportunity to use the restroom as needed.  The defendant also received periodic medical checks.

1.      **First Interview – June 21, 2014.**

█At approximately 7:30 a.m., two military guards brought the defendant to the FBI interview room.  He was blindfolded and handcuffed.  When they arrived at the room, the blindfold and handcuffs were removed, and the defendant sat in a chair.[7]  The military guards left the defendant with Agents Clark and O'Donnell and the FBI linguist.

█The agents asked the defendant about his well-being, including if he had been able to eat and drink and relieve himself.  They also asked if he had been afforded the opportunity to pray.  The defendant said that he was eating and sleeping well and was in overall good health. He mentioned that he had been examined by a doctor, who gave him eye drops; he also mentioned that he had a headache.  In sum, the defendant seemed to be rested and coherent.

█The agents introduced themselves to the defendant.   They told him that he was onboard a United States navy ship and that he was under arrest on charges pending in a United States court in connection with the attack on the American mission in Benghazi, Libya, on September 11-12, 2012.

█At about 8:00 a.m., the agents advised the defendant of his *Miranda* rights.   The agents told the defendant that, although they knew that he had met with other Americans, they did not know what he had said to them.   And that whatever he may have previously said

---

[7]     █Throughout the FBI interviews, the defendant was escorted to and from the interview room by military guards, while blindfolded and handcuffed.  The blindfold and handcuffs were always removed before the interview resumed.

████████████

███████████████

probably would not be used against him in court.[8]   The agents also explained that they were starting anew, and the defendant was not required to speak to them just because he may have spoken to the other officials earlier.   The defendant was told that, if he chose to speak to the agents, anything he said could be used against him in an American court.   The defendant was also told that he would be presented in court without undue delay.

███ The defendant stated that he understood his rights and wished to waive them.   The defendant then asked if an attorney was "here"; the agents responded no.   The defendant affirmed that he, nevertheless, wanted to speak to the agents.   He also noted that he reserved his right to consult an attorney in the future.   After confirming that the defendant could read and write in Arabic, the agents gave the defendant an advice-of-rights form, which had been translated into Arabic.   The form was read to the defendant, as he followed along.   After each paragraph was read to the defendant, he initialed the form, indicating that he understood his rights.   At approximately 8:20 a.m., the defendant orally waived his rights and signed the written waiver form.   He also wrote the following on the form:   "I understand from the conversation that I have the right to have an attorney present at any time but I agreed today 21 June 2014 to talk without an attorney present."

---

[8]      ███ The phrase "most likely" was used because voluntary, unwarned statements may be used to impeach a defendant, if he testifies.   *See Harris v. New York*,  401 U.S. 222 (1971).

███████████████

### إشعار بالحقوق

نحن ضباط منفذين للقانون الأمريكي.  لقد تم إعتقالك بسبب مخالفتك للقانون الإجرامي الأمريكي المتعلق بالهجوم على البعثة الأمريكية في بنغازي, ليبيا يوم الحادي عشر من سبتمبر 2012.  بما انك تحت قيد الإعتقال, القانون الأمريكي يوفر لك حقوق معينة في تعاملك معنا.

قبل ان نبدأ بطرح اية اسئلة, نريد التأكد من انك تفهم حقوقك الممنوحة لك .

لك الحق في البقاء صامتاً.

نحن نعلم انك تقابلت مع اعضاء آخرين من الحكومة الأمريكية في السابق.  نحن لا نعلم إذا قلت لهم او قالوا لك اي شيء.  أي شيء ذكرته في السابق لمسؤولين آخرين من الحكومة الأمريكية لم يكن موضوع الإجراءات الإجرامية الموجهة ضدك في الولايات المتحدة, ومن الغالب انها لن تستعمل ضدك في المحاكم الأمريكية.  نحن الآن نبدأ من جديد.

أنت غير مضطرٍ للتحدث معنا اليوم فقط لانك قد تحدثت مع آخرين في السابق.  إذا قررت التحدث معنا اليوم, فمن الضروري أن تعلم أن أي شيء تقوله يمكن أن يستخدم ضدك في المحاكم الأمريكية.

يحق لك استشارة محام قبل ان نوجه اليك أية اسئلة.

يحق لك اصطحاب محام معك خلال الأستجواب.

ان لم تكن لديك القدرة المالية على تعيين محامٍ سوف يُعَيْن لك واحداً قبل الإستجواب لو رغبت.

قبل أن تقرر ما إذا أردت التحدث معنا اليوم ام لا, نريد ان نوضح لك انه بما أنك قيد الإعتقال في تهم إجرامية أمريكية سيتم إحضارك إلى المحكمة في الولايات المتحدة ويدون أي تأخير غير ضروري.  عند وصولك الى المحكمة, القاضي سوضح لك التهم الموجهة ضدك ويعطيك الفرصة لتوكل محام حسب إختيارك, او إذا لم تكن لك القدرة المالية في تعيين محامي فسيتم تعيين محام لتمثيلك وأيضاً سيحدد ما إذا سيتم إطلاق سراحك بكفالة بأنتظار صدور لائحة الإتهام و/أو المحاكمة في القضية ضدك.

هل لديك أي أسئلة بخصوص ما وضّحته لك آنفاً ؟

الإقرار بالحقوق والتنازل عن الحق في حضور محامي والبقاء صامتاً

- انا على إستعداد لإدلاء بتصريحات والإجابة على الأسئلة. _____ تمرلاكان ___ أحـ ___
- لا اريد محام في الوقت الحاضر. _____ لعب وجودم اماندستقبلي _نخ ___ أ ___ حـ ___
- انا أفهم حقوقي وقراري هو بمحض إرادتي واختياري. _____ أ ___ حـ ___
- لم يُوجّه إليّ اي وعود او تهديدات ولم اتعرّض الى أية ضغوط او إكراه من اي نوع ___ نم ___ أ ___ حـ ___

الإسم: ___ أحمـ سالم فرج بوغتالة ___
التوقيع: ___
توقيع المترجم: ___ Moua c.Ice  meaf-c.Ice ___
إسم الشاهد: ___ SA JERRY L ODONNELL ___
توقيع الشاهد: ___
التاريخ/الوقت: ___ 0820 Z   21 JUNE 2014 ___

خونت سه الحديث ان لدي الحق في وجود محامي في اي وقت ولكن وفقت اليوم 2014/6/21
أضامكم في نير وجود المحامي

أحمد بوغتالة
2014/6/21

ARABIC ADVICE OF RIGHTS FORM

## Notice of Rights

We are United States Law Enforcement officers.  You have been arrested because of your violation of U.S. criminal law pertaining to the attack on the American Mission in Benghazi, Libya, on 11 September 2012.  While you are under arrest, U.S. law grants you certain rights in dealing with us.

Before we start asking any questions, we want to make sure that you understand your rights that are granted to you.

You have the right to remain silent.

We know that you met with other members of the U.S. Government in the past.  We do not know whether you told them or they told you anything.  Anything you stated in the past to other officials from the U.S. Government was not the subject of the criminal procedures leveled against you in the United States, and probably will not be used against you in U.S. courts.  We are now starting anew.

You are not compelled to speak with us today just because you have already spoken with others in the past.  If you decide to talk to us today, it is essential for you to know that anything you say could be used against you in U.S. courts.

You have the right to consult an attorney before we direct any questions to you.

You have the right to have an attorney present during questioning.

If you are unable to afford an attorney, one will be assigned to you prior to questioning, if you wish.

Before you decide whether you want to talk to us today or not, we want to clarify to you that since you are under arrest pending U.S. criminal charges, you will be arraigned before a court in the United States without any undue delay. When you appear in court, the judge will explain to you the charges against you and give you the opportunity to hire an attorney of your choosing, and if you cannot afford to hire a attorney, one will be assigned to represent you, and also the judge will determine whether to release you on bond pending the issuance of an indictment and/or a trial in the case against you.

Do you have any questions regarding what I have explained to you hereinabove?

USAO_0000063

**Acknowledgment of Rights and Waiver of the Right to Have an Attorney Present and Remain Silent**

- I am prepared to give statements and answer questions.  To the best of my ability [initials] A. D.

- I do not want an attorney at the present time.  Due to an attorney not being available; but in the future, yes [initials] A. D.

- I understand my rights, and my decision is made willingly and voluntarily.  [Initials] A. D.

- No promises were given to me nor were threats directed against me, and I was not subjected to any coercion or pressures of any type.  Yes. [Initials] A. D.

Name:  Ahmad Salem Faraj Bukhatala

Signature: _____

Signature of Translator: _Mona Elchaar_

Name of Witness:  *[sic]* SA Justin L. Odonnell

Signature of Witness: _____

Time/Date:  *[sic]* 0820  Z   21 June 2014

[Longhand] I understood from the conversation that I have the right to have an attorney present at any time; but today, 6/21/2014 A.D., I have consented to talk without the attorney being present.

_____

Ahmad Bukhatala

6/21/2014  A.D.

USAO 0000064

TRANSLATION OF ARABIC ADVICE OF RIGHTS FORM

███████████

At approximately 8:30 a.m., the interview was recessed.

███ About an hour later, the defendant was brought back to the interview room. The agents served the defendant tea. He reaffirmed that he was speaking to the agents on his own volition and that he understood that he could stop the interview whenever he wished.

███ At about 10:50 a.m., the agents offered the defendant a break, which he declined. He did take more tea. The agents also gave the defendant a sweatshirt, when he complained of being cold. A break was taken at approximately 11:30 a.m. The break lasted about one and one-half hours. During that time, the defendant prayed, used the restroom, and had a medical examination. When the interview resumed, the agents again advised the defendants of his rights, and confirmed that he wished to continue talking to the agents. The interview ended at approximately 2:00 p.m.

███ During the interview, the defendant described his background. He was born on May 7, 1971, and he finished nine years of schooling. Afterward, the defendant obtained a mechanics certificate with honors and ran his own garage. The defendant also described his activities during the 2011 Libyan Revolution, which included leading a group of approximately 140 fighters.

## 2.   Second Interview – June 22, 2014.

███ At approximately 8:20 a.m., the defendant was brought to the interview room. First the agents discussed the defendant's health and well-being. He said that he was eating and sleeping well and that he no longer had a headache. The defendant appeared to be coherent and rested. When the agents asked the defendant about his ability to pray, he mentioned that he had

███████████

███████████

been praying but had trouble with the timing.  Accordingly, the agents gave the defendant a watch, so he could properly schedule prayer sessions.

███  The agents advised the defendant of his rights at approximately 8:25 a.m.  He acknowledged that he understood his rights and wished to waive them and continue speaking to the agents.  As he had done the day before, the defendant also stated that he wanted to reserve his right to consult a lawyer in the future.  The agents gave the defendant a copy of the same advice of rights form that they presented to him the day before, and he reviewed and signed it.  (As before, the defendant noted on the form that, while he was willing to talk, he reserved his right to consult a lawyer.)

███  During the interview, the defendant was given tea.  Also two breaks were taken: First, there was a break from approximately 10:20 a.m. until 12:00 p.m.  Before the interview resumed, the agents again advised the defendant of his rights.  The defendant orally waived his rights and stated that he wished to continue the interview.  Second, there was a break from approximately 1:40 p.m. until 4:00 p.m.  At the beginning of the break, the agents gave the defendant a granola bar and tea and allowed him to pray and use the restroom.  The defendant then left with the military guards.  While he was away, the defendant ate lunch, had a medical exam, and prayed.  As before, the agents again advised the defendant of his rights before resuming the interview, and he confirmed that he wished to continue.  The interview ended at approximately 4:50 p.m.

**3.    Third Interview – June 23, 2014.**

███  At approximately 8:30 a.m., the defendant was brought to the interview room.  He

███████████

███████████████

stated that he felt fine, and he seemed fine to the agents.   The defendant also advised that he had been afforded the opportunity to pray.   After about 15 minutes, the defendant said that he felt nauseous – perhaps seasick.   Accordingly, at the defendant's request, the interview was recessed.

███ About seven hours later, at approximately 3:30 p.m., the interview was resumed.   The defendant explained that he felt better than he had earlier that day.   He was no longer nauseous, and he had eaten.   The defendant accepted tea from the agents but declined their offer of food. He appeared to be coherent.

███ At approximately 3:40 p.m., as they had done previously, the agents advised the defendant of his rights.   He acknowledged that he understood his rights and wished to waive them and continue speaking to the agents.   As he had done at the previous interviews, the defendant also stated that he wanted to reserve his right to consult a lawyer in the future.   The agents gave the defendant another copy of the same advice- of-rights form that he had previously been given, and he reviewed and signed it.   (As before, the defendant noted on the form that, while he was willing to talk, he reserved his right to consult a lawyer.)

███ The interview lasted about one and one-half hours, until 5:15 p.m.   During the interview, the agents gave the defendant a statement written in Arabic, in which a group had claimed responsibility for the attack on the Mission in Benghazi.   The defendant read the statement, and, based on his comments, demonstrated that he had comprehended what he had read.

4.      **Fourth Interview – June 24, 2014.**

███ At approximately 11:00 a.m., the defendant was brought to the interview room.   First,

████████████████

██████████

the agents discussed the defendant's health and well-being, and he reported no problems.  As before, the defendant stated that he had been afforded the opportunity to pray.  The defendant appeared to be coherent and rested.

██ At approximately 11:10 a.m., as they had done previously, the agents advised the defendant of his rights.  He acknowledged that he understood his rights and wished to waive them and continue speaking to the agents.  As he had done at the previous interviews, the defendant also stated that he wanted to reserve his right to consult a lawyer in the future; he stated that he understood that the oral and written advice-of-rights were a legal requirement.  The agents then gave the defendant another copy of the same advice of rights form that he had previously been given, and he reviewed and signed it.  (As before, the defendant noted on the form that, while he was willing to talk, he reserved his right to consult a lawyer.)  The defendant was offered tea and cookies; he accepted the former and declined the latter.

██ Later, the defendant was offered more tea, which he declined.  Also two breaks were taken:  First, a five-minute break was taken at approximately 12:45 p.m.  During the break, the defendant received a medical exam and no issues were reported.  Second, there was a break from approximately 1:50 p.m. until 4:20 p.m.  While he was away, the defendant ate, used the restroom, and prayed.  When the defendant returned, the agents again advised the defendant of his rights before resuming the interview, and confirmed that he wished to continue.  The interview ended at approximately 6:45 p.m.

██ During the interview, the defendant discussed, among other things, conditions in Libya, his associates, and the evening of September 11, 2012.  Additionally, the defendant said

██████████

███████████████

several things which demonstrate that he was capable of understanding the interview process and knowingly, intelligently, and voluntarily waiving his legal rights:  (1) he had commanded 25-30 men; (2) as a commander, he functioned as a liaison to the Libyan Revolutionary Council; (3) he described one of his subordinates as "simple"; (4) he discussed giving interviews to the western media; and (5) he mentioned that, at those interviews, he had experience speaking through interpreters.  Notably, on two occasions, the defendant exercised his rights and refused to answer certain questions:  (1) he would not answer questions about an associate named ██Subject # 46██; and (2) he would not answer questions about his last contact with an associate named ██Subject # 16██.

5.     **Fifth Interview – June 26, 2014.**[9]

██ At approximately 8:45 a.m., the defendant was brought to the interview room.  First, the agents discussed the defendant's health and well-being, and he reported no problems.  As before, the defendant stated that he had been afforded the opportunity to pray.  The defendant appeared to be coherent and rested.

██ At approximately 8:55 a.m., as they had done previously, the agents advised the defendant of his rights.  He acknowledged that he understood his rights and wished to waive them and continue speaking to the agents.  As he had done at the previous interviews, the defendant also stated that he wanted to reserve his right to consult a lawyer in the future; he again stated that he understood that the oral and written advice-of-rights were a legal requirement.  The agents then gave the defendant another copy of the same advice of rights form

---

[9]     ██)In order to give the defendant a break and also because the agents needed a break, there was no interview on June 25, 2014.

███████████████

████████

that he had previously been given, and he reviewed and signed the form.    (As before, the defendant noted on the form that, while he was willing to talk, he reserved his right to consult a lawyer.)   The defendant was offered tea and cookies; he accepted the former and declined the latter.

████ A two-hour break was taken at about 10:40 a.m.  During the break, the defendant was afforded the opportunity to pray and to use the restroom.  He also received a medical exam and no issues were reported.  When the defendant returned, the agents again advised the defendant of his rights before resuming the interview, and he stated that he wished to continue.  The interview ended at approximately 2:15 p.m.

████ During the interview, the defendant discussed, among other things, his understanding of the purpose of the American facilities in Benghazi, Libya, his associates, and the evening of September 11, 2012.  Additionally, the defendant described an interview that he had given to THE NEW YORK TIMES on October 18, 2012.

6.    **Sixth Interview – June 27, 2014.**

████ At approximately 8:30 a.m., the defendant was brought to the interview room.  First, the agents discussed the defendant's health and well-being, and he reported no problems.  As before, the defendant stated that he had been afforded the opportunity to pray.  The defendant appeared to be coherent and rested.

████ At approximately 8:40 a.m., as they had done previously, the agents advised the defendant of his rights.  He acknowledged that he understood his rights and wished to waive them and continue speaking to the agents.  As he had done at the previous interviews, the

████████

██████████

defendant also stated that he wanted to reserve his right to consult a lawyer in the future.  The agents then gave the defendant another copy of the same advice-of-rights form that he had previously been given, and he reviewed and signed it.  (As before, the defendant noted on the form that, while he was willing to talk, he reserved his right to consult a lawyer.)

██ Two breaks were taken:  First, a one hour and 20-minute break was taken at approximately 9:55 a.m.  During the break, the defendant was afforded the opportunity to pray and to use the restroom.    Second, there was a two-hour break taken from approximately 2:10 p.m. until 4:05 p.m.  During the break, the defendant was afforded the opportunity to pray, to eat, and to use the restroom.    After each of the two breaks, the agents again advised the defendant of his rights before resuming the interview, and he confirmed that he wished to continue.  Additionally, at approximately 12:30 p.m., the defendant had a medical exam, and no issues were reported.  The interview ended at approximately 4:35 p.m.

██ At the beginning of the interview, the agents told the defendant that an indictment had been returned against him in the United States District Court.  The defendant was told that, among other things, he had been charged with conspiracy.  The defendant asked the agents about American conspiracy law.  After their discussion, the defendant opined that conspiracy law was "unjust."  During the interview, the defendant discussed, among other things, the evening of September 11, 2012.  Additionally, the defendant corrected both a statement and an identification of a photograph that he had made in an earlier interview session.

██ After the interview was concluded, the agents met with the defendant again to explain the plan to transport him to the U.S. mainland by helicopter the following day.  At that time, the

██████████

██████████████

agents asked the defendant if he wished to waive his right to be presented in court upon his arrival in the United States and continue talking to the agents.   The defendant declined to postpone his appearance in court.   Accordingly, he was arraigned in the United States District Court for the District of Columbia on Saturday, June 28, 2014, at a special session convened for this purpose.

## V.      The defendant's *Miranda* waiver was valid.

████   As set forth below, the defendant validly waived his *Miranda* rights.   The defendant was carefully and repeatedly advised of his *Miranda* rights in his native language, both orally and in writing.   He knowingly, intelligently, and voluntarily waived those rights, and he did not invoke his right to counsel.   Before being advised of his *Miranda* rights, the defendant was interviewed by the ██IA██   Those interviews did not invalidate the defendant's *Miranda* waiver.   The unwarned interviews were not designed to undermine the efficacy of the defendant's *Miranda* waiver; nevertheless, sufficient curative measures were taken to ensure that the defendant would understand the import and effect of his *Miranda* waivers.

## A.      Standard.

██In *Miranda*, the Supreme Court stated that "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel."   384 U.S. at 475.   Subsequently, the Supreme Court has explained that "this 'heavy burden' is not more than the burden to establish waiver by a preponderance of the evidence."   *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010).   "Thus, the government must show it is more probable than not that [defendant's]

██████████████

███████████████

waiver of rights reflected 'an uncoerced choice and the requisite level of comprehension.'"

*United States v. Yunis*, 859 F.2d 953, 962 (D.C. Cir. 1988).

**B.     The defendant's *Miranda* waivers were valid despite being preceded by unwarned, intelligence interviews.**

███The *Miranda* Court, itself, acknowledged that, under appropriate circumstances, an

unwarned interview does not invalidate a subsequent *Miranda* waiver:

> We do not suggest that law enforcement authorities are precluded from questioning any individual who has been held for a period of time by other authorities and interrogated by them without appropriate warnings. A different case would be presented if an accused were taken into custody by the second authority, removed both in time and place from his original surroundings, and then adequately advised of his rights and given an opportunity to exercise them.

*Miranda*, 384 U.S. at 496.   Subsequently, the Supreme Court has addressed the impact of a

defendant's un-Mirandized statements in response to police interrogation on the admissibility of

a subsequent, Mirandized confession. *See Oregon v. Elstad*, 470 U.S. 298 (1985); *Missouri v.*

*Seibert*, 542 U.S. 600 (2004).

███First, in *Elstad*, the Supreme Court addressed the admissibility of a warned statement

given by a suspect after the police had already obtained an unwarned statement from him in

violation of *Miranda*.   Specifically, a police officer, who had just arrested a teenage burglary

suspect, told the suspect that the officer "felt" that the suspect was involved in a burglary; the

suspect then admitted that he had been present at the commission of the crime. *Elstad*, 470 U.S.

at 301.   Approximately one hour later, at the police station, the defendant was advised of his

*Miranda* rights and waived them.   He then confessed – to the original officer and another officer

– that he had committed the burglary. *Id.*   The *Elstad* defendant sought to suppress his

███████████████

████████████

confession on two grounds:   (1) that it was the "tainted fruit" of the prior un-Mirandized statement and (2) that the psychological impact of having "let the cat out of the bag" created a lingering compulsion that rendered subsequent statements involuntary.  *Id.* at 303-04, 310-11. The Supreme Court rejected both arguments.

██ As to the first ground, the Supreme Court declined to extend the "fruits" doctrine to violations of *Miranda*.  *Id.* at 307-09.  As to the second ground, the Court rejected the argument that the psychological impact of having "let the cat out of the bag" compromised the voluntariness of a subsequent informed waiver.  *Id.* at 311-12.  The Supreme Court stated that to accept such an argument would "effectively immunize[ ] a suspect who responds to pre-*Miranda* warning questions from the consequences of a subsequent informed waiver," which would come at a high cost to legitimate law enforcement activity but add little desirable protection to an individual's interest in not being required to incriminate himself.  *Id.* at 312.

(██ The Supreme Court held that "[a] subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement."  *Id.* at 314.  The Supreme Court explained that a defendant's provision of incriminating statements before being administered the *Miranda* warnings does not, in the absence of "any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will," result in such a degree of psychological coercion that any subsequent administration of the warnings will be ineffective. *Id.* at 309, 313.  The Court, therefore, concluded that "absent deliberately coercive or improper tactics in obtaining the initial statement," an unwarned admission does not give rise to any

████████████

█████████████

presumption that subsequent, warned statements were involuntary.  *Id.* at 314.

█ Second, in *Seibert*, the Supreme Court considered a police protocol for custodial interrogation whereby the police would deliberately delay giving *Miranda* warnings until after custodial interrogation had produced a confession, and then would re-interrogate the suspect on the same subjects in a warned statement.  542 U.S. at 604 (plurality opinion).  The plurality concluded that post-*Miranda* statements made in the context of successive unwarned and warned questioning are admissible only when "it would be reasonable to find that in th[e] circumstances the warnings could function 'effectively' as *Miranda* requires."  *Id.* at 611.  The plurality identified several facts present in that case that indicated that the *Miranda* warnings could not have functioned effectively:  (1) the unwarned interrogation was "systematic, exhaustive, and managed with psychological skill"; (2) the warned questioning followed the unwarned questioning by only 15-20 minutes; (3) the warned questioning took place in the same location as the unwarned questioning; (4) the same officer conducted both interrogations; and (5) the officer did nothing to dispel the defendant's probable misimpression that the warned interrogation was merely a continuation of the unwarned interrogation and that her unwarned inculpatory statements could be used against her.  *Id.* at 616 (plurality opinion).  The plurality reasoned that, in light of these factors, the *Miranda* warnings were ineffective, because "[i]t would have been reasonable [for the defendant] to regard the two sessions as part of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before."  *Id.* at 616-17 (plurality opinion).

█ Concurring in the judgment, Justice Kennedy provided the fifth vote for holding the

█████████████

█████████

post-warning statements to be inadmissible.  Justice Kennedy stated that the plurality's objective test "cuts too broadly" because it would apply regardless of whether a two-stage interrogation had been deliberately undertaken to circumvent *Miranda*.  *Seibert*, 542 U.S. at 621-22 (concurring).  Instead, Justice Kennedy favored "a narrower test applicable only in the infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning."  *Id.* at 622 (concurring).  Absent a "deliberate two-step strategy," in Justice Kennedy's view, the admissibility of post-warning statements should be governed by *Elstad*.  *Id.* (concurring).  "If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made."  *Id.*; *see also United States v. Straker*, 800 F.3d 570, 618 (D.C. Cir. 2015) ("Justice Kennedy's test applies only when police deliberately use a two-step interrogation to thwart *Miranda*.").

█Justice Kennedy provided examples of curative measures "designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* waiver."  *Id.*  For example, "a substantial break in time and circumstances before the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn. Alternatively, an additional warning that explains the likely inadmissibilty of the prewarning custodial statement may be sufficient."  *Id.*; *see also United States v. Hitselberger*, 991 F. Supp. 2d 130, 141 (D.D.C. 2014) ("While the 'question-first, warn-second' tactic can indeed be coercive, as seen in the facts of *Siebert*, no tactic is per se unconstitutional.  As usual,

█████████

█████████

the totality of the circumstances must be considered to determine whether the defendant waived

his rights 'knowingly and voluntarily.'").

██ In *Marks v. United States*, 430 U.S. 188, 193 (1977), the Supreme Court explained

that "[w]hen a fragmented Court decides a case and no single rationale explaining the result

enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken

by those Members who concurred in the judgments on the narrowest grounds."   Justice

Kennedy's opinion represents the judgement of the court in *Seibert*:

> Applying the *Marks* rule to *Seibert*, we hold that a trial court must
> suppress postwarning confessions obtained during a deliberate two-step
> interrogation where the midstream *Miranda* warning—in light of the objective
> facts and circumstances—did not effectively apprise the suspect of his rights.
> Although the plurality would consider all two-stage interrogations eligible for a
> *Seibert* inquiry, Justice Kennedy's opinion narrowed the *Seibert* exception to
> those cases involving deliberate use of the two-step procedure to weaken
> *Miranda's* protections.

*United States v. Williams*, 435 F.3d 1148, 1157 (9th Cir. 2006); *see also United States v.*

*Mashburn*, 406 F.3d 303, 308 (4th Cir. 2005) ("In *Seibert*, Justice Kennedy concurred in the

judgment of the Court on the narrowest grounds. . . . Justice Kennedy's opinion therefore

represents the holding of the *Seibert* Court . . . .").[10]

---

[10]    ██)We recognize that, in cases in which an impermissible intent is actually present, Justice Kennedy's opinion may provide a broader ground for exclusion, as his approach would exclude a second related statement "unless curative measures are taken before the postwarning statement is made," *Seibert*, 542 U.S. at 622, while the plurality would permit the introduction of the second statement even in the absence of curative measures, so long as the *Miranda* warnings "could function 'effectively' as *Miranda* requires . . . ." *Id.* at 611-612.  Nevertheless, it is difficult to identify actual litigated fact patterns in which the police harbor a subjective intent to undermine *Miranda*, as Justice Kennedy would require, but where the second warned statement would be admissible under the plurality's "effective warnings" approach but not Justice Kennedy's "curative measures" approach.   In any event, as demonstrated below, the defendant's post-warning statements are plainly admissible under both Justice Kennedy's approach and the *Seibert* plurality's approach.

█████████

█████████████

██ Accordingly, the majority of the federal courts of appeal that have addressed this issue has concluded that Justice Kennedy's concurring opinion represents the holding of *Seibert*.[11] The defendant too seems to acknowledge that Justice Kennedy's concurrence is controlling.  *See* Def. Mot. at 14.  Our circuit, however, has not resolved this issue.  *See Straker*, 800 F.3d at 617 ("We need not pick sides in that debate because . . . *Seibert* does not apply on these facts."); *see also United States v. Jackson*, 608 F.3d 100, 103 (1st Cir. 2010) (declining to find which *Seibert* opinion is controlling); *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1151 (10th Cir. 2006) (same).

██ Justice Kennedy did not articulate how a court should determine whether an interrogator had used a deliberate two-step strategy calculated to undermine a *Miranda* warning. *Capers*, 627 F.3d at 478.  Courts have determined that both objective and subjective factors should be considered in making this determination.  The Second Circuit analyzes objective factors and other Circuits have looked to both "objective evidence and any available subjective evidence" to make that determination.  *Id.* (citing *United States v. Williams*, 435 F.3d 1148, 1159 (9th Cir. 2006); *United States v. Street*, 472 F.3d 1298, 1314 (11th Cir. 2006) ("In deciding whether the agents used the 'question first' tactic against Street, we consider the totality of the circumstances including 'the timing, setting and completeness of the prewarning interrogation,

---

[11] ██)*See United States v. Capers*, 627 F.3d 470, 477 (2d Cir. 2010), and *United States v. Carter*, 489 F.3d 528, 535-36 (2d Cir. 2007); *United States v. Kiam*, 432 F.3d 524, 532-33 (3d Cir. 2006); *United States v. Mashburn*, 406 F.3d 303, 308-09 (4th Cir. 2005); *United States v. Courtney*, 463 F.3d 333, 338 (5th Cir. 2006); *United States v. Torres-Lona*, 491 F.3d 750, 758 (8th Cir. 2007); *United States v. Williams*, 435 F.3d 1148, 1157-58 (9th Cir. 2006); *United States v. Street*, 472 F.3d 1298, 1313 (11th Cir. 2006); *but see United States v. Heron*, 564 F.3d 879, 884 (7th Cir. 2009) ("[T]he *Marks* rule is not applicable to *Seibert*," as "Justice Kennedy's intent-based test was rejected by both the plurality opinion and the dissent[.]"); *United States v. Ray*, 803 F.3d 244, 272 (6th Cir. 2015) ("we adopt the *Seibert* plurality's multi-factor test for this Circuit").

███████████

████████████

the continuity of police personnel and the overlapping content of the pre- and post-warning statements.'"")).

████ Accordingly, the Court should review the totality of the circumstances surrounding the interrogations in order to determine that a two-step interrogation technique was not deliberately used to undermine the *Miranda* warning. The government has the burden to prove, by a preponderance of the evidence, that such a technique was not employed. *Capers*, 627 F.3d at 480. Here, the evidence – both subjective and objective – convincingly establishes that the intelligence interviews of the defendant were not conducted in order to weaken the effectiveness of the *Miranda* warnings to be given in subsequent warned interviews. Furthermore, even if the government's interrogation tactics implicate the concerns expressed in *Seibert*, the government took sufficient steps to attenuate any possible adverse impacts.

1. **The subjective factors demonstrate that there was no deliberate effort to circumvent *Miranda*.**

████ United States government officials sought to question the defendant, a suspected terrorist, in order to obtain any actionable, national security-related, intelligence information that he might have. Based on what was known to those officials at the time of the defendant's apprehension – including the defendant's location in Benghazi, Libya, his status as a Specially Designated Global Terrorist, his association with known terrorists, his involvement in the attack on the Mission, and his history of involvement with terrorism – there was ample reason to believe he had such actionable intelligence information. The purpose of conducting the initial, un-Mirandized interviews, therefore, was to obtain actionable intelligence – not to undermine the

████████████

██████████████

validity of a subsequent *Miranda* waiver.  *See, e.g., United States v. Thomas*, 664 F.3d 217, 223

(8th Cir. 2011) (unwarned interview preceding warned interview not intended to circumvent

*Miranda*, where police "asked questions to establish probable cause, not to circumvent *Miranda*

warnings."); *United States v. Nunez-Sanchez*, 478 F.3d 663, 668 (5th Cir. 2007) (no deliberate

attempt to employ a two-step strategy to circumvent *Miranda*, where agents asked defendant

about his immigration status before administering *Miranda* warnings).[12]

██Conducting an un-Mirandized interview to focus on questions relevant to the national

security of the United States is – unquestionably – legitimate.  *Cf. United States v. Ghailani*, 733

F.3d 29, 49 (2d Cir. 2013) (no violation of constitutional right to a speedy trial where defendant

was held for over two years by the CIA because "proceedings were permissibly and reasonably

delayed by weighty considerations relating to national security").  Here, the decision to conduct

an un-Mirandized interview was the product of discussions among the FBI and other elements of

the United States' Intelligence Community, as was the decision to conduct a subsequent

Mirandized interview that was intended to be separated in time, personnel, and setting from the

---

[12]    ██We note that the Second Circuit has stated that "[t]he only legitimate reason to delay intentionally a *Miranda* warning until after a custodial interrogation has begun is to protect the safety of the arresting officers or the public." *Capers*, 627 F.3d 470.  Even if the intelligence interviews exceeded the traditional public-safety inquiry concerning imminent plots or threats, *see New York v. Quarles*, 467 U.S. 649, 656 (1984) (recognizing "public safety" exception to *Miranda*, where law enforcement officials engage in custodial interrogation that is "reasonably prompted by a concern for the public-safety"), that would not establish a *Seibert* violation.  *Capers*, which addressed a domestic postal-theft investigation, did not contemplate and thus does not cast doubt on the "legitimacy" of the use of an un-Mirandized interview to gather national-security related intelligence information in the context of a suspected terrorist who is apprehended overseas.  The practice of overseas interrogations for purposes of intelligence gathering has been the subject of widespread discussion and debate between the Executive Branch and the Congress, among others.  *See, e.g., Lebron v. Rumsfeld*, 670 F.3d 540, 551-52 (4th Cir. 2012) (affirming the District Court's dismissal of plaintiff Padilla's civil claim alleging, among other things, coercive interrogations in violation of the Fifth and Eighth Amendments).  The Second Circuit plainly did not intend to enter that debate or address those issues in the *Capers* opinion, which involved two-step questioning in a wholly different factual context.

███████████

un-Mirandized interview.  This process was designed to enable the United States government both to protect its national security interests and to subsequently pursue a criminal investigation of the defendant, using all the tools that would otherwise be available, including Mirandized interviews:

> [I]n some cases, Article III courts have been used where defendants were first apprehended overseas by the U.S. Military.  In these cases, military and intelligence authorities have been able to coordinate effectively with law enforcement to ensure that terrorists could be apprehended and intelligence could be gathered while preserving the potential for criminal prosecution.

REPORT ON THE LEGAL AND POLICY FRAMEWORKS GUIDING THE UNITED STATES' USE OF MILITARY FORCE AND RELATED NATIONAL SECURITY OPERATIONS, December 2016, at 38 (https://assets.documentcloud.org/documents/3232594/Read-the-Obama-administration-s-memo-outlining.pdf).

███  Furthermore, the fact that the un-Mirandized interviews here were lengthy does not, in this case, reflect a deliberate effort to undermine the *Miranda* warnings that were later given.  Because the purpose of the un-Mirandized interviews was to explore fully the defendant's knowledge of any relevant national security intelligence information, a wide-ranging inquiry concerning the defendant's background, travel and, associates, not limited to imminent threats or plots, was required.  While the intelligence interviews may have been neither brief nor casual, their purpose, nonetheless, was not to elicit incriminating statements, and certainly not to elicit them so that a future *Miranda* warning would be of limited efficacy.  *Compare Seibert*, 542 U.S. at 621 (exhaustive interview managed with psychological skill was part of a deliberate strategy to undermine *Miranda* warnings given thereafter).  Rather, the purpose of the un-Mirandized

███████████

███████████

interviews, in this case, was to explore the defendant's travel, background, his association with terrorists, and his knowledge about any imminent terrorist plots against the United States.

███ Such an inquiry, by its nature, may be lengthy and searching. It is also one that is likely to yield information that is both of intelligence value and potentially incriminating to the defendant.[13] Nevertheless, eliciting incriminating statements so that subsequent *Miranda* warnings would be weakened was not the goal here; the goal was to obtain any relevant national-security-related intelligence information from the defendant.

███)Additionally, the FBI agents involved in the criminal investigation took steps specifically designed to separate the intelligence interviews from the subsequent Mirandized, law enforcement interviews. This approach was intended to enhance, not weaken, the *Miranda* warnings. Agents Clark and O'Donnell were never told the substance of the defendant's intelligence interviews. Nor did the ███ IA ███ interview team suggest any questions or approaches to the law enforcement interviewers – or vice versa. In fact, although not required by *Seibert*, the ███ IA ███ team left the USS *New York* before Agents Clark and O'Donnell boarded, and Agents Clark and O'Donnell do not even know the identities of the ███ IA ███ interviewers. These efforts to maintain the separation between the un-Mirandized interviews and the Mirandized interviews, which would ensure that the Mirandized interviews could not involve a "cross examination" based on the defendant's un-Mirandized statements, are compelling evidence that there was no deliberate effort to undermine the *Miranda* warnings in this case. *See Straker*, 800 F.3d at 618

---

[13]     ███ Another subjective factor potentially to be considered would be the extent of overlap between the subjects addressed in the intelligence interviews and in the law enforcement interviews. *See* Addendum.

███████████

███████████

("Equally importantly, the FBI agents did not refer back to the prior Trinidadian interrogations in an effort to elicit the same confessions."); *see also United States v. Miller*, 441 Fed. Appx. 804, 807 (2d Cir. 2011) (no deliberate effort to evade *Miranda* where the agent who conducted the Mirandized interview was aware of some of the defendant's statements at the un-Mirandized interview, and understood that the defendant had "confessed" at that interview). The FBI also took steps to ensure that the Mirandized interviews took place in a different setting than the prior intelligence interviews and with wholly different personnel. *Compare Seibert*, 542 U.S. at 615, 621 (the same agent conducted a continuous interview).

██ The FBI's actions demonstrate that the government did not subjectively intend to employ a questioning strategy that was designed to undermine the *Miranda* warnings at the time that they were given. Under Justice Kennedy's controlling analysis in *Seibert*, this establishes that there was no deliberate effort to undermine *Miranda* and therefore that the voluntariness principles of *Elstad*, 470 U.S. 298, should apply. Under that standard, the defendant's motion to suppress should be denied because there is no serious dispute that the defendant was read his *Miranda* rights before each of the subsequent interviews, and knowingly, intelligently, and voluntarily waived those rights; and, thereafter, made voluntary statements. *See* § V.C.2. *supra*.

**2.      The objective factors demonstrate that there was no deliberate effort to circumvent *Miranda*.**

██ The objective considerations also demonstrate that there was no deliberate effort to undermine the efficacy of the *Miranda* warning given to the defendant. First, entirely different United States government personnel conducted the Mirandized interviews and the un-Mirandized

███████████

███████████████

interviews.  *Straker*, 800 F.3d at 618 (waiver valid where, "there was a sharp discontinuity of police personnel, and the FBI did not 'treat[ ] the second [interrogation] as continuous with the first.'").  Unlike the United States government personnel who had conducted the un-Mirandized interviews, and who simply stated they were representatives from the United States government, Agents Clark and O'Donnell, who conducted the Mirandized interviews, identified themselves to the defendant as Special Agents of the FBI and told him that he had been charged with a crime in an American court.

███ Second, the interviewing agents specifically told the defendant that they did not know what – if anything – he had said in the prior interviews and that it was unlikely that anything he may have said could be used against him.  *Compare Seibert*, 542 U.S. at 620-621 (interrogating officer confronted the defendant in the Mirandized interview with her prewarning statements "and pushed her to acknowledge them") (Kennedy, J., concurring), and *Capers*, 627 F.3d at 484 (while not to the same degree as *Seibert*, the Mirandized interview was "essentially a cross-examination using information gained during the first round of interrogation"), *with Jackson*, 608 F.3d at 104 (finding no deliberate two-step strategy where, among other things, the prior admission was not used as a "lever" to induce a statement).

███ Third, the Mirandized interviews began two days after the un-Mirandized interviews ended.  This is a significant separation in time, far exceeding the separation in other circumstances where courts have found that the government did not employ a deliberate two-step procedure.  *See, e.g.*, *Bobby v. Dixon*, __ U.S. __, 132 S. Ct. 26, 32 (2011) (no deliberate effort to undermine *Miranda*; interval of four hours); *Carter*, 489 F.3d at 533 (no deliberate effort;

███████████████

██████████████

interval of approximately thirty minutes); *United States v. Miller*, 441 Fed. Appx. 804, 807 (2d

Cir. 2011) (no deliberate effort; interval of two and one-half hours); *United States v. Cummings*,

764 F. Supp. 2d 480, 514 (E.D.N.Y. 2011) (no deliberate effort; interval of approximately six

hours).

██ Fourth, the agents specifically informed the defendant that even if he had spoken to

others in the past, he did not have to speak to the interviewing agents. This warning was

specifically designed to make clear to the defendant that despite any prior statements, he was still

in a position to assert his right to silence in this instance.  No such warnings were given in

*Seibert*, *Capers*, or *Williams*.  *Compare United States v. Hasan*, 747 F. Supp. 2d 642, 667 (E.D.

Va. 2010) (finding *Miranda* waiver following unwarned interview valid because, among other

things, defendant advised that "*[i]t is possible* that the statements you previously made may not

be admissible against you in a court of law.") (emphasis added) *aff'd sub nom. United States v.*

*Dire*, 680 F.3d 446 (4th Cir. 2012).

██ An analysis of the totality of these objective factors, therefore, as well as the

subjective factors discussed above, establishes that the agents in this case did not use a deliberate

"two-step" strategy designed to undermine the defendant's *Miranda* rights, and, therefore, that

the defendant's Mirandized statements are admissible if they were voluntarily made, pursuant to

*Elstad*, 470 U.S. 298 (1985); *see Seibert*, 542 U.S. at 622.

3.    **Even if a deliberate two-step strategy had been utilized, sufficient curative measures were taken to render the *Miranda* warnings valid.**

██ If the Court were to conclude that a deliberate two-step strategy to circumvent

██████████████

███████████

*Miranda* had been employed, the inquiry would then shift to whether "curative measures [were] taken before the post-warning statement [was] made." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring).   Justice Kennedy's concurrence gave examples of curative measures that "allow[] the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn." *Id.*   As a threshold matter, we note that some of the same objective factors set forth above would also qualify as curative measures that were designed to, and did, ensure that a reasonable person in the defendant's position would understand the import and effect of the *Miranda* warnings and subsequent waivers.

██ There was a substantial break in time between the last intelligence interviews and the first law enforcement interview – a two-day period.   There was also a substantial break in circumstances.   The agents who conducted the Mirandized interviews were different from those who had conducted the intelligence interviews.   Like the intelligence interviews, the law enforcement interviews were conducted in a module on the USS *New York*.   But the module was significantly changed between the two sets of interviews.   Additionally, the warnings given to the defendant at the start of the law enforcement interviews explicitly stated that his prior statements "probably [would] not be used against [him]."   *Hasan*, 747 F. Supp. 2d at 667 (finding *Miranda* waiver following unwarned interview valid because, among other things, defendant advised that "*[i]t is possible* that the statements you previously made may not be admissible against you in a court of law.") (emphasis added).

██ In sum, these measures were sufficient to inform the defendant of the import and effect of the *Miranda* warnings.   "Under *Seibert*, this significant break in time and dramatic

███████████

██████████

change in circumstances created 'a new and distinct experience,' ensuring that [defendant's] prior, unwarned interrogation did not undermine the effectiveness of the *Miranda* warnings he received before confessing to Hammer's murder." *Bobby,* 132 S. Ct. at 32.

**C.      The defendant's *Miranda* waivers were voluntary, intelligent, and knowing.**

██   The decision to waive one's Fifth Amendment rights must be the product of "a deliberate choice to relinquish the protection those rights afford." *Berghuis v. Thompkins*, 560 U.S. 370, 385 (2010).  The Court should inquire first, whether "the relinquishment of the right [was] voluntary in the sense that it was the product of a free and deliberate choice," and second, whether the waiver was made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  To determine whether a *Miranda* waiver was "voluntary, knowing and intelligent," (*id.* at 421), the Court must look at the totality of the circumstances surrounding the case, "including the background, experience and conduct of the accused."  *Oregon v. Bradshaw*, 462 U.S. 1039, 1046 (1983) (citations and internal quotation marks omitted).  Here, as set forth below, the defendant's multiple waivers were made voluntarily, knowingly and intelligently and "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421.  The evidence to be adduced at the hearing will demonstrate (1) that the defendant's decision to waive his *Miranda* rights was voluntary and (2) that he understood exactly what he was doing when he executed those waivers.

**1.      The defendant's *Miranda* waiver was voluntary.**

██The voluntariness of a *Miranda* waiver is analyzed using the same guidelines as those

██████████

████████████

used in determining the voluntariness of statements.  *See Colorado v. Connelly*, 479 U.S. 157 (1986); *North Carolina v. Butler*, 441 U.S. 369 (1979).  Consequently, the test is whether the waiver was voluntary based on the totality of the circumstances.  As discussed in more detail below, the atmosphere at the time of the defendant's *Miranda* waivers was far from hostile.  He was not restrained, and he was provided food, drink, bathroom breaks, and the opportunity to pray.  The agents reminded the defendant of his *Miranda* rights throughout the interviews and did not coerce him to waive those rights or promise him anything in exchange for his waivers or his statements.  The defendant repeatedly acknowledged his rights and, in fact, repeatedly reserved his right to speak with a lawyer at a later time.  Moreover, he actually invoked his right to refuse to answer certain questions.  (*See* § IV.C.4, 6, *supra*.)

████With more specific application to the voluntariness of the defendant's *Miranda* waiver, we note the following.  The mere presence of some potentially coercive factors does not necessarily render a *Miranda* waiver involuntary.  For example, a *Miranda* waiver was deemed voluntary, where

> [p]rior to his arrest, Shi spent four days in a storage compartment where he had been kept by the crew. Still, the district court found that upon his release from the compartment, Shi appeared coherent and alert. Indeed, the district court credited the agents' description of Shi's demeanor as "cocky" and "not timid at all."  In addition, Shi was allowed access to a bathroom before the agents escorted him to the dining area to read him the warnings.

*United States v. Shi*, 525 F.3d 709, 728 (9th Cir. 2008).[14]

---

[14]  ████*See also Berghuis*, 560 U.S. at 386 (three-hour interrogation while seated in straight back chair); *United States v. Medunjanin*, 752 F.3d 576, 588 (2d Cir. 2014) (comments regarding expense of the defendant's attorney); *United States v. Vallar*, 635 F.3d 271, 284 (7th Cir. 2011) ("arrest[] at [defendant's] home at 6:30 a.m. by officers with weapons drawn, [defendant] handcuffed for about an hour while agents searched his home, and [defendant]

███████████████

██ Likewise, the fact that, when he was apprehended, the defendant resisted and suffered some minor injuries, did not render his *Miranda* waiver (which occurred six days later) involuntary. *See, e.g.*, *United States v. Yunis*, 859 F.2d 953, 960 (D.C. Cir. 1988) (waiver valid: both of defendant's wrists were fractured during his arrest); *United States v. Havlik*, 710 F.3d 818, 822-23 (8th Cir. 2013) (waiver valid: defendant was injured during arrest and waived rights after medical exam); *United States v. Marrero*, 651 F.3d 453, 470 (6th Cir. 2011) (waiver valid: defendant "had been stunned with a taser multiple times during his struggle with police officers"); *Watson v. DeTella*, 122 F.3d 450, 452 (7th Cir. 1997) (waiver valid: defendant "again failed to comply, [officer] kicked at him, striking him in the head. [Defendant], who was bleeding from the kick, surrendered and was arrested"); *United States v. Duvall*, 537 F.2d 15, 23 (2d Cir. 1976) (waiver valid: defendant advised of rights an hour after "arrest at gunpoint, the roughing-up of [defendant's] companion, and [defendant] being punched in the shoulder, and also of the strip search");



PHOTOGRAPH OF DEFENDANT TAKEN AFTER HIS APPREHENSION

*United States v. Michaeloski*, 2013 WL 139192 at *3 (E.D. Tenn. Jan. 10, 2013) (waiver valid: "Although Defendant was arrested by officers with

---

taken to the police station and forced to listen to audio tapes implicating him in the alleged conspiracy before he received and waived his *Miranda* rights and provided the post-arrest statement"); *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008) (intoxication and fatigue); *United States v. Burson*, 531 F.3d 1254, 1258 (10th Cir. 2008) (defendant exhausted and high on methamphetamines).

███████████████

guns drawn and in a forceful takedown, his initial questioning was not performed until approximately fifteen minutes after his arrest, his handcuffs were removed, and he was allowed to smoke a cigarette.").[15]

## 2.     The defendant's *Miranda* waiver was knowing and intelligent.

The evidence amply demonstrates that the defendant's *Miranda* waiver was knowing and intelligent.  The sole focus of this analysis is whether the defendant understood that any statements he made could be used against him, and this understanding is presumed upon the giving of *Miranda* warnings to a suspect:  "Indeed, it seems self-evident that one who is told he is free to refuse to answer questions is in a curious posture to later complain that his answers were compelled."  *Colorado v. Spring*, 479 U.S. 564, 574-76 (1987).  Here, the fact that the defendant understood his rights is buttressed by the defendant's background and his conduct during the interviews.

)First, and perhaps most significantly, the defendant was advised of and waived his *Miranda* rights 15 times.  *See, e.g., Yunis*, 859 F.2d at 959 (Agents "repeatedly asked Yunis, as each warning was read to him, whether Yunis understood the warning.  According to both agents, Yunis consistently answered that he did understand.").  The rights were presented to the

---

[15]       The defendant complains that he was blindfolded, gagged, and required to wear noise-cancelling headphones at the time he was apprehended (Def. Mot. at 4-5).  But those security measures did not affect the validity of his *Miranda* waiver, which occurred six days later.  *See, e.g., United States v. Abu Ghayth*, 945 F. Supp. 2d 511, 517 (S.D.N.Y. 2013) (interview voluntary, where "[d]uring breaks, one of the agents charged with security placed blackout goggles—essentially ski goggles with duct tape covering the plastic lenses—over Abu Ghayth's eyes and ear plugs and 'ear muffs,' which are akin to the ear covers used at a shooting range, over his ears, both for security purposes.").

██████████████

defendant in his native Arabic, both orally and in writing,[16] and the meaning of the rights was discussed with him. *See, e.g.*, *id.* (waiver valid where "the entire form was read to Yunis aloud, in Arabic"); *United States v. Elfgeeh,* 515 F.3d 100, 124-25 (2d Cir. 2008) (valid waiver by Arabic-speaking defendant where *Miranda* form written in Arabic was used and reviewed line-by-line); *United States v. Yousef*, 327 F.3d 56, 123 (2d Cir. 2003) (waiver valid, where defendant "was also read his *Miranda* rights in Arabic"); *United States v. Hasan*, 747 F. Supp. 2d 642, 670 (E.D. Va. 2010) ("The *Miranda* rights were recited to Defendants, through Ismail, the interpreter, in their native language.") *aff'd sub nom. United States v. Dire*, 680 F.3d 446 (4th Cir. 2012). Additionally, on each of the written waiver forms, the defendant made his own notation regarding his desire to reserve the right to consult a lawyer in the future. In sum, the waiver process was far from "a ritual, where the government agent[] only recite[d] a rote phrase and obtain[ed] a signature." Def. Mot. at 18.

██████Second, a brief review of the defendant's background demonstrates that he is neither unsophisticated nor uneducated. He, therefore, was not susceptible to misunderstanding either his rights or his legal predicament. At the time of his arrest, the defendant was 43 years old. He had completed nine years of formal schooling, and, during the interviews, the defendant demonstrated his ability to read and write Arabic. Additionally, the defendant received a mechanics license with honors. The defendant had run his own vehicle repair business; and, more importantly, he had commanded a militia and served as its liaison with the Libyan

---

[16]  ██████The defendant's claim that he was not provided with a written advice-of-rights form is simply wrong. (Def. Mot. at 2, 20). In fact, the defendant was presented with an advice-of-rights form, written in Arabic, at the beginning of each interview day, and the defendant both initialed and made notations on each form. These forms were provided to the defense on August 21, 2014 (Bates stamped USAO_0000063-74). ██████████████

███████████

government.   He had even granted interviews to international media outlets concerning the Benghazi attack, which, alone, evidences a high degree of sophistication.

███ Equally strong evidence that the defendant's waivers were knowing and intelligent can be found in his conduct during the interviews.  *See North Carolina v. Butler*, 441 U.S. 369, 373 (1979) (police may infer a knowing and intelligent waiver "from the actions and words of the person interrogated").   As an initial matter, the defendant's intelligence was quite evident throughout his time with the agents.   For example, he discussed his views of American conspiracy law with the agents.  *Compare Young v. Walls*, 311 F.3d 846 (7th Cir. 2002) (IQ 56; intelligence "sufficient if the suspect has enough mental capacity to make decisions in daily life"); *Moore v. Dugger*, 856 F.2d 129, 134-35 (11th Cir. 1988) (valid waiver by mentally handicapped defendant with IQ of 62 and functional intellectual capacity of 11-year-old when defendant appeared calm, responsive, and able to understand questions and acknowledged at trial that informed of right to counsel).   The defendant consistently presented himself as an alert and engaged conversationalist.   He never expressed or exhibited any inability to understand the meaning of the *Miranda* warnings on any of the 15 occasions when he received and waived them.   His ability to appreciate the consequences of waiving those rights was underscored when he invoked his right to refuse to answer certain questions (*see* § IV.C.4, *supra*) and then later to stop all questioning and be presented in court (*see* § IV.C..6, *supra*).  *See, e.g.*, *United States v. Andaverde*, 64 F.3d 1305, 1314 (9th Cir. 1995) (defendant demonstrated clear understanding of *Miranda* rights by later asserting them); *United States v. Toro-Pelaez*, 107 F.3d 819, 826 (10th Cir. 1997) (same).

███████████

█████████████

█ The defendant's presumed unfamiliarity with our legal system does not undermine the factors set forth above, which established that he intelligently waived his rights. *See Yunis*, 859 F.2d at 964-66 (noting that, due to the lack of applicable precedent, "[i]t is unclear what weight should be given to an alien's unfamiliarity with our legal culture in evaluating the validity of that alien's waiver" but ultimately concluding that, under the circumstances of that case, the defendant's "unfamiliarity with American law did not prevent him from understanding the *Miranda* rights as they were presented to him"); *United States v. Labrada–Bustamante*, 428 F.3d 1252, 1259 (9th Cir. 2005) (explaining that agent "was not required to explain to [the defendant] what the *Miranda* rights meant" and that "[t]he fact that [the defendant] might not be familiar with the United States' form of justice is merely one factor to be considered").   In *Hasan*, the defendants made a similar argument:

> Defendants argued that, as non-English speaking and illiterate Somali nationals, without any connection to the United States, they would have lacked any understanding of the existence and nature of the rights available to them under the Fifth Amendment even after having the rights recited to them in their own language.  Defendants argue that Somalia's government is barely functional, attorneys are uncommon there, and individual freedoms protecting persons who wish to refuse to answer questions from authorities are foreign and incomprehensible concepts.

747 F. Supp. 2d at 669.  Nevertheless, "the Court [found] that the totality of the circumstances in this case demonstrates that Defendants did, in fact, knowingly and intelligently waive their rights.  *Id.*  In sum, the fact that the defendant "did not grow up watching Law and Order" (Def. Mot. at 13) is of no moment.  *See, e.g.*, *Yunis*, 859 F.2d at 966 (finding *Miranda* waiver valid

███████████████

despite fact that the defendant "'did not grow up watching Hawaii Five-O or Matlock'").[17]

### 3. The defendant did not invoke his right to counsel.

In *Edwards v. Arizona*, 451 U.S. 477 (1981), the Supreme Court held that after a defendant has been given *Miranda* warnings, police may not question "an accused in custody if he has *clearly asserted* his right to counsel." *Id.* at 485 (emphasis added). Even before *Edwards*, the Court had "directed that the interrogation must cease until an attorney is present only if the individual states that he wants an attorney." *Michigan v. Mosley*, 423 U.S. 96, 104 n.10 (1975) (citation and internal quotations omitted). Even "the likelihood that a suspect would wish counsel to be present" does not constitute an invocation of the right to counsel. *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991) ("The rule of [*Edwards*] applies only when the suspect 'ha[s] expressed' his wish for the particular sort of lawyerly assistance that is the subject of *Miranda*.").

In *Davis v. United States*, 512 U.S. 452 (1994), the Supreme Court drove this point home:

> But if a suspect makes a reference to an attorney that is ambiguous or equivocal in
> that a reasonable officer in light of the circumstances would have understood only
> that the suspect might be invoking the right to counsel, our precedents do not

---

[17] The cases relied upon by the defendant do not support a different conclusion (Def. Mot. at 12, 20). First, in *United States v. Mei*, No. 00 CR 128, 2000 WL 1029207, at *2 (N.D. Ill. July 25, 2000), in determining whether the agent's actions were the functional equivalent of questioning, the court noted that the defendant, a foreign national, "is precisely the type of person who would require being informed of his rights." The court did not hold that the defendant could not comprehend his rights, and, in fact, upon being advised, the defendant immediately invoked. *Id.* Second, in *Gov't of Canal Zone v. Gomez*, 566 F.2d 1289, 1292 (5th Cir. 1978), unlike this case, the defendant was illiterate, arrested for the first time, and – most importantly – he was "informed that if he exercised his most basic right, that of counsel, he was guilty." Last, in *United States v. Fung*, 780 F. Supp. 115, 116 (E.D.N.Y. 1992), unlike here, the *Miranda* warnings were not given to the defendant orally and, instead, the agents simply "handed a card containing *Miranda* warnings in Chinese" to the defendant, who had "poor language skills."

██████████████

require the cessation of questioning.

*Id.* at 459 (the defendant had said, "maybe I should talk to a lawyer.").[18]   In sum, "Miranda . . . distinguished between the procedural safeguards triggered by a request to remain silent and a request for an attorney and . . . required that interrogation cease until an attorney was present only if the individual stated that he wanted counsel." *Edwards*, 451 U.S. at 485.[19]

██ Here, the defendant never made an unambiguous, unequivocal request for an attorney. After being advised of his *Miranda* rights – orally and in writing – the defendant waived them, indicating that he was willing to speak without the assistance of counsel.[20]   He did, however, note on the written *Miranda* form the following:  "I understand from the conversation, that I have the right to have an attorney present at any time but I agreed today 21 June 2014 to talk

---

[18] ██ For example, the following comments have been deemed ambiguous or equivocal:  (1) On the *Miranda* form the defendant wrote, "I do not understand this, my lawyer speaks . . . " *United States v. Oquendo-Rivas*, 750 F.3d 12, 15 (1st Cir. 2014); (2) the defendant asked whether his counsel had been notified, *United States v. Medunjanin*, 752 F.3d 576, 587 (2d Cir. 2014); (3) the defendant stated that he had "consulted an attorney and that the attorney directed him to cooperate unless he 'got stumped,'" *United States v. Whiteford*, 676 F.3d 348, 362 (3d Cir. 2012); (4) after agent told the defendant that she would be indicted, she responded that she needed a lawyer, *United States v. Scurlock*, 52 F.3d 531, 535 n.3 (5th Cir. 1995); (5) defendant asked, "Should I call my lawyer?" *United States v. Jara*, 973 F.2d 746, 750 (9th Cir. 1992); (6) the defendant said, "I don't know.  But if [lawyer] said to stop it I don't want to do what he said not to do," *Coleman v. Singletary*, 30 F.3d 1420, 1424 (11th Cir. 1994); (7) the defendant stated that she "might have to get a lawyer then, huh?" *United States v. Posada–Rios*, 158 F.3d 832, 867 (5th Cir.1998); (8) the defendant asked whether he should get an attorney, *Soffar v. Cockrell*, 300 F.3d 588, 595 (5th Cir. 2002) (*en banc*); and (9) the defendant declared that he would feel "more comfortable" with a lawyer, *United States v. Hitselberger*, 991 F. Supp. 2d 130, 143 (D.D.C. 2014).

[19] ██ )When a suspect makes an ambiguous or equivocal statement regarding counsel, agents are not required to clarify whether the suspect actually wants an attorney.   *Davis*, 512 U.S. at 461.  It is, however, good practice to attempt to clarify, *id.*, and that is exactly what the agents did here.  The agents discussed with the defendant in great detail his desire to reserve the right to consult a lawyer and confirmed that he was willing to speak without counsel at that time.

[20] ██ When the defendant asked if an attorney was currently available, he was accurately told no.  This did not in any way undermine the validity of the defendant's *Miranda* waiver.  *See In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 177, 192 (2d Cir. 2008) ("Admittedly, Odeh was told that neither an American nor a Kenyan appointed lawyer was currently available, but that information was simply the truth.  *Miranda*, after all, is not served when police make misrepresentations.").

██████████████

███████████████

without an attorney present."  (At the agents' suggestion, the defendant made a similar notation on subsequent waiver forms.)  The defendant also orally noted that he reserved his right to consult an attorney in the future, if he so desired.  Even if the defendant's desire to reserve his right to consult counsel in the future were somehow construed to be a product of the present unavailability of counsel, that assertion would still not constitute an unambiguous request for a lawyer.  *See, e.g., United States v. Bezanson-Perkins*, 390 F.3d 34, 36, 40 (1st Cir. 2004) (no unambiguous invocation of right to counsel where defendant stated, "So if I requested a lawyer, there would be one that would come right now?"); *United States v. Lux*, 905 F.2d 1379, 1382 (10th Cir. 1990) (question about how long it would take to get a lawyer, and whether suspect would wait in jail during the interim, was not an unambiguous invocation); *United States v. Doe*, 170 F.3d 1162, 1166 (9th Cir. 1999) ("what time will I see a lawyer," was not an ambiguous invocation).  Even if the defendant's statements were construed as both agreeing to talk without counsel and also requesting counsel, such a contradiction would not constitute an unambiguous invocation of his right to counsel.  *United States v. Brown*, 287 F.3d 965, 970 n.2, 973 (10th Cir. 2002) (defendant stated both that he would answer questions without a lawyer and that he wanted a lawyer).[21]

███ The defendant's argument that the failure to arrange to have a defense attorney available aboard the USS *New York* undermined his *Miranda* waiver is meritless.  (Def. Mot. at

---

[21]     ███)To the extent it may seem illogical for the defendant to agree to talk to the agents without a lawyer present, while clearly contemplating consulting with a lawyer in the future, such seemingly illogical thinking would not undermine the validity of the defendant's *Miranda* waiver.  *Cf. Connecticut v. Barrett*, 479 U.S. 523 (1987) (intelligent waiver even though defendant made an illogical decision about wanting to make an oral, not a written statement).

███████████████

██████████████

2, 16, 19.)  When the Supreme Court enunciated the rule of *Miranda*, it specifically stated that

the rule did not require the government to make an attorney available:

> This does not mean, as some have suggested, that each police station must have a "station house lawyer" present at all times to advise prisoners.  It does mean, however, that if police propose to interrogate a person they must make known to him that he is entitled to a lawyer and that if he cannot afford one, a lawyer will be provided for him prior to any interrogation.  If authorities conclude that they will not provide counsel during a reasonable period of time in which investigation in the field is carried out, they may refrain from doing so without violating the person's Fifth Amendment privilege so long as they do not question him during that time.

*Miranda,* 384 U.S. at 474; *see also Duckworth v. Eagan*, 492 U.S. 195, 204 (1989) ("*Miranda*

does not require that attorneys be producible on call, but only that the suspect be informed, as

here, that he has the right to an attorney before and during questioning, and that an attorney

would be appointed for him if he could not afford one.").[22]

## VI.    The defendant's custodial statements were voluntary.

██Likewise, the defendant's decision to talk to the agents was voluntary.  The sole focus

of the "voluntariness" inquiry is whether the statement was the product of government coercion.

*Colorado v. Connelly*, 479 U.S. 157, 169-70 (1986).  In this case, there is no evidence that the

defendant's "will [was] overborne and his capacity for self-determination critically impaired

---

[22]        ██In addition to moving to suppress his statements, the defendant has moved to suppress "any evidence gathered as a result of those statements."  (Def. Mot. at 1).  Even if the Court were to conclude that the defendant's statements were taken in violation of *Miranda*, any fruits of those statements should not be suppressed.  The Supreme Court has determined that the fruit-of-the-poisonous-tree doctrine, *see Wong Sun v. United States*, 371 U.S. 471, 484–87, does not apply to statements taken in violation of *Miranda*.  *See Oregon v. Elstad*, 470 U.S. 298, 304–09 (1985); *United States v. Patane*, 542 U.S. 630, 636 (2004) ("[T]he *Miranda* rule is a prophylactic employed to protect against violations of the Self–Incrimination Clause.  The Self–Incrimination Clause, however, is not implicated by the admission into evidence of the physical fruit of a voluntary statement.  Accordingly, there is no justification for extending the *Miranda* rule to this context.").

██████████████

███████████

because of coercive police conduct." *Colorado v. Spring*, 479 U.S. 564, 574 (1987) (citation and internal quotation marks omitted). Indeed, as discussed in more detail below, the atmosphere in which the defendant spoke was far from hostile. During the interviews, the defendant was not restrained; he was provided food, drink, bathroom breaks, and the opportunity to pray; and the agents did not force him to talk, coerce him, or promise him anything in exchange for his statements. Moreover, the agents reminded the defendant of his *Miranda* rights throughout the interviews. The defendant repeatedly acknowledged and waived his rights, and, perhaps most importantly, he invoked them and refused to answer certain questions.

Under these non-coercive conditions, the defendant's statements should not be suppressed. "[F]ar from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable." *United States v. Washington*, 431 U.S. 181, 187 (1977); *see also Michigan v. Tucker*, 417 U.S. 433, 459 n.23 (1974) ("completely voluntary confessions may, in many cases, advance the cause of justice and rehabilitation").

A.      **Standard.**

The burden of proof is on the government by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *United States v. Hallford*, 816 F.3d 850, 859 (D.C. Cir. 2016) ("the government carried its burden of proving by a preponderance of the evidence that Hallford's statements were voluntary"); *see also Bobby v. Dixon*, __ U.S. __, 132 S.Ct. 26, 32 n.4 (2011) (rejecting a suggestion that the state court shifted the burden of proof where the state court noted a lack of evidence of coercion).

███████████

███████████

**B.      The defendant was not coerced into giving a statement.**

███When determining whether a defendant's custodial statements were involuntarily elicited, courts look to the totality of the circumstances to determine whether the will of the defendant was overborne in such a way as to render his confession the product of coercion.   A statement is involuntary, in violation of due process, if a defendant's will was overborne based on the totality of the circumstances.   *See, e.g.*, *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (collecting cases); *Arizona v. Fulminante*, 499 U.S. 279, 285-89 (1991); *United States v. Murdock*, 667 F.3d 1302, 1305 (D.C. Cir. 2012) (voluntariness determination "'requires [a] careful evaluation of all the circumstances of the interrogation'").[23]   "If his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process."   *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961).   The focus is on whether the confession was obtained by using means "so offensive to a civilized system of justice that they must be condemned."   *Miller v. Fenton*, 474 U.S. 104, 109 (1985).

███Significantly, the Supreme Court has explained that "coercive police activity is a necessary predicate to the finding that a confession is not voluntary," *Connelly*, 479 U.S. at 167,

---

[23]   ███Recently, the D.C. Circuit noted that not the term "totality of the circumstances" does not literally mean that all circumstances surrounding an interview are relevant to a voluntariness determination:

> We hesitate to put this in terms of the "totality of the circumstances," a phrase that appears in some opinions dealing with the sort of issues confronting us in this case.   Sometimes these opinions treat the "totality" phrase as if it were a "test," which it is not. The phrase itself is "non-descriptive."   [citation omitted]   It tells us nothing about which circumstances are even relevant (surely, not all circumstances matter), and it reveals nothing about the probative value of any particular circumstance.

*Hallford*, 816 F.3d at 857 n.9.

███████████

███████████████

and that due process is not violated unless the coercion is "causally related to the confession." *Id.* at 163-64; *see also Hallford*, 816 F.3d at 857 ("The ultimate question is whether Hallford's 'will' was 'overborne and his capacity for self-determination critically impaired' as a result of the agents' conduct."). Accordingly, the defendant's allusions to his experience with "Qadaffi's torture prisons" and "televised executions of Qadaffi's political opponents" (Det. Mot. at 13) are irrelevant. *See, e.g., United States v. Abu Ghayth*, 945 F. Supp. 2d 511, 519 (S.D.N.Y. 2013) ("Indeed, it cannot be the case that where a criminal defendant allegedly has experienced past illness or mistreatment that theoretically could lead to disorientation, confusion, or other compromised medical states, the government must prove the negative – that the illness or mistreatment in fact did not have any such effect.").

███ Factors to consider in assessing the totality of the circumstances include the age, education, and intelligence of the accused; whether the accused has been informed of his constitutional rights; the length of the questioning; the repeated and prolonged nature of the questioning; whether the police or the accused initiated the dialogue; and the use of physical punishment, such as the deprivation of food or sleep. *See, e.g.,* 18 U.S.C. § 3501(b); *Schnekloth v. Bustamante*, 412 U.S. 218, 226 (1973). No one factor is dispositive.[24] Here, the totality of the

---

[24]    ███ Consequently, statements have been held to be voluntary even when some seemingly coercive factors were present. *See, e.g., United States v. Jacques*, 744 F.3d 804, 812 (1st Cir. 2014) (agents exaggerated the evidence and minimized the gravity of the suspected offense); *United States v. Cardenas*, 410 F.3d 287, 295 (5th Cir. 2005) ("Such basic police procedures as restraining a suspect with handcuffs have never been held to constitute sufficient coercion to warrant suppression."); *Carter v. Thompson*, 690 F.3d 837, 844 (7th Cir. 2012) (questioning a juvenile over fifty-five hour period); *United States v. Stokes*, 631 F.3d 802, 809 (6th Cir. 2011) (placed in a small room, handcuffed to a chair, and interviewed over the course of several hours in the very early morning, promise to relay cooperation to the prosecutor); *United States v. New*, 491 F.3d 369, 374 (8th Cir. 2007) ("influence of medications, the 'psychological implications' of his circumstances, and his physical helplessness in a strange location.").

███████████████

███████████████

circumstances leaves no doubt that the defendant's statements were not the product of government coercion and that they were completely voluntary.  The following facts support this conclusion.

███ There is no evidence that the defendant was ever subjected to the slightest coercion by the agents.  In his motion to suppress, the defendant alleges that he was seriously injured, while being apprehended.  (Def. Mot. at 4).  Even assuming that were true, six days passed between the defendant's apprehension and the beginning of his law enforcement interviews.  *See, e.g.*, *Hallford*, 816 F.3d at 859 (reversing suppression of statement where, "[t]he district court stated that Hallford arrived at George Washington Hospital in 'severe pain' but neglected to mention that there was no evidence he was still in pain when the agents interviewed him a day later."); *Holland v. McGinnis*, 963 F.2d 1044, 1050–51 (7th Cir. 1992) (statement voluntary where six hours elapsed between police beating and confession and officers who beat the defendant not the same ones who took his statement).

███ Besides the absence of any circumstances to suggest that the statements were coerced, there is an abundance of circumstances that indicate they were voluntary.  First, the agents treated the defendant respectfully throughout the interview process.[25]  Second, the defendant was reminded of his *Miranda* rights repeatedly throughout the interviews – 15 times in total.  *See, e.g., Yunis*, 859 F.2d at 961 ("The administration of proper *Miranda* warnings followed by a written waiver of the rights described in those warnings, will usually go far toward

---

[25] ███ For example, the agents were dressed in casual civilian clothes; they were unarmed; they spoke in normal conversational tones; they frequently inquired of the defendant's well-being; they afforded the defendant regular breaks to eat, rest, use the facilities, and pray; and they even gave the defendant a watch, so he could keep to his prayer schedule.

███████████████

█████████████

demonstrating that a decision to speak is not compelled."); *Spring*, 479 U.S. at 576 (*Miranda* warnings are strong evidence of voluntariness).   Third, the defendant initialed each waiver form and handwrote a notation on each form regarding his reservation of the right to consult with counsel.   *See United States v. Bethancourt*, 65 F.3d 1074, 1078-79 (3d Cir. 1995) (defendant's initialing of each paragraph and signature on each page indicates confession was voluntary). Fourth, the defendant's statements were obviously not spoon-fed to him by the agents.   He denied wrongdoing and corrected several of his statements.   *Harris v. Dugger*, 874 F.2d 756, 759 (11th Cir. 1989) (fact that defendant read and made corrections to written confession evidenced "a desire to confess").   Fifth, the defendant refused to answer certain questions.   *Hallford*, 816 F.3d at 859 ("And there is strong evidence that Hallford's will was not 'overborne.' As the interview concluded, Hallford refused the agents' request that he consent to a search of the car and he refused to permit the agents to examine his medical records.") (citation omitted).   Sixth, the defendant was not under the influence of alcohol or any drugs that would have rendered him unable to comprehend his rights.   Seventh, the defendant never requested the presence of an attorney, even though the agents advised him of his right to have a lawyer with him on numerous occasions.   *See, e.g., Ledbetter v. Edwards*, 35 F.3d 1062, 1069-70 (6th Cir. 1994) (fact that defendant was advised three times and never chose to request attorney alleviated concern that attorney necessary to make confession voluntary).

█████ Last, the length of the interview process did not render it involuntary.   In the absence of any evidence that the agents were coercive or overbearing during the interviews, the duration of the interviews would not – by itself – render any resulting statements involuntary.   Courts

███████████

considering challenges to lengthy interrogations have explained that it is not the lapse of time that is relevant to the inquiry of voluntariness, but rather the use of time to employ coercive police tactics or third degree practices. *See, e.g., United States v. Marrero*, 450 F.2d 373, 376 (2d Cir. 1971) ("It is not the lapse of time but the use of the time . . . to employ the condemned psychologically coercive . . . practices which is proscribed by the cases."); *Smith v. United States*, 390 F.2d 401, 403 (9th Cir. 1968) ("The determining factor is not the amount of time elapsing between arrest and confession, but rather the nature of police activities during this period."). Accordingly, lengthy interrogation sessions have been deemed to have been voluntary. *See, e.g.*, *Yunis*, 859 F.2d at 960-61 (extensive questioning during nine interrogation sessions over four days did not render confession involuntary); *United States v. Van Metre*, 150 F.3d 339, 348 (4th Cir. 1998) ("somewhat lengthy" 55-hour detention did not render confession involuntary because officers did not threaten or harm suspect, and suspect was not held in seclusion, was not subject to continuous and unrelenting questioning, and was not denied food or rest); *Reese v. Delo*, 94 F.3d 1177, 1183-84 (8th Cir. 1996) (confession to murders voluntary, despite defendant's alleged mental impairments, when defendant repeatedly given *Miranda* warnings, questioned intermittently over two days, provided food, drink and bathroom breaks, and interviews were not excessive in length). Here, the defendant was interviewed over the course of six days, but each session was broken up by frequent, meaningful breaks. Additionally, the defendant was specifically told that he was being taken to court in the United States. (*See* § IV.C.1, *supra*.)[26]

---

[26]  ███ The defendant claims that the failure to record his interviews is a "cloud that hangs over every aspect of

███████████

██████████

## VII.    The defendant's right to speedy presentment was not violated.

(█In light of the circumstances surrounding the defendant's apprehension, the only feasible mode of transportation was by sea.  This mode of transportation was not chosen to provide additional time to question the defendant.   The defendant's ship took a direct route to the United States, while steaming at an appropriate speed.  Accordingly, the delay in presenting the defendant was reasonable.

### A.    Standard.

██ "The burden of showing unreasonableness of delay in arraignment rests upon the defendant . . ." *Tillotson v. United States*, 231 F.2d 736, 738 (D.C. Cir. 1956); *see also United States v. Boche-Perez*, 755 F.3d 327, 336 (5th Cir. 2014) ("The defendant has the burden of demonstrating a *McNabb–Mallory* violation.").

### B.    The defendant's presentment was not unreasonably delayed.

██ "A person making an arrest outside the United States must take the defendant without unnecessary delay before a magistrate judge, unless a statute provides otherwise." Fed. R. Crim. P. 5(a).  Violations of Rule 5(a) can result in the exclusion of statements that are obtained from a

---

this suppression hearing" (Def. Mot. at 22).  His claim is footless for at least four reasons.  First, "there is no constitutional requirement that confessions be recorded by any particular means." *Yunis*, 859 F.2d at 961.  Second, sufficient evidence will be developed at the hearing on the defendant's motion for the Court to be able to determine the validity of the defendant's *Miranda* waiver and the voluntariness of his statements.  *See Hasan*, 747 F. Supp. 2d at 668 (rejecting complaint that *Miranda* warnings were not recorded:  "While it is certainly true that a video and/or audio recording would likely have shed significant light on this issue, the Court may ascertain the adequacy of Special Agent Knox's warnings based on the testimony provided at the evidentiary hearing.").  Third, the defendant misreads the Department of Justice's Policy with respect to electronic recording of statements (Def. Mot. at 22).  "The presumption [that interview will be recorded] does not apply outside of the United States." https://www.justice.gov/opa/pr/attorney-general-holder-announces-significant-policy-shift-   concerning-electronic-recording.  Last, even if DOJ policy applied here, it would not confer any rights on the defendant.  *See, e.g., United States v. Caceras*, 440 U.S. 741, 754 (1979) (IRS manual does not confer any substantive rights on taxpayers but is instead only an internal statement of policy).

██████████

███████████████

defendant prior to his presentment to a magistrate.  *See McNabb v. United States*, 318 U.S. 332, 341 (1943) (explaining that suppression, although not constitutionally required, was motivated by "considerations of justice not limited to the strict canons of evidentiary relevance"); *Mallory v. United States*, 354 U.S. 449, 455 (1957) (interpreting "without unnecessary delay" to mean that "the delay must not be of a nature to give opportunity for the extraction of a confession").  In light of these decisions, the rule requiring prompt presentment of a defendant after arrest became known as the "*McNabb–Mallory* rule."  "Under the so-called *McNabb–Mallory* rule, the Supreme Court has required suppression of confessions obtained after 'unnecessary delay' between arrest and arraignment."  *United States v. Yunis*, 859 F.2d 953, 967 (D.C. Cir. 1988).[27]

███The Omnibus Crime Act of 1968 modified the *McNabb-Mallory* Rule, establishing a six-hour "safe harbor" for delays:

> (c) In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate judge or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention: Provided, That the time limitation contained in this subsection shall not apply in

---

[27]  ███The primary concerns animating the *McNabb–Mallory* rule are not present here.  First, the defendant was arrested on a criminal complaint.  *Yunis*, 859 F.2d at  969 ("it should be noted that a principal concern of the *McNabb–Mallory* rule is absent from Yunis' case.  In the majority of criminal cases, police have no warrant for the arrest.  An arraignment is thus essential 'so that the issue of probable cause may be promptly determined' by a neutral magistrate.").  Second, the defendant was repeatedly advised of his *Miranda* rights.  *McNabb*, 318 U.S. at 344 (the requirement of prompt presentment ensures that persons taken into custody would, within a relatively short period, receive advice about their rights).

███████████████

███████████████

> any case in which the delay in bringing such person before such magistrate judge or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate judge or other officer.

18 U.S.C. § 3501(c).

███ In *Corley v. United States*, 556 U.S. 303 (2009), the Supreme Court held that Section 3501(c) eliminated the *McNabb-Mallory* rule for statements given within six hours of arrest, but that, when a statement is made after the six-hour period, the court must determine whether the delay was reasonable.  In determining the reasonableness of a delay, the court should consider, among other things, "the means of transportation and the distance to be traveled to the nearest available such magistrate judge or other officer."  18 U.S.C. § 3501(c).

███ While it is not reasonable to delay presentment in order to obtain a confession, *Mallory*, 354 U.S. at 455, courts should be circumspect about finding other causes of delay to be unreasonable.  *See, e.g., United States v. Garcia-Hernandez*, 569 F.3d 1100, 1106 (9th Cir. 2009) ("We have been careful not to overextend *McNabb–Mallory's* prophylactic rule in cases where there was a reasonable delay unrelated to any prolonged interrogation of the arrestee.").  Specifically, delay related to the transportation of the defendant is reasonable.  *See, e.g.*, *Yunis*, 859 F.2d at 957, 969 (time needed to transport defendant from Mediterranean Sea to Washington, D.C., found to be reasonable); *United States v. Purvis*, 768 F.2d 1237, 1239 (11th Cir. 1985) (finding delay reasonable when "a large part of the delay was necessitated by the fact that the arrest was made so far from port on the high seas").

███ After the defendant was apprehended in Benghazi, he was taken to the USS *New*

███████████████

██████████████

*York*, which lay off the coast of Libya.  He was then transported to the United States on board the

USS *New York*, a journey of approximately 5,300 miles.  While this journey took approximately

13 days,[28] it did not constitute unreasonable delay.  As we discuss below, there were no other

reasonable means of transporting the defendant that would have been faster.  Accordingly, by

definition, this method of transportation was not chosen to provide additional time to interrogate

the defendant.  *Compare* Def. Mot. at 2 (claim that defendant transported "by slow boat in order

to permit his extensive interrogation").

████ It was not feasible to transport the defendant by airplane for several reasons.

Inasmuch as the USS *New York* could not accommodate an airplane with the range to fly to the

United States from the Mediterranean Sea, flying the defendant to the United States would have

required either (1) transit through a third country or (2) the deployment of a larger ship, *i.e.*, an

aircraft carrier.

████ Transit through a third country was an option that was explored but not feasible.

First, any country in the European Union would have required the government to waive the death

penalty and raised other political considerations.  This would not have been reasonable.  As this

Court has noted, the government cannot be forced to abandon the option of seeking the death

penalty.  *United States v. Khatallah*, 160 F. Supp. 3d 144, 157 (D.D.C. 2016) ("Even if the Court

could make such a determination, however, '[t]he decision to seek the death penalty . . . is a

matter of prosecutorial discretion.'  The Court may not intrude on this exercise of prosecutorial

---

[28] ██ We note that the defendant waived his right to speedy presentment on the sixth day of his journey.  *See* § IV.C.1, *infra*.

██████████████

███████████

discretion any more than it could order the government to seek a prison sentence of no more than five, ten, or twenty years when the charged statute allows for a life sentence.") (citation omitted); *cf. United States v. Mills*, 925 F.2d 455, 461 (D.C. Cir. 1991) ("the prosecutor may select one alternative charge over another precisely *because* the selected offense carries a more severe sentence") (emphasis in original), *vacated on other grounds by United States v. Mills*, 964 F.2d 1186, 1188 n.3 (D.C. Cir. 1992) (*en banc*).   At bottom, any delay caused by eschewing transit through a European country was reasonable.   *See Yunis*, 859 F.2d at 968 (finding delay reasonable where "the government rejected the option of flying Yunis to the United States from a Mediterranean country, on the grounds that this could create extradition problems").

███ Second, countries ████████ G-26 ████████, were deemed not to be a feasible option because of those countries' domestic situations.   Based on recent experience with such operations and general familiarity with the conditions in ████ G-26 ████ countries, it was determined that it not be fruitful to request their assistance.   *Yunis*, 859 F.2d at 968 ("the government effectively demonstrated that alternatives were never 'seriously considered' only because their defects were readily apparent").   Nevertheless, one such country[29] was asked to allow transit, and it declined to grant permission.

(█ Similarly, reasonableness did not mandate the deployment of a larger ship, such as an aircraft carrier, which could have accommodated aircraft with sufficient range to fly to the United States.   The deployment of an aircraft carrier and the necessary auxiliary ships would have been a massive undertaking.   In addition to being astronomically expensive, it would have

---

[29]      ██ )This country was ██ G-24 ██

███████████

██████████████

interfered with the deployment of such forces on vital national security missions.  In Yunis, the court found that it was not necessary to postpone the capture to coordinate with the scheduled presence of an aircraft carrier; the court thereby implicitly recognized that the government is not required to make an aircraft carrier available for transport.  *Yunis*, 859 F.2d at 968 ("postponing Yunis' arrest for two or three weeks (to a time when the USS *Saratoga* would have been in the eastern Mediterranean) was not feasible"); *see also United States v. Boche-Perez*, 755 F.3d 327, 337 (5th Cir. 2014) ("*McNabb–Mallory* does not require law enforcement officers to drop everything and rush to the magistrate when doing so would imperil public safety").

██ Accordingly, transit via by the USS *New York* was the only reasonable option.  And the defendant was transported onboard that ship as expeditiously as possible.  The USS *New York* took a direct route to the United States, made no port calls, and steamed at its optimal speed.  (At one point the ship experienced engine trouble, but it resumed its normal speed as soon as the necessary repairs could be made.)  Any delay arising from transit onboard the USS *New York*, was, therefore, reasonable.[30]

---

[30] ██)The defense noted that it had "found no case that has held a thirteen-day delay reasonable" (Def. Mot. at 10).  *But see United States v. Savchenko*, 201 F.R.D. 503, 506 (S.D. Cal. 2001) ("the 16 days is more than reasonable for the transport of the fishing vessel from the high seas approximately 500 nautical miles from Mexico to this district under these facts and circumstances.").  *See also United States v. Zakharov*, 468 F.3d 1171, 1180 (9th Cir. 2006) (10-day delay reasonable where defendant transported "1620 nautical miles to the United States" and "the ships proceeded to the nearest United States port, San Diego, and made no stops along the way"); *United States v. Vilches-Navarrete*, 413 F. Supp. 2d 60, 67 (D.P.R. 2006), *aff'd*, 523 F.3d 1 (1st Cir. 2008) ("the time spent transporting the vessel carrying defendants from the high seas for further search in Puerto Rico (approximately 5 days) was not an unreasonable delay in bringing defendants before a magistrate. . . . There is no evidence on the record that the Coast Guard purposely slowed their progress or took a longer route than necessary."); *United States v. Purvis*, 768 F.2d 1237, 1238–39 (11th Cir. 1985) (5-day delay reasonable even though "the Coast Guard cutter did not proceed directly to Key West, Florida, the nearest United States port, but rather continued its normal law enforcement patrolling activities."); *United States v. Odom*, 526 F.2d 339 (5th Cir. 1976) (5-day transit by ship was not unreasonable delay, where defendant was arrested 200 miles from the nearest American territory and "the helicopter that brought Drug Enforcement Administration agent Miller to the 'Valiant' was too large to land, so it

██████████████

███████████

**C.  Even if the Court were to determine that the delay in presentment was unreasonable, the defendant's statements should not be suppressed because he waived his right to speedy presentment.**

███Even if the Court were to determine that the delay in the defendant's presentment was not reasonable, it would not be appropriate to suppress his statements.  By waiving his *Miranda* rights, the defendant also waived his rights to a speedy presentment:  "We find that appellant, by validly waiving his *Miranda* right to silence and an attorney, and by agreeing to speak with the police, has thereby also waived any *Mallory* right to be brought before a magistrate 'as quickly as possible.'"  *Pettyjohn v. United States*, 419 F.2d 651, 656 (D.C. Cir. 1969).

███)The D.C. Circuit has explained that a *Miranda* waiver also functions as a waiver of speedy presentment inasmuch as "one of the purposes of appearing before a magistrate is to have the defendant's rights explained to him—rights now explained in a *Miranda* warning."  *United States v. Salamanca*, 990 F.2d 629, 634 (D.C. Cir. 1993) (when an accused validly waives his *Miranda* rights, he also waives his right to presentment without unnecessary delay).  A number of other circuits have also held that, by voluntarily agreeing to speak to law enforcement after having been advised of the rights to remain silent and to an attorney, a defendant necessarily waives the right to be brought before a magistrate as quickly as possible.  *See, e.g., United States v. Barlow*, 693 F.2d 954, 959 (6th Cir. 1982) ("waiver of one's *Miranda* rights also constitutes a waiver under *McNabb-Mallory*"); *United States v. Indian Boy X*, 565 F.2d 585, 591 (9th Cir. 1977) ("the strong policy this court has in following the rule that the waiver of [*Miranda* rights] .

---

would have been difficult and possibly dangerous to attempt to fly Odom to an American port"); *United States v. Greyshock*, 719 F. Supp. 927, 933 (D. Haw. 1989) (finding 9-day delay reasonable and rejecting defendant's argument that "they should have been air-lifted to a magistrate, or that they should have been permitted to use the Coast Guard radio equipment to contact a magistrate").

███████████

███████████████

. . also constitutes a waiver of" right to speedy presentment); *United States v. Howell*, 470 F.2d 1064, 1067, n. 1 (9th Cir. 1972) (*Miranda* warning "operated to waive the requirements of Rule 5(a) and *Mallory*"); *O'Neal v. United States*, 411 F.2d 131, 136-37 (5th Cir. 1969) (same); *United States v. Duvall*, 537 F.2d 15, 24 n.9 (2d Cir. 1976) (noting weight of authority); *but see United States v. Keeble*, 459 F.2d 757, 759 (8th Cir. 1972), *reversed on other ground*s, 412 U.S. 205 (1973).[31]

███ The rule in the D.C. Circuit that a *Miranda* waiver also constitutes a waiver of speedy presentment was not disturbed by the Supreme Court's decision in *Corley, supra*.  Although the *Corley* majority noted that the defendant in that case had waived his *Miranda* rights (556 U.S. at 311), and the dissenting opinion also noted the *Miranda* waiver issue (*id.* at 327-28), the majority opinion did not address, much less decide, the significance of that waiver.  Nor was there any reason for the Supreme Court to address the issue, because the government did not argue that Corley's *Miranda* waiver foreclosed his prompt-presentment claim.  At most, the issue was lurking in the record in *Corley*.  But the Supreme Court has expressly directed lower courts not to treat its opinions as having decided issues that are merely lurking in the record.  *See, e.g., Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004); *Webster v. Fall*, 266 U.S. 507, 511 (1925).

---

[31]  ███ Here, the defendant waived his *Miranda* rights on June 21, 2014 – six days after he was taken into custody.  This is of no moment, as the right to waive speedy presentment may be waived *nunc pro tunc*.  *Everetts v. United States*, 627 A.2d 981, 985 (D.C. 1993) ("Hence, recognizing that voluntariness of the confession and of the waiver are the touchstone of analysis under § 3501, we have rejected appellant's argument that a valid *Miranda* waiver cannot waive *a prior period* of unnecessary delay." (emphasis added)).  If the Court were to disagree, the defendant's waiver on June 21 is still significant in that it reduced the period of delay that must be justified from 13 to six days.

███████████████

███

██While *Corley* may have implications for the question whether, and if so in what circumstances, a valid *Miranda* waiver operates to waive the right of prompt presentment, the only post-*Corley* cases to address this question, of which we are aware, have held that a *Miranda* waiver still constitutes a waiver of prompt presentment:

> We therefore do not read *Corley* as effectively overruling our precedents holding that a waiver of *Miranda* rights is a waiver of the right to prompt presentment.  Rather, the issue is one that "merely lurk[s] in the [*Corley*] record, ... [not] ruled upon, [and] . . . not to be considered as having been so decided as to constitute precedent[ ]," since the "judicial mind was not asked to focus upon, and the opinion did not address, the point at issue . . . ."

*Brown v. United States*, 979 A.2d 630, 637 (D.C. 2009); *see also United States v. Hector*, 2013 WL 2898078 at *13 (N.D. Ga. Jan. 29, 2013) (post-*Corley*:  "the Court sees no choice other than to find that Defendant's multiple *Miranda* waivers vitiated any prompt presentment problem"), report and recommendation adopted in part and rejected on other grounds, 2013 WL 2898099 (N.D. Ga. June 11, 2013); *United States v. Phillips*, 2015 WL 2341981, at *9 (W.D. La. May 13, 2015, *aff'd* 2016 WL 4394545 (5th Cir. Aug. 17, 2016) (same).   The decision in *Corley,* therefore, did not disturb the D.C. Circuit's rule; thus, by waiving his *Miranda* rights, the defendant also waived his right to speedy presentment.

███

## VIII. Conclusion.

■)The defendant's motion to suppress his custodial statements should be denied for the following reasons: (1) the defendant's *Miranda* rights were not undercut by the unwarned interviews; (2) the defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights; (3) the defendant did not invoke his right to counsel; (4) the defendant voluntarily made his statements; (5) the defendant's presentment was not unreasonably delayed; and (6) in any event, the defendant waived his right to a speedy presentment.

Respectfully submitted,

CHANNING D. PHILLIPS
UNITED STATES ATTORNEY
D.C. Bar Number 415793

By: _____
Michael C. DiLorenzo
MD Bar No. 93121400189
Julieanne Himelstein
D.C. Bar No. 417136
Opher Shweiki
D.C. Bar No. 458776
John Crabb Jr.
N.Y. Bar No. 2367670
Assistant United States Attorneys
National Security Section
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7809
michael.dilorenzo@usdoj.gov